# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County Florida

Case Number 8:23-CV-181-SDM-JSS

# Second Amended Verified Complaint

# Introduction

Plaintiff, Blake Warner, *pro se*, hereby amends his complaint, pursuant the Court's order Doc. 37, against The School Board of Hillsborough County, Florida ("HCSB") for violations of Title VI of 42 U.S.C. § 2000d et seq ("1964 Civil Rights Act"), 20 U.S.C. 1703 ("Equal Educational Opportunities Act"), 42 U.S. Code § 3601 et seq ("Fair Housing Act"), and Art. IX, § 1, Fla. Const. for unlawful manipulation of housing values in Hillsborough County through operating a segregated school system, and 42 U.S.C. § 1983 for denying him due process with the school choice application process.

The HCSB has significantly contributed to racial imbalance in the Hillsborough County housing market by drawing boundaries around racial lines. The HCSB then

used these racial boundaries as a pretext for discrimination through redlining and steering.

An interactive version of the map boundaries presented are available at: https://grandwizarddavis.de/

## PLAINTIFF

1. Mr. Warner is African-American.

2. Mr. Warner has continuously resided in Hillsborough County since 2016.

## DEFENDANT

3. Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.

4. The HCSB accepts federal funds through the Individuals with Disabilities Education Act ("IDEA"), Title I-VII, and the Cares Act.

## JURISDICTION AND VENUE

5. This court has jurisdiction pursuant 28 U.S. Code § 1331, 1367, 1343, 2201, and 2202, and 42 U.S. Code § 3613 and 1983.

6. Venue is proper pursuant 28 U.S.C. § 1391 because Defendant reside in the Middle District of Florida, and all events giving rise to Mr. Warner's claims occurred in the Middle District of Florida.

## PARENTAL RIGHTS

7. Mr. Warner has a fundamental right under the Fourteenth Amendment to make decisions concerning the care, custody, education, and control of J.W. *see* Troxel v. Granville (2000).

8. The educational welfare/placement of J.W. is closely tied to the Mr. Warner's Fourteenth Amendment fundamental rights and his ability to advocate for J.W.'s rights.

9. The state of Florida has additionally given Mr. Warner the following rights:

    (a) The right to direct the education and care of J.W.[1]; and

    (b) The right, pursuant to s. 1002.20(2)(b) and (6), to apply to enroll J.W. in a public school[2].

## EEOA

10. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

11. As laid out below, the HCSB has a pattern and/or practice of assigning students to farther away schools resulting in more segregation.

## TAMPA REGIONS

12. For the purposes of this complaint, the following regions are defined as follows:

13. *south tampa* is defined as the area between Gandy Boulevard and Kennedy Boulevard.

---

[1] *see* Fla. Stat. § 1014.04(a)
[2] *see* Fla. Stat. § 1014.04(c)

14. *west tampa* is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.

15. *east tampa* is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.

16. *south tampa*'s population is predominantly White. *see* Exhibits A and B.

17. *west tampa*'s population is predominantly Hispanic. *see* Exhibits A and C.

18. *east tampa*'s population is predominantly African-American. *see* Exhibits A and D.

19. The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.

## Map Compactness

20. Compactness is a quantitative measure of a boundary's shape and how tightly packed, or compact, the boundary is.

21. The compactness of a boundary is a critical measure when evaluating if a boundary is discriminatory. A map that is not compact may be considered gerrymandered.

22. All of the compactness measures and boundaries provided here are approximate, and are subject to change as more data becomes available before trial.

# I   Schools

## School Boundary Compactness

23. All of the Hillsborough County school statistics cited here and attached are approximate and based on imperfect data, such as some schools missing and non-exact boundary definitions. These statistics and graphs will change slightly and improve as more data becomes available through discovery.

24. The School Board only has three high schools which have compact boundaries:



LENNARD HIGH SCHOOL

| Accuracy: | 78% | Grade: | C |
|---|---|---|---|
| Minorities: | 72.5% | Utilization: | 96% |
| LS Exclusion: | 6% | FS Inclusion: | 17% |
| Displacement: | 0.35:1 | R: | compact |

ALONSO HIGH SCHOOL

| Accuracy: | 78% | Grade: | A |
|---|---|---|---|
| Minorities: | 72% | Utilization: | 97% |
| LS Exclusion: | 13% | FS Inclusion: | 10% |
| Displacement: | 1.39:1 | R: | compact |

ROBINSON HIGH SCHOOL

| Accuracy: | 94% | Grade: | A |
|---|---|---|---|
| Minorities: | 52.5% | Utilization: | 75% |
| LS Exclusion: | 0% | FS Inclusion: | 4% |
| Displacement: | 0.08:1 | R: | compact |

25. The two of the top three *least* compact high schools are negro schools:



BLAKE HIGH SCHOOL

| Accuracy: | 26% | Grade: | C |
|---|---|---|---|
| Minorities: | 76.4% | Utilization: | 90% |
| LS Exclusion: | 49% | FS Inclusion: | 63% |
| Displacement: | 0.55:1 | R: | gerrymandered |

GAITHER HIGH SCHOOL

| Accuracy: | 30% | Grade: | B |
|---|---|---|---|
| Minorities: | 62.9% | Utilization: | 98% |
| LS Exclusion: | 65% | FS Inclusion: | 29% |
| Displacement: | 4.49:1 | R: | gerrymandered |

MIDDLETON HIGH SCHOOL

| Accuracy: | 34% | Grade: | C |
|---|---|---|---|
| Minorities: | 87.5% | Utilization: | 76% |
| LS Exclusion: | 61% | FS Inclusion: | 24% |
| Displacement: | 4.91:1 | R: | gerrymandered |

26. Nearly all of the School Board's school boundaries are gerrymandered. *see* Exhibits X, Y, and Z.

There is only one compact Middle School: Shields Middle School. The rest are gerrymandered.

27. The top three *least* compact middle schools are: Randall Middle School, Memorial Middle School, and Barrington Middle School:



| RANDALL MIDDLE SCHOOL | | MEMORIAL MIDDLE SCHOOL | | BARRINGTON MIDDLE SCHOOL | |
|---|---|---|---|---|---|
| Accuracy: 7% | Grade: A | Accuracy: 25% | Grade: C | Accuracy: 23% | Grade: B |
| Minorities: 32.5% | Utilization: 98% | Minorities: 90.5% | Utilization: 57% | Minorities: 51.4% | Utilization: 97% |
| LS Exclusion: 92% | FS Inclusion: 28% | LS Exclusion: 52% | FS Inclusion: 64% | LS Exclusion: 28% | FS Inclusion: 73% |
| Displacement: 30.71:1 | R: gerrymandered | Displacement: 0.60:1 | R: gerrymandered | Displacement: 0.14:1 | R: gerrymandered |

## A.  NUMBERS DEFINED

28. A "Local Student" is a student who resides closest to that school. A "Foreign Student" is a student who is resides closer to a different school. In a perfectly compact map, a foreign student would never be assigned because they would always be assigned to their closest school where they are a local student.

