# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County, Florida

Case Number 8:23-CV-181

# Motion for Preliminary Injunction and Incorporated Memorandum of Law

## I  Introduction

Plaintiff, pursuant to Fed. R. Civ. P. 65, moves the Court for a narrowly tailored mandatory preliminary injunction to force Defendant to place a single student (Plaintiff's child J.W.) at Carrollwood K-8 for the 2023-2024 sixth grade school year, or in the alternative enjoin *Defendant* from implementing the recently promulgated Carrollwood K-8 format change–outlined in Exhibit E–to maintain the status quo.

1

# Memorandum of Law

## II  Legal Standards

Injunctive relief is appropriate where, as here, Plaintiffs can establish that:

1. they have a substantial likelihood of success on the merits; and
2. irreparable injury will result absent injunctive relief; and
3. the balance of the equities tips in their favor; and
4. the injunction would serve the public interest;[1]

### 1.  Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." Winter v. Nat. Res. Def. Council, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." Nken v. Holder, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of persuasion on each factor, and each is required for preliminary relief. Id.

At the preliminary-injunction stage, courts "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" 828 Mgmt., LLC v. Broward Cnty., 508 F. Supp. 3d 1188, 1193 (S.D. Fla. 2020) (quoting Levi Strauss & Co. v. Sunrise Int'l Trading, 51 F.3d 982, 985 (11th Cir. 1995)).

---

[1] *see* e.g., Siegel v. Lepore, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc).

## 2. Liberally Construed

20 U.S. Code § 1703(c) is a remedial statutes and should be liberally construed to effect the legislature's remedial purpose.

# III  Argument

## 1. Standing

Mr. Warner has standing because he suffers a concrete injury in the form of increased transportation costs to more distant schools, being denied an equal educational opportunity to enroll his child at Carrollwood K-8, and a decrease in the property value of his home.

The Superintendent freely admits to manipulating property values through assigned schools in a news interview[2]:

> "We moved the school district from number 35 in the state to number 19th. We reduced the number of historical "D" and "F" schools in this school district. The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools. And what *that* does is, that increases property values. The more we continue to address our high quality education within within everyone of our schools." -Addison Davis

If better school ratings increase the property values of homes that are assigned to them, then the inverse must also be true: assigning low performing schools to a home decreases that homes property value.

---

[2] *see* Exhibit M, https://www.wfla.com/news/hillsborough-county/hillsborough-county-schools-superintendent-to-present-re-zoning-recommendation-to-school-board/

2. **Plaintiffs Are Substantially Likely to Prevail on the Merits**

   A. **20 U.S. Code § 1703(c): EEOA Closest School**

   A plain reading of the statute would reveal the elements of this cause of action to be:

1. the assignment by an educational agency of a student to a school; and
2. other than the one closest to his or her place of residence within the school district in which he or she resides; and
3. the assignment results in a greater degree of segregation of students on the basis of race, color, sex, or national origin among the schools of such agency than would result if such student were assigned to the school closest to his or her place of residence within the school district of such agency providing the appropriate grade level and type of education for such student;

1. Defendant assigned Plaintiff's child (J.W.) to Adams Middle School. *see* Exhibit K.
2. J.W.'s home is 1.6 miles from Carrollwood K-8. *see* Exhibit A.
3. J.W.'s home is 2.3 miles from Adams Middle School. *see* Exhibit B.
4. Adams Middle School is a failing school with a D-rating from the Florida Department of Education. *see* Exhibit G.
5. Adams Middle School's student demographics are 29.65% black, 55.13% Hispanic, and 7.05% white. *see* Exhibit F pp. 1.
6. Carrollwood K-8 is a school with an A-rating from the Florida Department of Education. *see* Exhibit G.

7. Carrollwood K-8's student demographics are 7.56% black, 39.56% Hispanic, and 41.78% white. *see* Exhibit F pp. 4.

8. Defendant created a greater degree of segregation when they assigned the Mr. Warner's African-American household to the further away minority school (Adams) despite there being a closer white school (Carrollwood K-8).

   While the EEOA is ambiguous on how the distance between the schools and the residence is measured, Defendant cannot show any reasonable measure of distance where Adams Middle School is closer to the Plaintiff's home than Carrollwood K-8:

1. Driving distance is 1.6 miles vs 2.4 miles (Adams is 50% further);

2. Drive time is 6 minutes vs 6-9 minutes (Adams takes 25% more drive time on average);

3. 1.24 miles v 1.68 miles as the crow flies (Adams is 35% further);

4. Walking time is 32 minutes vs 45 minutes (Adams takes 40% longer);

5. Biking time is 8 minutes vs 13 minutes (Adams takes 62% longer);

   By all objective measures, Carrollwood K-8 is significantly closer to Plaintiff's home than Adams Middle School.

   The resulting increased segregation is also indisputable: Defendant's own race report[3] states that Adams Middle School is 92.95% non-white and that Carrollwood is 58.22% non-white. The reason for this race disparity is because Carrollwood K-8 is beset on all sides by predominantly white neighborhoods, and Adams Middle is mostly surrounded by minority neighborhoods[4]. The

---
[3] *see* Exhibit F
[4] *see* Exhibit Q

5

disparity in educational opportunity between the schools is vast (Carrollwood K-8 is an A-rated school, where Adams is D-rated).

Both Carrollwood K-8 and Adams Middle school offer appropriate grade instruction for J.W. (sixth grade) for the 2023-2024 school year.