29. The Local Student Exclusion Ratio ("LS Exclusion") represents the percent of local students who are not assigned to that school. A LS Exclusion

ratio of 0.2 means that 20% of the local students are assigned to a different more geographically distant school.

30. The green area represents the area of local students are actually assigned to that school.

31. The red area in the graphs represents local students who are excluded from that school. The LS Exclusion ratio is calculated as:

$$LER = \frac{area(red)}{area(green) + area(red)} \qquad (1)$$

32. The Foreign Student Inclusion Ratio ("FS Inclusion") represents the percent of assigned students who are foreign students. A FS Exclusion ratio of 0.4 means that 40% of the assigned student population are foreign students.

33. The yellow area represents the foreign students. The FS Inclusion ratio is calculated as:

$$FIR = \frac{area(yellow)}{area(green) + area(yellow)} \qquad (2)$$

34. The displacement ratio represents that ratio between excluded local students and included foreign students. For example, a displacement ratio of 12:1 indicates that 12 local students lost their seat at that school for every 1 foreign student that was assigned. A high displacement ratio indicates that a school is trying hard not to assign local students and still fill capacity. A great example of this is A-rated Fishkawk Elementary which borders C-rated Pinecrest Elementary:

7



FISHHAWK CREEK ELEMENTARY SCHOOL          PINECREST ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 13% | Grade: | A |
| Minorities: | 33.7% | Utilization: | 100% |
| LS Exclusion: | 86% | FS Inclusion: | 1% |
| Displacement: | 693.94:1 | R: | gerrymandered |

| | | | |
|---|---|---|---|
| Accuracy: | 65% | Grade: | C |
| Minorities: | 34.5% | Utilization: | 67% |
| LS Exclusion: | 1% | FS Inclusion: | 33% |
| Displacement: | 0.03:1 | R: | gerrymandered |

35. The Displacement ratio is calculated as:

$$D = \frac{area(red)}{area(red) + area(yellow)} \tag{3}$$

36. Accuracy is a percent of how close the assigned boundary is to a perfectly compact boundary (closest school boundary). With 1.0 being perfectly accurate and 0.0 not being accurate at all. This is the closest single number to a measure of compactness used in this document.

37. Accuracy is calculated as:

$$A = \frac{area(green)}{area(red) + area(yellow) + area(green)} \tag{4}$$

38. Utilization is the school utilization percent, and is from the School Board's last published 40-day enrollment numbers.

8

39. Minorities represents the percent of the school's student that are minorities.

### B. ANALYSIS

40. Coincidentally, all of the compact school boundaries beset on two or more sides by natural borders or the county line. They are not compact due to the diligent efforts of the school board, they are compact only because the board did not have much discretion to screw it up.

41. Significant amounts of red and yellow areas are strong indicators of gerrymandering.

42. Blake and Middleton are the two negro high schools in Tampa; the high degree of non-compactness in these boundaries, combined with the nearby white neighborhoods that are not assigned to these schools suggests that race was the predominant factor when drawing these boundaries.

## SOUTH TAMPA

### ELEMENTARY SCHOOLS

43. All of the *south tampa* school boundaries correspond nearly perfectly to the Home Owners' Loan Corporation ("HOLC") maps which was created by the federal government in 1933 which racially segregated housing. *see* Exhibit G and H.

44. The three *south tampa* elementary schools which border *west tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.



GRADY ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 44% | Grade: | A |
| Minorities: | 41.4% | Utilization: | 104% |
| LS Exclusion: | 41% | FS Inclusion: | 36% |
| Displacement: 1.24:1 | | R:   gerrymandered | |

MITCHELL ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 55% | Grade: | A |
| Minorities: | 36.4% | Utilization: | 96% |
| LS Exclusion: | 23% | FS Inclusion: | 32% |
| Displacement: 0.61:1 | | R:   gerrymandered | |

GORRIE ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 60% | Grade: | A |
| Minorities: | 28.2% | Utilization: | 92% |
| LS Exclusion: | 39% | FS Inclusion: | 1% |
| Displacement:40.25:1 | | R:   gerrymandered | |

45.  The three *west tampa* elementary schools which border *south tampa*–Tampa Bay Boulevard, West Tampa, and Just (until it closed)–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.



AMPA BAY BOULEVARD ELEMENTARY SCHOO

| | | | |
|---|---|---|---|
| Accuracy: | 24% | Grade: | C |
| Minorities: | 95% | Utilization: | 55% |
| LS Exclusion: | 49% | FS Inclusion: | 68% |
| Displacement: 0.45:1 | | R:   gerrymandered | |

WEST TAMPA ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 41% | Grade: | C |
| Minorities: | 95.6% | Utilization: | 68% |
| LS Exclusion: | 49% | FS Inclusion: | 30% |
| Displacement: 2.18:1 | | R:   gerrymandered | |

JUST ELEMENTARY SCHOOL

| | | | |
|---|---|---|---|
| Accuracy: | 30% | Grade: | F |
| Minorities: | 97.8% | Utilization: | 47% |
| LS Exclusion: | 33% | FS Inclusion: | 63% |
| Displacement: 0.29:1 | | R:   gerrymandered | |

46. The bordering *south tampa* schools are extremely over utilized, while the bordering *west tampa* are extremely underutilized. The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *south tampa* to underutilized–majority minority– *west tampa* to balance out the utilization. Rather than do this, the HCSB closed a minority school and left the bordering *south tampa* schools at a staggering 100-119% utilization despite their stated goal to reduce utilization to the 80% range. The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.

## Plant, Jefferson, and Blake High School

47. Plant is over capacity, yet 44% percent of it's students should not even be assigned there. The 44% are distant predominantly white students who would otherwise be assigned to minority schools Jefferson and Blake. It makes no sense why the school board would go out of its way to assign distant students to a school that is over capacity.