The reason for this is obvious: The Hillsborough County School Board manufactures A-rated schools by going out of their way to exclude under performing minorities from their best schools. They went so far as to bus in distant white students to help the school grade, but then excluded near by minority students who resided in "undesirable" neighborhoods. The political influence is palpable, it is no coincidence that the border in question between Carrollwood and Lake Magdalene corresponds directly with the Original Carrollwood Home Owners Association boundary. This boundary they used, does not correspond to any major roads. It is the result of a likely racist HOA applying political pressure to the school board to indirectly draw their boundary around. And decades later, they succeeded again in 2023 by convincing the school board to convert Carrollwood from a K-5 to a K-8 further isolating those Original Carrollwood residents from Negros.

## B. REMEDY

"In formulating a remedy for a denial of equal educational opportunity or a denial of the equal protection of the laws ... a court ... shall consider and make specific findings on the efficacy in correcting such denial of the following remedies and shall require implementation of the first of the remedies". *see* 20 U.S. Code § 1713.

Here, the desired remedies sought in this injunction are the top two: (a) assigning students to the schools closest to their places of residence which provide the appropriate grade level and type of education for such students, taking

into account school capacities and natural physical barriers; and (b) assigning students to the schools closest to their places of residence which provide the appropriate grade level and type of education for such students, taking into account only school capacities;

As previously outlined, Carrollwood K-8 has capacity to accept Plaintiff's enrollment. The proposal that the school board voted on lists Carrollwood K-8's capacity at 886 with projected enrollment of only 651 (73% utilization) for the 2025-2026 school year[5].

To whatever extent that Carrollwood K-8 does lack capacity (it does not), that is only because Defendant unlawfully assigned geographically distant white students to fill the capacity. Defendant cannot bus in distant white students then deny local/closer minority students by claiming overcapacity. Large swaths of the Carrollwood K-8 boundary reside further away from Carrollwood K-8 than Plaintiff's home[6]. Put simply, if Carrollwood K-8's boundary were drawn in a manner compliant with the EEOA, available capacity would be high after you jettisoned all of the incorrectly assigned students. Removing area 1 alone would free up 40 student seats[7].

## 3. Plaintiffs Will Suffer Irreparable Harm Absent an Injunction

Absent a preliminary injunction prior to the start of the start of the 2023-2024 school year, J.W. would have to start the school year off at a different school, and the psychological harm to a child having to change schools is well known. Mr. Warner's parents are retired U.S. military, he moved around constantly as a child.

---

[5] see Exhibit E pp. 3
[6] see Exhibit N.
[7] "Area 1: Hill Middle to Carrollwood PK-8: 40 assigned students shifting". see Exhibit E.

As such he knows first hand how hard it is on a child to change schools.

J.W. is currently enrolled at for the sixth grade is Coleman Middle School, which is approximately 12 miles away. Absent an injunction, that is the school he is slated to attend[8] will attend. The great distance results in a loss of community for *Plaintiffs*. The Mr. Warner cannot attend all school events or be more involved with the school activities. And the relationships that J.W. fosters at that school cannot be maintained in his neighborhood. It would fragment his life and his home and school communities.

### 4. THE BALANCE OF THE EQUITIES WEIGHS IN FAVOR OF PLAINTIFFS

Defendant will not be harmed if the injunction is granted, quite the opposite actually: they would benefit because the school J.W. is currently enrolled at for the sixth grade is Coleman Middle School which is one of the most over-crowded middle schools in Hillsborough County at 109% utilization. Transferring him from Coleman to Carrollwood (which has capacity) would help ease school crowding issues, which Defendant has publicly stated many times is their primary reason for engaging in the re-boundary analysis in the first place. It is quite a curious thing that the Defendant would even resist a transfer from an over-utilized school to an under-utilized one. It smells of first amendment retaliation. Defendant receives the same amount of money in funding for J.W. regardless of whether he attends Coleman or Carrollwood.

---

[8]notwithstanding a pending school choice application to a closer school, however we will not know if that was accepted until "early august".

### 5. INJUNCTIVE RELIEF IS IN THE PUBLIC INTEREST

"The last two requirements for a preliminary injunction involve a balancing of the equities between the parties and the public." Florida v. Dep't of Health & Hum. Servs., 19 F.4th 1271, 1293 (11th Cir. 2021). "Where the government is the party opposing the preliminary injunction, its interest and harm—the third and fourth elements—merge with the public interest." Id. (citing Swain v. Junior, 958 F.3d 1081, 1091 (11th Cir. 2020)).

Moreover, the State "is in no way harmed by the issuance of an injunction that prevents the state from enforcing unconstitutional restrictions." Legend Night Club v. Miller, 637 F.3d 291, 302–03 (4th Cir. 2011). Conversely, for Plaintiffs, even minimal infringements upon First Amendment values constitute irreparable injury. Catholic Diocese, 141 S. Ct. at 67. As Dr. A recognized when it enjoined New York's similar scheme, "the public interest lies with enforcing the guarantees enshrined in the Constitution and federal anti-discrimination laws." Dr. A, 2021 WL 4734404, at *10. Indeed, "[p]roper application of the Constitution . . . serves the public interest [because] it is always in the public interest to prevent a violation of a party's constitutional rights." Dahl, 2021 WL 4618519, at *6.

### 6. BOND

Bond should not be required for the injunction because of the strength of the underlying merits and the strong public interest of both the state and the United States in rooting out racial educational discrimination. *see* BellSouth Telecommunications, Inc. v. MCIMetro Access Transmission Servs., LLC, 425 F.3d 964, 970–71 (11th Cir. 2005). Additionally, as outlined previously, Defendant would not be harmed, but rather benefit from the injunction.

| | |
|---|---|
| 7-13-2023 | /s/ Blake Warner |
| —————————— | —————————— |
| Date | Signature |
| | Blake Warner, *pro se* |
| | 2211 S Village Ave |
| | Tampa, FL 33612 |
| | E-Service: BLAKE@NULL3D.COM |

10