PLANT HIGH SCHOOL          JEFFERSON HIGH SCHOOL          BLAKE HIGH SCHOOL



| Accuracy: | 51% | Grade: | A | Accuracy: | 52% | Grade: | C | Accuracy: | 26% | Grade: | C |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minorities: | 31.1% | Utilization: | 101% | Minorities: | 91.2% | Utilization: | 63% | Minorities: | 76.4% | Utilization: | 90% |
| LS Exclusion: | 10% | FS Inclusion: | 44% | LS Exclusion: | 27% | FS Inclusion: | 34% | LS Exclusion: | 49% | FS Inclusion: | 63% |
| Displacement: | 0.14:1 | R: | gerrymandered | Displacement: | 0.74:1 | R: | gerrymandered | Displacement: | 0.55:1 | R: | gerrymandered |

11

48. The following map shows the locations and boundaries for Plant High
    School (orange), Jefferson High School (yellow), and Blake High School
    (purple):



49. Plant High School is nearly *twice* as far from Davis Island as Blake High
    School is by ground transportation, yet students in that affluent white en-
    clave are not assigned to Blake, a predominantly African-American school.

50. Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach
    Park, and Oakford Park are at least twice as close to Jefferson High School
    than Plant, and in some cases literally across the street from Jefferson, yet

those white students are assigned to Plant and the school district is unable to give a cognizable reason why.

51. The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the following image:



52. The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School. The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:



## Coleman, Madison, and Pierce Middle School

53. The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-American population directly to their north, despite them being significantly closer to Coleman than Pierce.



COLEMAN MIDDLE SCHOOL    PIERCE MIDDLE SCHOOL    MADISON MIDDLE SCHOOL

| | COLEMAN | | | PIERCE | | | MADISON | |
|---|---|---|---|---|---|---|---|---|
| Accuracy: | 45% | Grade: | A | Accuracy: | 55% | Grade: | C | Accuracy: | 64% | Grade: | C |
| Minorities: | 28.3% | Utilization: | 104% | Minorities: | 93.3% | Utilization: | 69% | Minorities: | 72.2% | Utilization: | 58% |
| LS Exclusion: | 42% | FS Inclusion: | 31% | LS Exclusion: | 11% | FS Inclusion: | 40% | LS Exclusion: | 19% | FS Inclusion: | 23% |
| Displacement: | 1.59:1 | R: | gerrymandered | Displacement: | 0.19:1 | R: | gerrymandered | Displacement: | 0.79:1 | R: | gerrymandered |

54. Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the School Board closed Monroe, to avoid sending white students to minority schools directly to the north.

55. The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:



## North Tampa

### Carrollwood K-8

56. On May 9, 2023, Defendant promulgated a format change for Carrroll-wood Elementary, converting it from kindergarten through fifth grade ("K-5") to kindergarten through eighth grade ("K-8") effective August 2023 with the 2023-2024 school year for the sixth grade. *see* Exhibit J.

57. J.W. is starting the sixth grade for the 2023-2024 school year.

58. Defendant assigned Plaintiff's child J.W. to Adams Middle School–located at 10201 N Blvd, Tampa, FL 33612.

59. Carrollwood K-8 is located at 3516 McFarland Rd, Tampa, FL 33618.

60. Both Adams Middle School and Carrollwood K-8 are operated by Defendant.

61. Carrollwood K-8 has a non-compact boundary:

CARROLLWOOD ELEMENTARY SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 33% | Grade: | A |
| Minorities: | 57.6% | Utilization: | 73% |
| LS Exclusion: | 63% | FS Inclusion: | 21% |
| Displacement: | 6.12:1 | R: | gerrymandered |

62. The children it includes in the yellow and green areas are significantly more White than the excluded red areas.

63. The children it excludes to the south of Gunn Highway and Busch Boulevard are predominantly Latino and African-American.

64. The children it excludes to the east are significantly more likely to be African-American or Latino than the children it included in the green and yellow areas.

### Hill Middle School

65. Hill has a non-compact boundary:



HILL MIDDLE SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 37% | Grade: | B |
| Minorities: | 68.6% | Utilization: | 83% |
| LS Exclusion: | 46% | FS Inclusion: | 43% |
| Displacement: | 1.11:1 | R: | gerrymandered |

66. Hill's assignment boundary is being manipulated to protect two border-
ing white schools: A-rated Carrollwood K-8 and A-rated Martinez Mid-
dle School. Nearby affluent white students who should be assigned to Hill,
are instead assigned to Martinez and Carrollwood. To fill those student
seats back up, they gerrymandered the boundary to pull in distant minor-
ity neighborhoods that the A-rated schools do not want. The result is a
significantly higher concentration of minorities at Hill, and a decrease of
minority enrollment at Martinez and Carrollwood.

## Lake Magdalene Elementary

Lake Magdalene's boundary was just changed for the 2024-2025 school year. They reassigned a large swath of white students from Miles Elementary to Lake Magdalene, despite those students being significantly closer to Miles. Miles is a low performing minority school, and the reassignment of these white students only further concentrated minorities there. The school board gerrymandered the Miles boundary so hard, that it now resembles a penis and testicles:

MILES ELEMENTARY SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 28% | Grade: | C |
| Minorities: | 90.9% | Utilization: | 81% |
| LS Exclusion: | 56% | FS Inclusion: | 54% |
| Displacement: | 1.08:1 | R: | gerrymandered |

### Miles Elementary

67. The School Board juiced the numbers it told the public on it's boundary website to try to justify changing Miles' boundary.  The website indicates that Miles' utilization is around 109% to justify relocating a large portion of it's white students to Lake Magdalene away from predominantly minority Miles.  Yet the numbers the School Board reports to the state indicates that Miles' utilization is 81%.  Miles is not over capacity, the School Board lied to segregate it:

| Miles Elementary | Remove |
|---|---|
| School level | ES |
| Enrollment (school year 2021-22) | 794 |
| Capacity | 726 |
| Utilization (school year 2019-20) | 117% |
| Utilization (school year 2020-21) | 108% |
| Utilization (school year 2021-22) | 109% |

| Metric | Existing | S4 | S5 |
|---|---|---|---|
| Anticipated utilization | 113% | 87% | 87% |
| Assigned pupils rezoned | 0 | 228 | 228 |
| Anticipated utilization (with temporary classrooms) | 109% | 84% | 84% |
| Capacity (with temporary classrooms) | 754 | 772 | 772 |
| Capacity | 726 | 747 | 747 |
| Anticipated enrollment | 821 | 652 | 652 |
| Total assigned pupils | 1,259 | 986 | 986 |

### Gaither High School

68. Gaither has a non-compact boundary:

GAITHER HIGH SCHOOL



| | | | | |
|---|---|---|---|---|
| Accuracy: | 30% | Grade: | | B |
| Minorities: | 62.9% | Utilization: | 98% |
| LS Exclusion: | 65% | FS Inclusion: | 29% |
| Displacement: | 4.49:1 | R: | gerrymandered |

69. Mr. Warner resides on the edge of the Gaither red area, yet his home is assigned to Chamberlain High School. In 2022, Gaither's enrollment was 62.9% minority, in contrast to Chamberlain's 88.1%.

## Chamberlain High School

70. Gaither has a non-compact boundary:

CHAMBERLAIN HIGH SCHOOL



| Accuracy: | 38% | Grade: | C |
|---|---|---|---|
| Minorities: | 88.1% | Utilization: | 63% |
| LS Exclusion: | 52% | FS Inclusion: | 34% |
| Displacement: | 2.10:1 | R: | gerrymandered |

71. Mr. Warner resides on the edge of the green and yellow area that borders Gaither's boundary. There was a huge red area of students that were much closer than Mr. Warner, yet they excluded them and assigned him there instead to dilute minority enrollment at Gaither.

## 1. BOUNDARY CHANGES

72. The School Board promulgated controversial district wide boundary changes for the 2024-2025 school year on June 20, 2023 with a 4-3 vote, over the objections of minority members who were opposed to the disproportionate nega-

tive impact that the changes would have have African-American and Hispanic communities.

73. The white board members (along with a Moroccan), with an additional seat obtained through illegal gerrymandering, overrode the minority members to cram through the changes in a sharply divided 4-3 vote.

## 2.  ASSIGNMENT SHENANIGANS

74. Everytime the School Board creates a K-8, they always make the 6-8 boundary the exact same as the PK-5.

75. This is done because elementary boundaries are significantly smaller than middle school, so its easy to segregate.

76. Each and every time the school board creates a K-8, it is due to community pressure to segregate: either to pack white kids in, or to pack black kids in.

77. Sulphur Springs K-8 packs poor performing minorities into a small school.



SULPHUR SPRINGS K-8 SCHOOL



| | | | |
|---|---|---|---|
| Accuracy: | 16% | Grade: | C |
| Minorities: | 95% | Utilization: | |
| LS Exclusion: | 83% | FS Inclusion: | 12% |
| Displacement: | 34.94:1 | R: | gerrymandered |

78. Carrollwood K-8, Maniscalo K-8, and Lutz K-8 were all designed to segregate and isolate affluent white families from having their children assigned to nearby minority middle schools.



CARROLLWOOD ELEMENTARY SCHOOL | MANISCALCO K-8 SCHOOL | LUTZ K-8 SCHOOL

| Accuracy: | 33% | Grade: | A | Accuracy: | 54% | Grade: | A | Accuracy: | 56% | Grade: | A |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Minorities: | 57.6% | Utilization: | 73% | Minorities: | 59.7% | Utilization: | 79% | Minorities: | 37.4% | Utilization: | 86% |
| LS Exclusion: | 63% | FS Inclusion: | 21% | LS Exclusion: | 31% | FS Inclusion: | 27% | LS Exclusion: | 9% | FS Inclusion: | 40% |
| Displacement: | 6.12:1 | R: | gerrymandered | Displacement: | 1.22:1 | R: | gerrymandered | Displacement: | 0.15:1 | R: | gerrymandered |

79. The school board also play games by not assigning children to certain schools, even if those children live across the street. Walker Middle School is a great example of this. The School Board does not assign students to Walker, because they know under-performing minorities attend the school they are assigned the vast majority of the time, and they wanted that school to have a good grade. So they made it 100% lottery based to discourage minorities from attending.

## Fair Housing Act

80. Hillsborough County home buyers and renters frequently make decisions on which neighborhoods to purchase or rent based substantially on the public schools that are assigned to properties.

81. The assigned schools are provisioned services and/or facilities in connection with the residence that is assigned to them.

82. The HCSB is the entity who assigns public schools to specific residences, usually through the promulgation of a boundary map.

83. Promulgating school boundary maps that unlawfully segregate by race under the EEOA is de facto racial discrimination under the Fair Housing Act.

84. At all times relevant, there has been at least one residential real estate property for sale in each of the affected neighborhoods.

85. "Steering" is the practice of influencing a buyer's choice of communities based upon one of the protected characteristics under the Fair Housing Act, which are race, color, religion, gender, disability, familial status, or national origin.

86. "Redlining" is a discriminatory practice that puts services (financial and otherwise) out of reach for residents of certain areas based on race or ethnicity, often times by drawing lines on maps.

87. The HCSB artificially inflated the property values in *south tampa* by racially segregating white students into white schools to fabricate "A-rated" schools by excluding minority students.

88. On the flip side, this caused the schools that were deprived of those white students to get less resources and lower school grades, which depressed property values in homes assigned to those manufactured minority schools.

89. This pricing imbalance steered minorities to minority neighborhoods that they could only afford due to HCSB segregation based pricing manipulation, and affluent white people to the segregated white neighborhoods, further entrenching the segregation.  Effectively redlining along the HCSB's segregated school boundaries.

## II   DISPARATE TREATMENT

90. diminution in property values "Any discrimination in housing that is based on unsupported stereotypes, prejudices, fear stemming from ignorance or generalizations, or aversion toward the handicapped is illegal.". Epicenter of Steubenville v. City of Steubenville, 924 F. Supp. 845, 851 (S.D. Ohio 1996).

91. A plaintiff need not prove that discrimination was the sole motivating factor in the challenged action; it is sufficient that he show that discrimination was a motivating factor. Community Services, Inc. v. Wind Gap Municipal Authority, 421 F.3d 170, 177 (3d Cir. 2005); Regional Economic Community Action Program, Inc. v. City of Middletown, 294 F.3d 35, 49 (2d Cir.), cert. denied, 537 U.S. 813 (2002); Community Housing Trust v. Dep't of Consumer and Regulatory Affairs, 257 F. Supp. 2d 208, 225 (D.D.C. 2003); Sunrise Dev., Inc. v. Town of Huntington, 62 F. Supp. 2d 762, 774 (E.D.N.Y. 1999).

92. A municipality may be liable for actions that deny housing opportunities because of discriminatory animus by its constituents, i.e., "for effectuating the discriminatory wishes of the body politic," even though the local officials did not themselves inflame, direct, or encourage such discriminatory sentiments. United States v. City of Chicago Heights, No. 99 C 4461, 1999 WL 1068477 at *5 (N.D. Ill. Nov. 19, 1999).

93. The School Board acquiesced to their constituents pressured adopt known racially discriminatory school assignment boundaries.

## PROPERTY VALUES

94. The Superintendent freely admits to manipulating property values through assigned schools in a news interview[3]:

---

[3]*see* Exhibit F, https://www.wfla.com/news/hillsborough-county/hillsborough-county-schools-superintendent-to-present-re-zoning-recommendation-to-school-board/

"We moved the school district from number 35 in the state to number 19th.  We reduced the number of historical "D" and "F" schools in this school district.  The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools. And what *that* does is, that increases property values.  The more we continue to address our high quality education within within everyone of our schools."

-Addison Davis

95. On June 21, 2023, WTSP 10 Tampa Bay published an article titled "Hillsborough County Schools redistricting plan sparks concerns over property values"[4]

96. In that article, The President of Greater Tampa Realtors stated that the redistricting will change Hillsborough County Property values.

97. They also quoted parents who stated that they made housing purchasing decisions based on the assigned schools:

"Concerned parents are now speaking out about how the changes could impact their children's education and their property value."

"'That's why I bought my house in this area, for the schools,' said Elena Ivani, the mother of two young boys."

"Ivani said when she and her husband were house hunting eight years ago, they were only looking at A-rated public school districts."

"If I wanted them to go to private school, we would have stayed in the house we were in and put that money towards private education,"

"'I'm hoping my home's value at least stays level, but in all honesty, would you pay a premium for a C-rated school?' Ivani asked. "

---

[4] *see*  Exhibit  K.   https://www.wtsp.com/article/news/local/hillsboroughcounty/hillsborough-county-schools-redistricting-plan-property-values/67-979bab7e-012f-437e-8530-26a69ae58958

"'I'm most likely moving in three years,' said Ivani."

98. About 88 percent of Hillsborough County students are educated at public schools, and 12 percent at private schools.

99. Public education has traditionally been tied directly to housing through residential assignment policies that assign homes to schools via school attendance zones.

100. Housing is the traditional gateway to public education.

101. School zones are typically designed so that students attend schools near home, and despite growing opportunities to opt out or choose another school via charters, magnets, and public school open enrollment policies, 71 percent of students attend their assigned public school.

102. Families with children predictably take housing selection seriously, as housing often determines children's access to educational opportunities.

103. At least half of households with children consider school district quality when selecting a neighborhood during home buying.

104. Homes assigned to poor performing schools will have less demand from those households, therefore that home's value will decrease.

105. Homes that are assigned to well performing schools will have more demand from those households, therefore that home's will increase.

106. This chart shows the national values of homes vs the quality of the elementary school it is assigned:



107. The United States Census Bureau reports that the median household income for <u>black</u> households is $30,772 per year in Tampa, while the <u>white</u> households make nearly double at $59,390.

108. Any increase in property values will disproportionately price out more minorities from those neighborhoods.

109. Race is directly tied to property values: neighborhoods become more gentrified with higher concentrations of white residents the higher their property values are.

## INJURY

110. As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school

aged students in his community were being discriminated against because of their race... in the year 2023.

111. Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.

112. Defendant's unlawful conduct proximately caused Mr. Warner to suffer the afore-mentioned emotions, which have manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race dis-crimination in housing and the school system.

113. Between August 2017 and October 2022, Mr. Warner continuously resided in *south tampa* at residences assigned to A-rated schools Plant High School, Wilson Middle School, and Mitchell Elementary.

114. Due to HCSB's manipulation of property values, Mr. Warner was priced out of *south tampa* and had to relocate to relocate to *nouth tampa* where he was assigned to failing schools.

115. This increased segregation in both *south tampa* and *nouth tampa*.

116. Had The School Board assigned all students to their closest school, property val-ues in area of *south tampa* that Mr. Warner resided would have decreased, and he would have purchased a home there.

117. This move resulted in a loss of community for Mr. Warner.

118. Mr. Warner spent much of his childhood in *south tampa*. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.

## REDISTRICTING

119. Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic

population is packed into district 1, the African-American population into district 5, and white population into districts 2, 3, and 4.

120. 46% of Hillsborough County's population is non-Hispanic white, yet the board managed to gerrymander the districts to give white constituents mote voting power by giving them more board seats.

121. The School Board then used this slim white majority to cram through unpopular rebundary decisions that disproportionally harmed minority communities in District 5, such as the controversial closing of Just Elementary along a slim 4-3 vote.

122. This image shows the racial map overlaid with the district boundaries shown in blue lines:



123. The School Board has seven (7) board members, five of which are elected by constituents in their respective geographically defined voting districts, two (2) at-large county wide districts.

124. The School Board promulgates their own voting district maps.

125. A new district map was promulgated on December 16, 2021. *see* Exhibit R.

### 1.   School Board meeting

126. The School Board held a special called meeting on Dec 10, 2021, to discuss redistricting.  At that meeting, the board members made the following statements:

### Stacy Hahn

127.   "SO WHEN THE OPPORTUNITY TO REDISTRICT CAME UPON ALL OF US THIS YEAR, I THOUGHT THAT IT WAS THE PERFECT OPPORTUNITY TO CREATE AN HISPANIC SEAT ON THE SCHOOL BOARD TO REPRESENT OUR HISPANIC COMMUNITY"

"IT'S THE OPPORTUNITY TO CREATE THE SEAT, AND THEN IN 2024, HAVE HISPANIC REPRESENTATION FOR THAT COMMUNITY. SO THAT'S HOW I APPROACHED THIS TASK."

"BUT THE MAP DOES, BY FAR, PROVIDE THE HIGHEST HISPANIC POPU-LATION OF 46.6%, WHICH WOULD ENABLE HISPANIC MINORITIES THE OPPORTUNITY TO ELECT THEIR CANDIDATE OF CHOICE AND GUAR-ANTEE A SCHOOL BOARD MEMBER SEAT"

"NOW LET ME JUST DISCUSS MAP E SPECIFICALLY AND SOME OF THE HIGHLIGHTS OF MAP E. FIRST OF ALL, ANOTHER THING THAT MS. GRAY SAID THAT I'M GOING TO PUSH BACK ON HERE IS THAT SHE MEN-TIONED THAT MAP F HAD THE HIGHEST HISPANIC COMMUNITY. AC-

TUALLY, MAP E DOES AT 46.6%. MAP F IS AT 44.9%. 1.7% MAY NOT SEEM LIKE A BIG DIFFERENCE, BUT IT'S CLOSE TO 10,000 VOTES THAT YOU WOULD BE TAKING AWAY FROM THE HISPANIC COMMUNITY WITH MAP F. I DON'T THINK – I WOULD THINK IF YOU TOOK 10,000 VOTES AWAY FROM YOUR DISTRICT, MEMBER SHAKE TODAY, YOU AND YOUR CONSTITUENTS WOULD BE UPSET. I'M SAYING THAT BECAUSE 10,000 VOTES IS A LOT OF VOTES AND A LOT OF PEOPLE"

"WITH MAP E, NOT ONLY IS IT ONE OF THE HIGHEST AT 40.6, BUT IT ALSO CREATES AND GUARANTEES A HISPANIC SEAT"

"SO I UNDERSTAND WHEN YOU SAY, OKAY, CERTAIN PEOPLE WHO VOTED FOR YOU ARE NOW GOING TO BE TAKEN OUT OF THAT DISTRICT, YOU GET TO CONTINUE TO SERVE IN YOUR SEAT, BUT IT'S NOT – IT'S ABOUT THE ADVOCACY. IT'S ABOUT HAVING A PERMANENT ADVOCATE FOR THE HISPANIC COMMUNITY THAT PERSONALLY UNDERSTANDS THEIR NEEDS AND CHALLENGES. SO, YOU KNOW, THAT'S REALLY A CON-CERN FOR ME."

## A.  KAREN PEREZ

128.    "THE MAP THAT I SUBMITTED HAS ONE OF THE HIGHEST HISPANIC POPULATIONS IN DISTRICT ONE. AND IT'S PROJECTED TO GROW AN-OTHER 5.4 OVER THE NEXT DECADE. SO MAP F ACTUALLY UNITES HILLSBOROUGH COUNTY'S HISPANIC COMMUNITY EVEN BETTER THAN THE CURRENT MAP."

"MAP F HAS BY FAR THE LARGEST AFRICAN AMERICAN POPULATION IN DISTRICT 5 OUT OF 41.1% OF THE POPULATION BEING BLACK. THE LARGEST INCREASE IN HILLSBOROUGH COUNTY IN HISTORY. NONE OF THE HISTORICALLY BLACK DISTRICTS IN HILLSBOROUGH COUNTY, TAMPA CITY COUNCIL, THE COUNTY COMMISSION OR THE SCHOOL BOARD HAVE EVER HAD A MAP THAT INCREASED THE BLACK POPU-LATION IN THAT DISTRICT. THIS ENORMOUSLY."

### B.   Henry Washington

129.   "WHAT I'M LOOKING AT IS INCREASING THE LARGEST BLACK POPULATION. AND I DON'T EVER WANT TO DECREASE THAT IN DISTRICT 5."

"ALSO, FOR EXAMPLE, PROGRESS VILLAGE, I CAN NEVER UNDERSTAND WHY WE DIVIDE PROGRESS VILLAGE. THAT'S PRETTY MUCH PREDOMINANTLY A BLACK AREA. HALF OF THE AREA GOES TO ANOTHER DISTRICT, THE OTHER HALF GOES TO DISTRICT FIVE. SO I WANT THE DISTRICTS TO UNDERSTAND THAT I WANT MY PEOPLE TO BE TOGETHER IN THOSE AREAS"

"AND I'M HERE TO REPRESENT DISTRICT 5 HISPANICS. I HAVE HISPANICS IN MY AREA. I REALLY DO, BUT I'M HERE TO REPRESENT DISTRICT 5. AND TO ME, MAP F GIVES ME THE BEST OPPORTUNITY TO REPRESENT DISTRICT 5.".

### C.   Nadia Combs

130.   "SO THAT'S WHY I PERSONALLY VOTED FOR THAT AS NUMBER SIX. AND I WANT TO KEEP THE HISPANIC COMMUNITY TOGETHER. OBVIOUSLY. I AM OUT THERE. I AM VERY ACTIVE. AND I THINK YOU DON'T HAVE TO BE HISPANIC TO REPRESENT AND FIGHT FOR HISPANICS IN THIS DISTRICT. SO FOR ME, THAT IS WHY I WOULD CHOOSE MAP F BASED ON THE WAY I BASICALLY CATEGORIZE MINE. SO THANK YOU SO MUCH."

### D.   Melissa Snively

131.   "IT CREATES HISPANIC DISTRICT. MAYBE WE NEED TO TWEAK IT IF MEMBER COMBS IS NOT LIVING IN IT."

### E.   Lynn Gray

132. "AND LAST, DISTRICT 5, WE DID ENSURE THAT IT HAS THE HIGHEST BLACK POPULATION."

## 2.   Promulgated Map

133. The HCSB stated "Given the population distribution in Hillsborough County, having a high black population in District Five maximizes the opportunity for a minority candidate to be elected. When considering the demographic profile of each map, any map that identified a significant reduction in the black population in District Five was discarded". *see* Exhibit R.

134. The HCSB stated "The black population percentage for district five .. is 41.1%". *see* Exhibit R.

135. The black population percentage for Hillsborough County is approximately 18%.

## 3.   Predominant Factor

136. The school board used race as the predominant factor when drawing the map to concentrate African-American voters into District 5, and Hispanic voters into District 1.

137. This artificially created high concentrations of White voters in Districts 2, 3, and 4.

138. Districts 2, 3, and 4 all elected White representatives.

139. Some board members were motivated to maximize their chances of re-election.

140. Specifically, Henry Washington desired to pack a high concentration of African-American voters into District 5 to maximize his chances of re-election.

141. Stacy Hahn and Melissa Snively were all too happy to accommodate Henry Washington's desire, to keep African-Americans out of their district to maximize their own chances of re-election.

142. The push to pack Hispanics into District 1 kept them out of White districts 2, 3, and 4.

143. Race-based considerations were not simply a factor when redrawing district lines, they were the predominant factor.

144. The board members were actually bragging about whose map could pack the most minorities into isolated districts.

145. When they weren't referencing voters explicitly by race, they did so through pretextual phrases such as "keeping the community together".

146. The United States Census reports the following racial demographics for Hillsborough County: 18.5% African American, 30.5% Hispanic, 46% White non-Hispanic.

147. The county is majority African-American and Hispanic, yet the majority of the School Board seats went to White candidates.

148. The School Board achieved this result by diminishing the influence of African-American and Hispanic voters by packing them into their own respective districts.

149. Racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole.". Shaw v. Reno, 509 U.S. 630, 650 (1993).

150. At the time of the last election, Mr. Warner resided in White District 2 and had his vote diluted. He currently resides in District 3, and again has his voted diluted.

151. The School Board ensured that a Hispanic board member was not even elected to the Hispanic district they just packed, by rejecting any maps that placed Member Combs' home outside of District 1 so that she would continue to be eligible to run for the District 1 seat. Member Combs is not Hispanic.

## 4.  COMPACTNESS

### A.  POLSY-POPPER MEASURE

152. The Polsy-Popper score is a commonly used measure of compactness for voting maps that compares the boundary shape to a square that has the same perimeter as the boundary by calculating the area ratio between the two. It quantifies how contorted the boundary is. It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.

$$PPM = \frac{4 * area(B)}{perimiter(B)^2} \tag{5}$$

153. None of the five districts are compact as measured by the approximate polsy-popper scores:

District 1: 0.74

District 2: 0.57

District 3: 0.53

District 4: 0.38

District 5: 0.41

### B.  REOCK MEASURE

154. The Reock score is another commonly used measure of compactness for voting maps that compares a boundary shape to the minimum-bounding square by calculating the ratio of the boundaries occupied space within that minimum-bound square. It quantifies how stretched out the bound-

38

ary is. It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.

$$RM = \frac{area(B)}{max(width(B), height(B))^2} \tag{6}$$

155. None of the five districts are compact as measured by the approximate Reock scores:

District 1: 0.64

District 2: 0.69

District 3: 0.67

District 4: 0.47

District 5: 0.50

## INTENT

156. The fact that the school boundaries correlate nearly 1-to-1 directly to race.

157. The fact that the school board explicitly used race to draw the district maps to segregate.

158. The fact that the HCSB has a history of refusing to desegregate.

159. The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.

160. The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.

161. The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.

162. The affluent white residents of *south tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.

163. Those affluent white *south tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.

164. Superintendent Addison Davis has capitulated to this political pressure, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:



**Tim McGaughey**  Author  Group expert
There was a question about where the superintendent stands on this so far. Dr. Hahn commented that there was a soft commitment to keep the 130 families in the district.

Note: I assume this referenced scenario 2 and WBA, WSP.

1d 

165. The school board members are poised to approve yet another racially segregated map, despite knowing full and well that those maps are racially segregated, because they lack the political courage to overcome that political pressure from *south tampa* residents:



**Tim McGaughey** Author Group expert
I was very disappointed in this meeting overall. The fact that people were repeatedly asking or stating the same thing didn't help. Ultimately, one of the things that really bothered me about this meeting was how politically charged it was.
* A neighbor brought up politics and complained about the makeup of the board.
* Dr. Hahn discussed politics for several minutes and complained about some of her other board members.
* Martin Garcia was asked about a legal opinion and instead said that the superintendent and a few board members were trying to cram this down, that Dr. Hahn was the only reasonable board member and that everybody needed to work to elect other board members.
1d                                                                              👍 3

**Tim McGaughey** Author Group expert
Part of why this all bothered me is that I felt the positions of the other board members was very mis-represented. Claiming that Dr. Hahn is the only one interested in this is just clearly not true.

Also, the questions/comments were pretty much just about Plant. I can't recall a question about Grady, Mabry, or Coleman, which are also relevant to the area.

Plus of course, the HOA comments.
1d                                                                              👍 5

**Rachel Nestor**
**Tim McGaughey** her speech at Plant felt like a political rally as well which is not appropriate in the slightest.
13h                                                                             👍

166. School Board Member Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).

167. A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.

## Stacy Hahn's Statements

168. On or about January 11, 2023, Stacy Hahn gave a news interview with New Channel 8 WFLA[5].

169. This interview was broadcast on public television as well as printed on WFLA's website.

170. Stacy Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.

171. During this interview, Stacy Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".

172. There is no legal basis for District 2 families to stay in District 2.  School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.

173. "District 2" is the racially gerrymandered Caucasian district that Stacy Hahn represents.  "District 2"'s population is predominantly white.

174. District 1's population is predominantly minority and borders District 2 to the north.

175. Stacy Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.

176. Stacy Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.

---

[5] *see*   https://www.wfla.com/news/hillsborough-county/hundreds-attend-plant-high-school-meeting-to-protest-proposed-hillsborough-school-redistricting/

# DISPARATE IMPACT

177. The current school boundaries are arbitrary and the HCSB cannot have any legitimate objective for them because they violate the EEOA.

178. The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.

179. This further harms the minority communities throughout Hillsborough County because their property values are decreased, while the property values increase in the segregated white neighborhoods.

# COUNTS

## COUNT I

### 42 U.S. Code § 3601 et seq: Disparate Treatment

180. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

181. Defendant intended to unlawfully segregate students by race and/or color through *south tampa* school assignment boundary maps which are the terms, conditions, or privileges of a sale or rental of a dwelling, or the provision of services or facilities in connection therewith; or otherwise made housing unavailable by pricing minorities out of certain neighborhoods due to unlawful pricing manipulation.

## COUNT II

### 42 U.S. Code § 3601 et seq: Disparate Impact

182. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

183. Defendant's school assignment boundary maps had a discriminatory effect on minority students in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race and/or color, or otherwise made housing unavailable by pricing minorities out of certain neighborhoods due to unlawful pricing manipulation.

## COUNT III
### 20 U.S. Code § 1703(c): Closest School

184. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

185. The EEOA declares unlawful segregation as "the assignment by an educational agency of a student to a school, other than the one closest to his or her place of residence within the school district in which he or she resides, if the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student".

186. Mr. Warner's home is 1.6 miles from Carrollwood K-8.

187. Mr. Warner's home is 2.3 miles from Adams Middle School.

188. Adams Middle School is a failing school with a D-rating from the Florida Department of Education ("FDOE").

189. Adams Middle School's student demographics are 29.65% black, 55.13% hispanic, and 7.05% white according to the FDOE.

190. Carrollwood K-8 is a good school with an A-rating from the FDOE.

191. Carrollwood K-8's student demographics are 7.56% black, 39.56% hispanic, and 41.78% white according to the FDOE.

192. Defendant created a greater degree of segregation when they assigned the African-American Plaintiff to further away minority school (Adams) despite there being a closer white school (Carrollwood K-8).

193. The School Board Denied Mr.  Warner an educational opportunity by assigning his sixth grade child J.W. to Adams Middle School for the 2023-2024 school year, instead of Carrollwood K-8.

## COUNT IV
### 42 U.S.C. § 2000d et seq: Disparate Treatment

194. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

195. 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.".

196. Defendant receives federal financial assistance to fund it's school programs.

197. Defendant intentionally discriminates on the basis of race and/or color in it's school assignment boundaries.

## COUNT V

*42 U.S.C. § 2000d et seq: Disparate Impact*

198. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

199. 42 U.S.C. § 2000d provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.".

200. Defendant receives federal financial assistance to fund it's school programs.

201. Defendant's school assignment boundaries have a discriminatory effect on the basis of race or color.


# Count VI
*42 U.S.C. § 1983: Due Process*

202. Plaintiff re-alleges and incorporates by reference ¶ 1 - 9

203. The School Board opened a school choice application window on July 10, 2023.

204. That same day, Mr. Warner logged into the School Board's school choice application website to apply for School Choice for his child J.W. to get into Carrollwood K-8 and another school.

205. The website presented a list of schools to Mr. Warner to choose from, however Carrollwood K-8 was not on the list so he was unable to apply for that school.

206. However, the other school was available so Mr. Warner applied to it.

207. Mr. Warner then tried to apply for "Hardship" to get into Carrollwood K-8, however he was prevented from doing so unless he withdrew his application to the other school.

208. While Mr. Warner might assume the School Board believe the school is over capacity and decided not to list it, Mr. Warner still has a right under Florida law to apply to a) get a response that the school is over capacity and b) be put on a waiting list to be notified if capacity becomes available throughout the year.

209. Additionally, even if Mr. Warner was able to apply for Hardship, the criteria for being accepted is arbitrary and capricious. There are no requirements or procedures for being accepted to hardship, the School Board just wants you to submit a 2000 character essay explaining "a compelling reason for this hardship request".

210. Florida is a controlled open enrollment state: School Boards have a non-discretionary ministerial duty to "allow a parent from any school district in the state ... to enroll his or her child in ... any public school ... that has not reached capacity in the district ... The school district ... shall accept the student, pursuant to that school district's or charter school's controlled open enrollment process"[6].

211. Mr. Warner have a clearly established right to enroll in any public school that is below capacity. *see* Fla. Stat. § 1014.04, Fla. Stat. § 1002.20, Fla. Stat. § 1002.31, and the fundamental right of parents to direct the care, upbringing, and education of their children under Fourteenth Amendment of the United States Constitution.

212. Defendant has deprived Mr. Warner of those clearly established rights and liberties through their actions complained of herein.

---

[6]*see* Fla. Stat. § 1002.31(2)(a)

213. The school board has no "open enrollment process" for Carrollwood K-8.

214. The school board has implemented a written policy[7] of blanket refusing all general choice applications for Carrollwood K-8 in violation of Fla. Stat. § 1002.31.

215. Mr. Warner is not eligible to apply for choice hardship because Carrollwood K-8 is not capped / at-capacity. *see* Exhibit J.

216. Mr. Warner has no procedural way to apply for general choice admission into Carrollwood K-8 for the 2023-2024 school year.

217. The expanded Carrollwood K-8 has available capacity for the 2023-2024 school year. *see* Exhibit J pp. 2 - 3.

218. Mr. Warner has exhausted all administrative remedies, though that is not required to bring a 1983 due process claim. *see* Monroe v. Pape.

# COUNT VII

### *42 U.S.C. § 1983: Equal Protections - District Map Gerrymandering*

219. Plaintiff re-alleges and incorporates by reference ¶ 1 - 6

220. Plaintiff re-alleges and incorporates by reference ¶ 20 - 22

221. Plaintiff re-alleges and incorporates by reference ¶ 119 - 155

222. The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws."

---

[7]"General school choice options will be closed for Carrollwood PK-8". *see* Exhibit J pp. 3

223. Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.

224. As alleged in detail above, race was the predominant factor in the design of all five Miami City Commission districts.  Race predominated over all other redistricting criteria when each of these districts was drawn.

225. Thee use of race as the predominant factor in creating the districts was not narrowly tailored to advance any compelling state interests, including compliance with the Voting Rights Act.

226. Map-drawing in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making, is presumptively invalid under the Equal Protection Clause.

227. Consequently, the districts do not survive strict scrutiny.

228. Therefore, the districts violate Mr. Warner's rights under the Equal Protection Clause and 42 U.S.C. § 1983.

## Count VIII

### Art. IX, § 1(a), Fla. Const.: Free Public Education

229. Plaintiff re-alleges and incorporates by reference ¶ 1 - 179

230. Art. IX, § 1(a), Fla. Const. states:

> "Adequate provision shall be made by law for a ... high quality system of free public schools"

231. The School Board's manipulation of housing property values results in an additional fee that parents must pay to attend certain public schools in the

form of higher rents or higher home sales prices.  The fee that must be paid is the difference between the manipulated housing prices minus the price that housing would be but-for the School Board's pricing manipulation.

# Count IX

### *Art. IX, § 1(a), Fla. Const.: Uniform Public Schools*

232. Plaintiff re-alleges and incorporates by reference ¶ 1 - 6

233. Plaintiff re-alleges and incorporates by reference ¶ 20 - 79

234. Art. IX, § 1(a), Fla. Const. states:

> "Adequate provision shall be made by law for a uniform, [and] efficient ... system of free public schools"

235. School attendance boundaries are promulgated via administrative law.

236. Gerrymandered school attendance zones that assign a substantial amount of students to schools other than the one closest to their place of residence is neither uniform nor efficient regardless if such assignments have a racially discriminatory effect.

237. Gerrymandered school attendance zones that assign a substantial amount of students to schools other than the one closest to their place of residence that exacerbates racial segregation is neither uniform nor efficient.

# III  RELIEF

Plaintiff respectfully requests that this court:

## SCHOOL ASSIGNMENT MAP CHALLENGES

1. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the Fair Housing Act; and

2. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of Title VI of the Civil Rights Act; and

3. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of Art. IX, § 1 of the Florida Constitution ; and

4. enter a permanent injunction enjoining Defendant from promulgating any school assignment boundary maps complained of herein that violate the previous declarations; and

5. enter an order directing Defendant to redraw it's school assignment boundaries that complies with all federal, state laws, and this court's orders; and

6. award Plaintiff compensatory damages and punitive damages; and

7. award Plaintiff costs of suit and reasonable attorney fees; and

8. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## EEOA CHALLENGES

9. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the EEOA; and

10. enter an order directing Defendant to redraw the Carrollwood K-8 assignment boundary map to be in compliance with the EEOA; and

11. enter an order directing Defendant to admit J.W. to Carrollwood K-8 for the 2023-2024 school year in compliance with the EEOA; and

12. award to the Plaintiff costs of suit and reasonable attorney fees; and

13. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## Due Process

14. declare the actions, omissions, policies, and procedures of Defendant, complained of herein to be in violation of the Due Process Clause; and

15. enter an order directing Defendant to admit J.W. to Carrollwood K-8; and

16. award to the Plaintiff costs of suit and reasonable attorney fees; and

17. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## District Map Challenges

18. declare the actions, omissions, policies, and procedures of the School Board, complained of herein to be in violation of the Equal Protections Clause; and

19. declare the 2022 school board election invalid with regards to Districts 2 and 4 seats; and

20. enter an order directing Defendant to hold a special election; and

21. award Plaintiff nominal damages; and

22. award Plaintiff costs of suit and reasonable attorney fees; and

23. grant whatever additional relief this Court deems appropriate and just under the circumstances.

## DEMAND FOR BENCH TRIAL

Plaintiff hereby demands a trial by judge on all issues.

## UNSWORN DECLARATION

I declare under penalty of perjury that the foregoing is true and correct. Executed on:

7-10-2023

_____
Date

_____
Signature

Blake Warner, *pro se*

2211 S. Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

54