# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County Florida

Case Number 8:23-CV-181-SDM-JSS

# Plaintiff's Response to
# Defendant's Motion to Dismiss

Defendant moved to dismiss Plaintiff's Second Amended Complaint ("SAC") presumably pursuant Rule 12(b)(6). Defendant argues that the court should dismiss the SAC with prejudice because Plaintiff should not be given more than one opportunity and cites unpublished *Eiber Radiology, Inc. v. Toshiba Am. Med. Sys., Inc.*, 673 F. App'x 925, 929 (11th Cir. 2016) with the summary "explaining district courts do not have to give more than one opportunity to amend a complaint, and "dismissal with prejudice" is the "default" under Rule 12(b)(6)". However this is a gross misrepresentation of the cited case, what *Eiber* really held was:

> "We have never required district courts to grant *counseled plaintiffs* more than one opportunity to amend a deficient complaint, nor have we concluded that dismissal with prejudice is inappropriate where a counseled plaintiff has

failed to cure a deficient pleading after having been offered ample opportunity to do so." *Id* at *11 (11th Cir. Dec. 20, 2016) (emphasis mine)

In any event, the claims presented in the SAC have never been dismissed on the merits, each amendment was done either as a matter of right, consent of the parties, or by the court for the practical purpose of consolidating actions. In *Eiber*, the Plaintiff's attorney was given an opportunity to cure a procedural defect and they failed to do so. There are no allegations that Mr. Warner failed to cure any defects when given an opportunity to do so by the Court, and even if there were, *pro se* Plaintiffs are given more leniency in this regard than counseled Plaintiffs.

*Pro se* complaints are to be liberally construed. *see* Alba v. Montford, 517 F.3d 1249, 1252 (11th Cir. 2008).

# I  STANDARDS

## 1.  PLAINTIFF NEED ONLY PLEAD A PRIMA FACIE CASE AT THE PLEADING STAGE

"'The elements of a claim of race discrimination under 42 U.S.C. § 1981 are also the same as a Title VII disparate treatment claim in the employment context.' *Rice-Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000)." *Gibson v. JetBlue Airways Corp., No. 20-10943*, at *8 (11th Cir. Nov. 18, 2021).

"The plaintiff can establish a claim of ... race discrimination through direct evidence or circumstantial evidence. Alvarez, 610 F.3d at 1264. Where a plaintiff supports her § 1981 discrimination claim using circumstantial evidence, we generally apply the McDonnell Douglas burden-shifting framework. Brown v. Ala. Dep't of Transp., 597 F.3d 1160, 1174, 1181 (11th Cir. 2010)." *Id.*

"To evaluate a claim of discrimination under the FHA, we use the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)" *Molina v. Aurora Loan Services, LLC, 635 F. App'x 618*, 13 (11th Cir. 2015).

"To withstand a motion to dismiss, a plaintiff asserting discrimination under the FHA need not allege specific facts establishing a prima facie case. *see Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Still, in order to avoid

dismissal, a plaintiff's complaint 'must provide enough factual matter (taken as true) to suggest intentional . . . discrimination.' *Davis v. Coca-Cola Bottling Co. Consol.*, 516 F.3d 955, 974 (11th Cir. 2008) (quoting Twombly, 550 U.S. at 556)." *id*

## II   Settlement Release does not Apply

Defendant misrepresents the release as "broad" and "extremely broad", when the plain language only releases claims "specifically related J.W.'s education, services, and educational program" (emphasis mine). The conjunctive "and" means all three must be present which the School Board did not and can not allege.

The release only covers claims that accrued on or before March 15, 2022.

### Count I, II: Fair Housing

These counts are *generally* challenging the assignment of *all* students in *south tampa*, and is thus not "specifically related J.W.'s education, services, and educational program". J.W. is not referenced at all in these counts.

Mr. Warner could bring the exact same claims even if J.W. did not exist, because the claim is not predicated on J.W. at all, but rather the assignment of *all* students in *south tampa* and how those assignments affected property values. Even a childless person could bring the *exact* same claims.

Additionally, the claim did not accrue until Mr. Warner purchased a home in October 2022, well after the date of release.

### Count III, VI: EEOA and School Choice

Defendant raises the nonsensical argument that nothing has changed between the settlement release date and present with regards to the schools assigned to his home, therefore it is released. This argument fails because Mr. Warner and J.W. never resided in *north tampa* during any time periods covered by the release, so it is impossible for the release to cover claims related to J.W.'s assignment to *north*

*tampa* schools.  SAC ¶ 113, 114.  Additionally, the challenged Carrollwood K-8 school boundary was created on May 9, 2023—more than a year after the release date. SAC ¶ 56.

## Count IV: 2000d: Disparate Treatment

This claim alleges that Mr. Warner was denied the benefits of and/or be subjected to discrimination under any program.  To the extent that the release might apply specifically to (or derrived from) J.W., many of the events occurred after the date of release.  For example the Carrollwood K-8 assignment and school choice application accrued after the date of release.

## Count VII: District Voting Map Gerrymandering

The equal protections clause challenge to the District Map is not "specifically related to J.W.'s education".  Every voter in Hillsborough County can vote for School Board members, regardless if they have children attending public school or not, and the claim is derived from Mr. Warner's right to vote, not J.W.'s.  In any event, voting is not related to education *at all*.

## Count VIII, IX

The release does not apply to these counts for the same reasons Counts I - IV do not apply.

## 1.  Release is Unenforceable

In addition to being knowingly and voluntarily signed, a valid agreement also must: (1) offer some sort of consideration in exchange for the waiver of the right to sue; (2) not require the party to waive future rights; and (3) comply with applicable state and federal laws.

### A.   CIVIL RIGHTS WAIVER WAS NOT KNOWINGLY, VOLUNTARILY, AND INTELLIGENTLY MADE

Waiver of civil rights claims are closely scrutinized. *Morey v. McDonald*, CASE NO.: 8:16-cv-3232-T-23AEP, at *6 (M.D. Fla. June 29, 2017) ("The waiver of a Title VII claim is closely scrutinized, and in determining whether a waiver is "knowingly" and "voluntarily" signed, the "totality of the circumstances" are examined. *Puentes v. United Parcel Service, Inc.*, 86 F.3d 196, 198 (11th Cir. 1996)."). Federal Employment discrimination, housing discrimination, and educational discrimination law are all like Clay County kissing cousins[1].

"In determining whether a release was knowingly and voluntarily entered, the factors that guide a court include: the plaintiff's education and business experience; the amount of time the plaintiff considered the agreement before signing it; the clarity of the agreement; the plaintiff's opportunity to consult with an attorney; the employer's encouragement or discouragement of consultation with an attorney; and the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled." Beadle v. City of Tampa, 42 F.3d 633, 635 (11th Cir. 1995)

The *Beadle* factors challenged here are the lack of consideration given to Mr. Warner in exchange for the release, and the lack of clarity of the agreement with regard to the scope of the release.

### B.   THE RELEASE LACKS CLARITY OF THE SCOPE

To the extent that the Court finds that the claims are covered by the release, the release is unenforceable because the scope of the release was not clear and unambiguous to Mr. Warner. The words "specifically related to J.W.'s education..." would be superfluous and meaningless if the court extends that to practically any claim against the School Board by virtue that they always have some connection to J.W.'s education.

---

[1] The Supreme Court and several lower courts have relied on Title VII precedents to interpret Title VIII. *see DiCenso v. H.U.D.*, 96 F.2d 1004, 1008-09 (7th Cir. 1996); *Huntington Branch of the N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.), aff'd per curiam, 488 U.S. 15 (1988); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 128889 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978);

The release itself gives examples of the types of claims that the parties expected to be released: "all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services". These are all claims or relief associated with I.D.E.A. and Section 504 litigation which is what the underlying litigation was about. Nothing in the agreement either expresses or implies that the release went beyond I.D.E.A. and Section 504 claims, much less to housing discrimination claims, voting map challenges, and racial discrimination challenges to school assignment maps.

The nonsensical interpretation of the release that Defendant is asking this court to adopt would also preclude Mr. Warner from bringing a premise liability claim against the school board if he had a slip-and-fall at J.W.'s school. It would render the words "specifically related to J.W.'s education" meaningless.

The original draft release prepared by the School Board did contain a broad release for both Mr. Warner and J.W., however Mr. Warner refused to sign it and indicated to the School Board that he was unwilling to release any of his claims, and was only willing to release disability claims related specifically to J.W.'s education. In response, the School Board amended the release to include the phrase "specifically related J.W.'s education, services, and educational program" and then specifically listed out a series of educational disability related claims that the parties intended to release. Discovery is required to flush out the facts related to this, as such release cannot be applied at the 12(b) stage, however the Court is free to rule it does *not apply* based on other arguments presented.

## C.   No consideration given to Mr. Warner

All consideration in the agreement was given to Mr. Warner's child, J.W., therefore the release is only enforceable on J.W., *not* Mr. Warner as there is no valid contract with Mr. Warner.

# III   Plaintiff's Second Amended Complaint does not violate the Court's Order

Mr. Warner interprets the Court's order to forbid him from doing the following *pro se*: a) directly representing the child; b) asserting *jus tertii* standing; and c) bringing any of the child's claims as a natural or plenary guardian.

Mr. Warner does not interpret the order from preventing him from raising any claims that are independently his own, regardless if they implicate the rights of his child. To that end, Fla. Stat. § 1014.04 "The Parental Bill of Rights" gives Mr. Warner the independent right to direct the education of his minor child, and the right to apply to enroll his minor child in a public school. Additionally, Mr. Warner has a fundamental right under the Fourteenth Amendment to make decisions concerning the care, custody, education, and control of his child. *see Troxel v. Granville* (2000).

## 1.   Count VI: Due Process

The due process school choice claim (SAC Count VI) fits squarely within these rights given to Mr. Warner.

## 2.   Count III: EEOA

The relevant EEOA provisions read together (emphasis mine):

"An *individual* denied an equal educational opportunity, as defined by this subchapter may institute a civil action" § 1706

"No State shall deny equal educational opportunity to an *individual* on account of his or her race ... by—" § 1703

"the assignment ... of a *student* to a school, other than the one closest to his or her place of residence ..." § 1703(c)

The *individual* is not the same person as *student*. The articles *an* and *a* are indefinite articles which indicates that the identities are not known to the reader. When indefinite articles are used in repetition, they do not refer to the same person.

If the legislature intended for both nouns ("individual" and "student") to refer to the same purpose, they would have omitted the second article:

> "No State shall deny equal educational opportunity to *an* individual on account of his or her race ... by the assignment ... to a school, other than the one closest to his or her place of residence ..."

or added the definite article *the*:

> "No State shall deny equal educational opportunity to *an* individual on account of his or her race ... by the assignment ... of *the* student to a school, other than the one closest to his or her place of residence ..."

To the extent that there is any ambiguity here, it has long been a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Liberally construing statutory standing here would clearly effectuate the purpose of the EEOA: to eliminate segregation in the public school system.

What practically limits who can bring a 1703(c) claim is Article III standing. Mr. Warner suffered a particularized injury by this assignment in the form diminution of property values, increased transportation costs, and loss of community.

With regards to the "educational opportunity" that Mr. Warner was denied, as argued below, Mr. Warner has a clearly established right under federal and state law to enroll his child in a public school. Unlawfully assigning his child to a different school denies him that educational opportunity.

# IV   THE FAIR HOUSING ACT APPLIES TO THE SCHOOL BOARD'S ALLEGED ACTIONS.

## 1.   PROXIMATE CAUSE

"The proximate-cause inquiry is not easy to define, and over the years it has taken various forms; but courts have a great deal of experience applying it, and there is a wealth of precedent for them to draw upon in doing so. *see Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 838-839, 116 S. Ct. 1813, 135 L. Ed. 2d 113 (1996); *Pac. Operators Offshore, LLP v. Valladolid*, 565 U.S. 207,

224-225, 132 S. Ct. 680, 181 L. Ed. 2d 675, 691 (2012) (Scalia, J., concurring in part and concurring in judgment). Proximate-cause analysis is controlled by the nature of the statutory cause of action. The question it presents is whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits.

Put differently, the proximate-cause requirement generally bars suits for alleged harm that is 'too remote' from the defendant's unlawful conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118*, 133 (2014)

## 2. HISTORY

### *City of Miami v. Bank of Am. Corp.*, NO. 1:13-CV-24506-WPD (S.D. FLA. 2013)

On December 13, 2013, the City of Miami brought a complex Fair Housing Act action against Bank of America alleging violations of 42 U.S.C. § 3604(b) and § 3605(a) by engaging in discriminatory mortgage lending practices that resulted in a disproportionate and excessive number of foreclosures in minority neighborhoods, causing the city—inter alia—to suffer financial loss in the form of decreased tax revenue from depreciated property values.

The trial court dismissed the action stating that the City had failed to demonstrate proximate cause between the Bank's unlawful conduct and the injuries suffered by the City.

### *City of Miami v. Bank of Am. Corp.*, 800 F.3D 1262 (11TH CIR. 2015)

The City appealed, and the Eleventh Circuit reversed holding that proximate cause had been met with the foreseeability test.

### *Bank of Am. Corp. v. City of Miami*, 137 S. CT. 1296 (2017)

The Bank appealed to the Supreme Court, which then reversed the Eleventh Circuit holding that foreseeability alone does not satisfy the proximate cause element of a FHA claim. and imposed the more stringent "direct relation standard" which necessitates a direct relationship between the injurious conduct and alleged harm. While the Court declined to outline the precise boundaries

of that standard, it did offer some guidance:

1. foreseeability *alone* will not satisfy the proximate cause element;

2. the proximate cause theory does not generally find liability "beyond the first step" of a causal chain;

3. the two considerations for expanding proximate causation beyond the first step are:

   (a) the nature of the statutory action; and

   (b) the statute's policy goals; and

   (c) the consideration of what is "administratively possible and convenient."

4. that proximate cause turns on "whether the harm alleged has a sufficiently close connection to the conduct the statute prohibits".

5. the Court cited three cases in emphasizing the principle of "directness" over "foreseeability": *Holmes v. Securities Investor Protection Corporation, 503 U.S. 258, 112 S. Ct. 1311*, 117 L. Ed. 2d 532 (1992)., *Anza v. Ideal Steel Supply Corp., 547 U.S. 451, 126 S. Ct. 1991*, 164 L. Ed. 2d 720 (2006). and *Hemi Group, LLC v. City of New York, NY, 559 U.S. 1, 130 S. Ct. 983*, 175 L. Ed. 2d 943 (2010). abc.

### *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019)

On remand from the Supreme Court, the Eleventh Circuit *again* found proximate-cause for the city by going beyond the "first step" (opinion vacated as moot after the parties settled).

"It is clear, though, that proximate cause does not always cut off at the first step after a violative act. A general tendency is not the same as a hard and fast rule that dictates the outcome in every case ..." *Id*

"If, in fact, there were a hard and fast 'only the first step' rule limiting liability, a plaintiff homeowner who was forced into foreclosure on account of a predatory bank loan that violated the Fair Housing Act would never be able to plausibly allege that the foreclosure was proximately caused by the bank's predation" *Id*

"the FHA has a broad remedial purpose, is written in decidedly far-reaching terms, and is perfectly capable of accommodating the type of aggregative causal connection that the City has identified between the Banks' alleged misconduct and financial harm to Miami." *Id*

"Most obviously, the '[t]he language of the [FHA] is broad and inclusive.' Trafficante v. Metro. Life Ins. Co., 409 U.S. 205, 209, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972). It provides for suit by "an aggrieved person," 42 U.S.C. § 3613(a)(1)(A), (c)(1), expansively defined as 'any person who claims to have been injured by a discriminatory housing practice,' § 3602(i)" *Id*

### 3.  THE FIRST STEP

It is well established in the antitrust context that the "first step" are the direct buyers. *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Plaintiff is undisputably the direct home buyer as he purchased a home in October 2022, and he alleges that he was priced out of *south tampa* regarding that home purchase. SAC ¶ 113, 114.

Even if this court finds that the causal chain goes beyond the first step, the Eleventh Circuit on remand from *Miami* none-the-less went beyond the first step again in *City of Miami v. Wells Fargo*, 923 F.3d 1260 (opinion was vacated as moot after the parties settled) as argued above.

The causal chain in *Miami* looked like this:

1. the bank engaged in discriminatory lending practices;

2. the lending practices triggered higher default rates;

3. the default rates caused higher foreclosure rates;

4. the foreclosure rates led to a decrease in property values; and

5. this harmed the City because it ultimately led to less property tax revenue.

The causal chain in the instant action is significantly shorter:

1. the School Board engaged in discriminatory school assignment practices;

2. the assignments lead to an increase in property values in white neighborhoods;

3. Plaintiff was harmed by being priced out of those white neighborhoods.

The causal chain in *Miami* was longer and more attenuated than the instant case, and the Eleventh Circuit *still* found proximate cause, therefore it is almost certain they would find proximate-cause in this instant action.

### 4. HOLMES FACTORS

The *Holmes Factors*[2] weigh heavily in favor of Plaintiff:

#### A. THE ABILITY TO DISTINGUISH THE DAMAGES ATTRIBUTABLE TO THE VIOLATION, AS DISTINCT FROM OTHER, INDEPENDENT, FACTORS

This action is seeking both equitable relief and damages. To the extent that we need to quantify the degree of pricing manipulation, that is possible using statistical analysis of the sales prices of homes and the schools they are assigned to. The results can be controlled to exclude external factors affecting property values by closely studying the sales prices of homes that flip from one school to another, as well as expert testimony from property appraisers and other real estate professionals.

The Eleventh Circuit has held that damages relates related to property values are able to be handled by the courts. City of Miami v. Wells Fargo & Co., 923 F.3d 1260, 1281 (11th Cir. 2019) ("In no small part, we conclude that the City has adequately—that is to say, plausibly—pled proximate cause because we find it entirely practicable and not unduly inconvenient for the courts to handle damages like the City's tax revenue injury.")

#### B. THE RISK OF MULTIPLE RECOVERIES; AND

To the extent that this action seeks equitable relief, multiple recoveries are not possible. The damages sought are in relation to harms suffered directly to Mr.

---

[2] *see Holmes v. Securities Investor Protection Corporation*, 117 L. Ed. 2d 532

Warner regarding his real-estate transactions, no one else would have standing to assert those exact injuries.

## C. WHETHER MORE DIRECT PLAINTIFFS COULD BE COUNTED ON TO VINDICATE THE LAW AS PRIVATE ATTORNEYS GENERAL.

Plaintiff was an African-American prospective home-buyer who did in-fact purchase a Home in October 2022. As far as the FHA goes, you cannot get more direct than that.

## 5. FORESEEABILITY

It is common knowledge by prospective home-buyers and renters alike that the value of a property is significantly linked to the schools that are assigned to it because people are willing to pay a significant premium to get into elite public schools. SAC ¶ 94-109. And people without children pay the premium because the higher property values that the young families pay, increases the price of nearby properties through comps which creates barriers to minorities to enter that neighborhood. In sum, young families pay the price premium to get their children into elite schools and people without children pay the premium to live in a segregated neighborhood: one hand jerks off the other.

The Hillsborough County Public Schools superintendent proudly admits to knowing that they are manipulating property values in these affluent areas:

> "We moved the school district from number 35 in the state to number 19th. We reduced the number of historical "D" and "F" schools in this school district. The number of "D" and "F" schools we reduced the number of persisting and low performing schools. we increased the percentage of A, B, and C schools. And what that does is, that increases property values. The more we continue to address our high quality education within within every-one of our schools" [3]

Multiple news reports link school assignments to property values:

_____
[3] *see* SAC Exhibit F https://www.wfla.com/news/hillsborough-county/hillsborough-county-schools-superintendent-to-present-re-zoning-recommendation-to-school-board/

"That's why I bought my house in this area, for the [A-rated] schools," Elena Ivani said, a parent whose sons will now attend a C-rated high school under the plan ... Ivani said when she and her husband were house hunting eight years ago, they were only looking at A-rated public school districts ... I'm hoping my home's value at least stays level, but in all honesty, would you pay a premium for a C-rated school?" [4]

"Tampa realtor Amy Greenfield said home values are higher in neighborhoods assigned to better schools, and people will pay more to be in an area with 'A' rated schools." [5]

"Parents have started multiple petitions against the redistricting plan, citing concerns over the school choices, emotional impact on children and property value." [6]

## 6.  RELAXED PROXIMATE CAUSE

The Supreme Court imposed a more stringent *direct relation* standard in *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296 for FHA proximate cause pleadings only for *damages*. All of their language around the matter surrounded *damages*. Nothing in the opinion expressed or implied that actions for equitable relief should be held to the higher standard. Concerns about multiple recoveries and calculating damages simply are not applicable to equitable claims. And jettisoning these more stringent requirements for equitable relief would further the statutory intent of the FHA to desegregate housing.

Thus this instant action should be held to the less stringent Foreseeability standard that the Eleventh Circuit originally applied to FHA actions.

## 7.  MAKING HOUSING UNAVAILABLE § 3604(A)

The Eleventh Circuit has affirmed liability under § 3604(a) for merely "affecting the availability" of housing. The manipulation of property values clearly af-

---

[4] *see* SAC Exhibit K https://www.wtsp.com/article/news/local/hillsboroughcounty/hillsborough-county-schools-redistricting-plan-property-values/67-979bab7e-012f-437e-8530-26a69ae58958

[5] https://www.baynews9.com/fl/tampa/news/2023/01/06/hillsborough-proposed-school-boundary-changes-impact-on-property-value

[6] https://www.fox13news.com/news/hillsborough-county-parents-start-petitions-against-proposed-new-school-boundaries

fects the availability of housing when it causes housing segregation:

> "The complaint in this case adequately states a cause of action under § 3604(a), since this suit alleges race-based discrimination affecting the "availability" of housing within Hillsborough County. The Fair Housing Act is concerned with both the furtherance of equal housing opportunity and the elimination of segregated housing." *Jackson v. Okaloosa County, 21 F.3d 1531*, 1542 (11th Cir. 1994)

## 8. The "provision of services" prong of § 3604(b) applies to the School Board

As outlined below in section § 100.65(a) "Discrimination in Terms, Conditions, Privileges, Services, and Facilities", HUD's interpretation of § 3604(b) does not require that the tortfeasor be directly involved in the real-estate transaction. HUD gives several examples of liability that do not involve direct involvement in the real-estate transaction: § 100.65(b)(2), (4), (5), (6), and (7). All of those examples, given their plain meaning, could apply to post-sale conduct as well.

## 9. 24 C.F.R. § 100 Imparts Liability to the School Board

### A. Chevron's Deference

The applicable U.S. Department of Housing and Urban Development ("HUD") rules and interpretations of 42 U.S.C. 3601 et seq—codified in 24 C.F.R. § 100—are binding on this court through a *Chevron*'s deference. *see Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837 (1984). If the statute is ambiguous or silent on an issue, then a federal court must defer to an agency's interpretation of a statute so long as it is "permissible".

### § 100.7(a)(1) "Liability"

§ 100.7(a)(1)(i) imparts direct liability under the FHA for a "person's own conduct that results in a discriminatory housing practice". It does not state

that the person must be directly involved in a real-estate transaction, only that their conduct resulted in a discriminatory housing practice. As a practical matter, the *proximate cause* element limits how far the ripple can flow from the alleged conduct and the discriminatory housing practice.

§ 100.7(a)(1)(ii) imparts direct liability under the FHA for "failing to take prompt action to correct and end a discriminatory housing practice by a third-party". At the very least, Defendant is aware that it's school boundary assignment maps are used by third parties (such as white home buyers) to perpetuate housing segregation. Defendant has, and always had, the power to fix their school boundary maps to fix this issue, yet has refused to do so.

### § 100.65(a) "Discrimination in Terms, Conditions, Privileges, Services, and Facilities"

Section A of this rule states:

"It shall be unlawful, because of race ... to impose different terms, conditions or privileges relating to the sale or rental of a dwelling or to deny or limit services or facilities in connection with the sale or rental of a dwelling." 24 C.F.R. § 100.65(a)

Defendant misrepresents Plaintiff's position and the rule by focusing on "in connection with the sale or rental of a dwelling". The rule is actually two disjunctive clauses:

1. to impose different terms, conditions or privileges relating to the sale or rental of a dwelling; or

2. to deny or limit services or facilities in connection with the sale or rental of a dwelling.

The first clause applies because the school assigned to a property is a "term, condition, or privilege" related to the sale or rental of a dwelling. As the SAC alleges, the assigned school is one of the most important factors a prospective buyer considers when making real-estate purchasing decisions.

16

Likewise, second applies because the assigned schools are services or facilities connected to the sale or rental of a dwelling.

HUD gives the following example of what falls under this rule:

"Limiting the use of privileges, services or facilities associated with a dwelling because of race ... of an owner, tenant or a person associated with him or her." 24 C.F.R. § 100.65(b)(4)

*All* public schools in Hillsborough County are associated with a dwelling because the property taxes levied directly upon that dwelling are used to directly fund the schools, and are often paid at the closing of the real-estate transaction and through escrow accounts associated with those same transactions. The School Board unlawfully denies minority neighborhoods access to closer white schools through the promulgated school boundary assignment maps that prevent children in those minority neighborhoods from enrolling at the white schools.

### § 100.70(a) "Restrict Housing"

Section A of this rule states:

"It shall be unlawful, because of race ... to **RESTRICT OR ATTEMPT TO RESTRICT THE CHOICES OF A PERSON** by word or conduct in connection with seeking, negotiating for, buying or renting a dwelling so as **TO PERPETUATE, OR TEND TO PERPETUATE, SEGREGATED HOUSING PATTERNS,** or to discourage or obstruct choices in a community, neighborhood or development." (emphasis mine)" 24 C.F.R. § 100.70(a)

This binding HUD interpretation is unambiguous: you do not have to be directly involved in real-estate transactions—as Defendant would like this Court to believe—to be liable under the FHA.

This section is on-point because the SAC accuses the School Board of perpetuating segregated housing patterns through it's exercise of discretion in promulgating school boundary assignment maps.

The examples HUD gives remove any doubt that § 100.70(a) applies to the School Board:

"Discouraging any person from ... purchasing or renting a dwelling because of race ... or because of the race ... of persons in a community, neighborhood or development." § 100.70(c)(1)

The SAC alleges that Defendant prices out minorities from white neighborhoods by unlawfully raising the property values in those neighborhoods. Raising the cost of specific homes would tend to discourage minorities from purchasing homes in those areas.

"Assigning any person to a particular section of a community, neighborhood or development, or to a particular floor of a building, because of race." § 100.70(c)(4)

Individual schools are a section of the community, and the SAC alleges that Defendant assigns students to them based on race.

### § 100.70(b) "Discriminate in Services"

Section B of this rule states:

"It shall be unlawful, because of race ... to engage in any conduct relating to the provision of housing or of services and facilities in connection therewith that otherwise makes unavailable or denies dwellings to persons." 24 C.F.R. § 100.70(b)

The examples HUD gives remove any doubt that § 100.70(b) applies to the School Board:

"Refusing to provide municipal services or property or hazard insurance for dwellings or providing such services or insurance differently because of race ..." § 100.70(d)(4)

Schools are municipal services. By segregating students in minority neighborhoods, the school board is denying them access to municipal services that are provided to students in white neighborhoods.

"Enacting or implementing land-use rules, ordinances, procedures, building codes, permitting rules, policies, or requirements that restrict or deny housing opportunities or otherwise make unavailable or deny dwellings to persons because of race ..." § 100.70(d)(5)

Defendant's School boundary assignment maps are ordinances, procedures, policies, and/or implementations of address requirements that restrict or deny housing opportunities (or otherwise make unavailable) to minorities by unlawfully manipulating the property values in white neighborhoods to the point where significantly fewer minorities can afford to purchase or lease property in those neighborhoods.

## 10. DISTINGUISH

### A. GOURLAY V. FOREST LAKE ESTATES CIVIC ASSOCIATION, NO. 8:02-CV-1955-T-30TGW (M.D. FLA. 2003)

This case arose from a dispute between a homeowner and their Home Owners Association ("HOA") alleging adverse discriminatory actions taken by the HOA against the homeowner because they had taken in foster children *after* the sale of the house. The instant action alleges discriminatory actions that occur and affect housing transactions *before* the sale.

There are generally two ways to be priced out of a neighborhood: a) through the initial cost of the home and b) through the manipulation of post-sale non-fixed costs such as property taxes and insurance. The first part, the initial cost of the home, implicates the actual sale of dwellings which places it outside of the purview of *Gourlay*. In addition, *Gourlay* was only concerned with one small provision of the FHA, whereas the instant action invokes parts of the FHA that *Gourlay* did not decide.

### B. ROY V. BOARD OF COUNTY COM'RS WALTON COUNTY, FLA., NO. 3:06-CV-95, 2007 WL 3345352 (N.D. FLA. NOV. 9, 2007)

This case arose from a dispute where a property owner alleged that the government denied his zoning permit to construct a wall for discriminatory reasons. The property owners' tenuous FHA theory was couched on their intention "to market their properties substantially, but not exclusively, to African-

Americans and thus the defendants' obstruction has a harsher impact on African-Americans than whites." and he was trying to shoe horn his permit denial into a FHA claim. Defendant cited this case in support of it's proposition that "provision of services" ... "must relate to the sale of a dwelling, and **NOT JUST OWNERSHIP OF THE DWELLING.**" (emphasis mine). This is distinguished from the instant action because the SAC does not allege that prices were manipulated on owned properties by existing property owners, rather it alleges the price manipulation of properties that are for sale creating barriers to entry for minorities to purchase homes in white neighborhoods. In any event, the allegations in the SAC do relate to the sale of dwellings. Plaintiff also plead "tester" standing which falls outside of the scope of *Roy*.

## V   PLAINTIFF PLEAD A CLAIM UNDER THE EEOA

Defendant argues that the EEOA claim must fail because "Plaintiffs' own complaint admits they would not be sorted based on race ... but rather by 'home address' and by the existing boundaries."[7], however the complaint pleads that assigning by address is pretext for racial discrimination. It is a moot point in any event, as intent is not required to be plead under § 1703(c) as it is a disparate impact cause of action. Put simply, Plaintiff does not need to allege or prove de-jure segregation or intent to sustain a § 1703(c) claim, only that he was assigned to a further away school that resulted in a greater degree of racial segregation which the SAC pleads.

The School Board maintains that 1704(c) is only actionable if students are "wholly or substantially separated . . . on the basis of race, color, sex, or national origin". *U.S. v. Hinds County School Board* 560 F.2d 619 (5th Cir. 1977). Assuming this is true, the SAC plead that Carrollwood K-8 is 41.78% white, and bordering Adams Middle School is 7.05% white. SAC ¶ 189, 191. A 592% increase in black assignment to bordering Adams Middle School is "substantial" by any measure. The further SAC further

---

[7]unsurprisingly without citation.

plead that this disparity was caused by gerrymandering the assignment boundary by assigning students to further away schools.

### PLAINTIFF DOES NOT NEED TO ALLEGE THAT HIS ASSIGNED SCHOOL WAS CHANGED

Defendant asserts (without citation) that "Plaintiffs do not allege there have been material changes to the assignment for their residence, which is the predicate for their claim". The EEOA does not state that a student must be *re-assigned* to a further away school, only *the assignment of a student to a school other than the one closest to his or her place of residence*. The claim is that once Carrollwood K-8 was created, Plaintiff was no longer assigned to the closest school. Accepting Defendant's completely unsupported position would lead to the absurd result of school boards being allowed to open new schools and then only assign students in predominantly white neighborhoods to them[8].

Defendant cites no authority for the notion that the School Board is immune from EEOA claims once the school system has been declared unitary in an unrelated action (*Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cty., Fla.*, 244 F.3d 927 (11th Cir. 2001)) if the school assignment boundaries are not materially changed. Assuming the School Board is trying to invoke § 1707, that is an affirmative defense that they must plead and prove, not an element of a § 1703(c) claim. Such an argument would be frivolous given the breadth of the boundary changes the School Board promulgated this year (let alone the last twenty years).

## VI   PLAINTIFF CAN USE § 1983 TO ENFORCE STATE-CREATED AND FEDERAL RIGHTS

As a preliminary matter, Defendant's arguments fail to distinguish the difference between a procedural due process challenges and substantive. And they misstate the

---

[8]Which is funny enough, what they are doing with Carrollwood K-8.

entire purpose of the claim by focusing excessively on the hardship process, and ignoring the main point of the claim:  That Mr. Warner has a federal and state-created right to *apply* for J.W. to attend Carrollwood K-8, not that he has a right to attend that school (at least at this juncture in the litigation).  Whether the school is over-capacity (projected or otherwise) is immaterial, Mr. Warner has the right to apply, be denied, and then placed on a waiting list.

## 1.  DUE PROCESS STANDARDS

"The Due Process Clause offers two different kinds of constitutional protection: procedural due process and substantive due process, and a violation of either may form the basis for a suit under § 1983. McKinney v. Pate, 20 F.3d 1550, 1555-56 (11th Cir. 1994) ( en banc)." Slakman v. Buckner, 434 F. App'x 872, 875 (11th Cir. 2011)

"'[T]he Due Process Clause was intended to prevent government officials from abusing their power, or employing it as an instrument of oppression.' County of Sacramento v. Lewis, 523 U.S. 833, 846, 118 S.Ct. 1708, 1716, 140 L.Ed.2d 1043 (1998) (internal quotations and citations omitted)." *Davis v. Carter, 555 F.3d 979*, 981 (11th Cir. 2009)

### A.  SUBSTANTIVE

"The substantive component of the Due Process Clause "protects individual liberty against 'certain government actions regardless of the fairness of the procedures used to implement them."' Collins v. City of Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 1068, 117 L.Ed.2d 261 (1992) (quoting Daniels v. Williams, 474 U.S. 327, 331, 106 S.Ct. 662, 665, 88 L.Ed.2d 662 (1986))." Davis v. Carter, 555 F.3d 979, 981-82 (11th Cir. 2009)

### B.  PROCEDURAL

"'A § 1983 action alleging a procedural due process clause violation requires proof of three elements: a deprivation of a constitutionally-protected liberty or property interest; state action; and constitutionally inadequate process.' Zisser v. Fla. Bar, 747 F.Supp.2d 1303, 1317 (M.D. Fla. 2010) (citing Cryder v. Oxendine, 24 F.3d 175, 177 (11th Cir. 1994))." *Anthony v. City of Naples, & 7-Eleven, Inc., Case No: 2:16-cv-543-FtM-99MRM*, at *10 (M.D. Fla. Dec. 1, 2016)

### C.   RIGHTS

The *Amended Complaint* alleges the existence of both a federal and state-created educational rights:

### D.   FEDERAL RIGHTS

"The liberty interest at issue in this case — the interest of parents in the care, custody, and control of their children — is perhaps the oldest of the fundamental liberty interests recognized by this Court. More than 75 years ago, in Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923), we held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.' Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925), we again held that the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.'" *Troxel v. Granville, 530 U.S. 57*, 65 (2000)

### E.   STATE RIGHTS

"Rights created by state law (e.g., tort and employment law) are protected by procedural ... due process" *DeKalb Stone, Inc. v. County of DeKalb, 106 F.3d 956*, 960 (11th Cir. 1997) (quoting McKinney v. Pate, 20 F.3d 1550 (11th Cir. 1994)

"We recently reiterated this logic in the context of state education rights. C.B. ex rel. Breeding v. Driscoll, 82 F.3d 383 (11th Cir. 1996). In accordance with school board policy and procedures, several students were suspended after telephone conferences with parents. Id. at 385-87. The Court held that because the decision to suspend a student is an executive act, any deprivation of the state-created right to attend school is protected only by the guarantee of procedural due process. Id." *Id*

## 2.   ARGUMENT

To be clear, the procedural and substantive due process claim in the SAC alleges that Defendant denied Plaintiff the right to *apply* for school choice by making the application process unavailable. SAC ¶ 203 - 218. The mere act of applying for a school fits squarely within the federally protected "right to direct the ... education of children". *see supra* 1. C. D..

Additionally, the state-created rights cited in the SAC are protect-able by procedural due process. *see supra* 1. C. E..

### 3.   Misrepresentations and Distinguishments

#### A.   Section 1014.04

Defendant misrepresented Fla. Stat. 1014.04(1)(c) by stating "Section 1014.04 outlines general parental rights (including rights unrelated to education), and does not state anything about school choice." yet the statute states that parents have "The right, pursuant to s. 1002.20(2)(b) and (6), to apply to enroll his or her minor child in a public school", yet the referenced Fla. Stat. 1002.20(6) is explicitly about school choice. *Plaintiff* explicitly referenced it in the *Amended Complaint* ¶ 16(b), 33, and 45. Yet Defendant intentionally misrepresented the statute to this Court when it omitted references to 1002.20 in it's summary then stated that the statute did "not state anything about school choice" when it clearly does by reference.

Defendant then states that "parents may seek school choice, but there is nothing under [Fla. Stat. § 1002.20(6)] obligating schools to accept those children." but this contention misses the point of the procedural due process claim: that Defendant made the application process unavailable to *Plaintiff*, and that he has the *right* to *apply*. To whatever extent that the school is at capacity is purely academic at this point because Defendant has not actually denied *Plaintiff* citing overcapacity. Even if the school is over capacity, *Plaintiff* still has the right to apply and to be put on a waiting list. *see* Fla. Stat. 1002.31(3)(j).

Again, academic until Defendant actually accepts an application from *Plaintiff* and then denies him citing over-capacity, however Defendant argues that the *Amended Complaint* concedes that the school has a capacity issue citing ¶ 18. However Defendant omits ¶ 19 - 21 which a) clarify that the numbers cited are for the 2025-2026 school year and that there is capacity available for the 2023-2024 and 2024-2025 school years. Furthermore, the attached Exhibit E (which is more recent and what the school board actually approved) states that

the proposed utilization rate for 2025-2026 school year is 99% indicating that there is capacity available.

**B.   *Stevenson v. Blytheville Sch. Dist. #5, 800 F.3d 955*,  969 (8TH CIR. 2015)**

Defendant misrepresented the holding in *Id* by stating "the Stevenson court rejected the proposition that a general state school choice law created a property interest enforceable through the constitution". What *Id* really held was that an *Arkansas* state school choice law that gave school boards discretion to exempt themselves from the school choice law did not convey a protect-able property interest to the parents, which is correct: it is not a right if the government has discretion to deny it to you.

The *Florida* law at issue is a *non-discretionary* open enrollment statute and the "Parental Bill of rights", both of which create enforceable rights.

"In summary, although the 2013 Act prohibited nonresident school districts from considering certain characteristics of an applicant, it still invested the nonresident school district with the discretion to decide whether to accept a student seeking transfer. Cf. Horton v. City of Smithville, 117 Fed.Appx. 345, 347–48 (5th Cir.2004) ('[D]iscretionary statutes do not give rise to constitutionally-protected property interests.' (footnote omitted))" *Id*

"'In reviewing whether the appellants have a protected property interest, we must examine what the 2013 Act provides to the appellants. And, by its plain language, what it provides to them is the possibility of transfer to another district, not a guarantee or absolute right to transfer.'" *Id*

**C.   *Anderson v. Hillsborough Cty. Sch. Bd., 390 F. App'x 902*,  903 (11TH CIR. 2010)**

Defendant misrepresented to this Court that "this court has never decided that a Florida student has a property or liberty interest in attending a particular high school." by quoting a 2010 Eleventh Circuit opinion which was written eleven years before the "Parental Bill of Rights" was enacted, and six years before Fla. Stat. 1002.31 was amended to switch Florida from a discretionary

open-enrollment school choice state to a non-discretionary open-enrollment
school choice state[9].

In any event, the opinion explicitly stated that it was not deciding the issue
that Defendant cited it for:

> "But this is not a case where we need decide this question ...  assume ar-
> guendo, therefore, that the due process clause of the Fourteenth Amend-
> ment applies to both Anderson's temporary suspension and the Boards's
> decision to place her in an alternative school" *id*

### D.   *Mazevski v. Horseheads Central School Dist.*, 950 F. Supp. 69 (W.D.N.Y. 1997).

This *New York* case is not about enforcing state-created rights or school choice
through the due process clause at all, rather *Id* held that there is no *federal* right
to participate in a high school marching band without any underlying state-law
right.

### E.   *United States Knight v. Jacobson, 300 F.3d 1272*,  1276 (11th Cir. 2002)

Defendant asserts that "Section 1983 applies to violations of 'the Constitution
and laws,' and that language refers to the Constitution and laws of the United
States Knight v.  Jacobson, 300 F.3d 1272, 1276 (11th Cir.  2002) (emphasis
added) ('Section 1983 does not create a remedy for every wrong committed
under the color of state law, but only for those that deprive a plaintiff of a fed-
eral right.').

The cited portion of *Knight* was a narrow Fourth Amendmentment false
arrest case which held that federal law, not state law, governs the validity of ar-
rests under the Fourth Amendment. The instant claim is Fourteenth Amend-
ment Procedural Due Process claim, not a Fourth Amendment False Arrest
claim.  The elements and relevant case law between the two types of claims

---

[9]*see*   https://www.tampabay.com/news/politics/stateroundup/gov-rick-scott-signs-school-choice-education-bill-19-others-into-law/2273265/

are wholly distinct: Fourth Amendment case law is completely inapplicable to Procedural Due Process claims.

### F. *Dean v. Escambia County Commissioners*, 3:05-cv-00029-LC (N.D. Fla. April 20, 2005)

Defendant additionally cites a *Northern* District Court opinion, *Id*, in which a *pro se* plaintiff collaterally challenged an unfavorable state court judgment regarding the height of his residential fence, by suing–inter alia–the special master acting in a judicial capacity who presided over the case and the neighbor who reported the city code violation at issue, in federal court. Unsurprisingly, the magistrate judge recommended dismissal under the Rooker-Feldman Doctrine. However only one of the cases cited in the quoted excerpt deal with *procedural due process* with regards to state-created rights (and it was denied on standing grounds):

1. Baker v. McCollan held state tort of negligence is not actionable through § 1983.

2. Knight v. Jacobson was about Fourth Mmendment false arrest.

3. J.H. ex rel. Higgin v. Johnson was a substantive due process claim based on the theory that the state failed to prevent the sexual assault of a child in their custody.

4. White v. Olig was another Fourth Amendment false arrest case.

5. Barry v. Fowler another Fourth Amendment false arrest case.

6. Street v. Surdyka another Fourth Amendment false arrest case.

7. Ouzts v. Maryland National Insurance Co appears to be another Fourth Amendment false arrest case.

8. Moore v. The Marketplace Restaurant, Inc false arrest/false imprisonment case.

9. Moore v. Kusper due process case, but court held plaintiff lacked standing due to lack of harm.

10. Clark v. Link was another Fourth Amendment false arrest case.

Not withstanding Knight v. Jacobson, none of these cases are binding on this court. And none of them were on-point. It appears to be a magistrate judge being a bit sloppy in throwing a bat-shit-crazy *pro se* plaintiff out of court.

# VII   STRICT SCRUTINY APPLIES TO THE EQUAL PROTECTIONS CLAIM

Defendant appears to be confused about the scope of the Equal Protections claim. The SAC Equal Protections Count VII is styled "42 U.S.C. § 1983: Equal Protections - District Map Gerrymandering", which specifies it is a challenge to the "District Voting Map" under the federal constitution because race was the predominant factor or motivation when drawing the map, *not* the "School Boundary Assignment Map", school choice, or any invocation of state law.

Defendant asserts that strict scrutiny does not apply because "Plaintiff does not cite to any lines drawn using explicit racial distinctions", however the SAC is replete with such citations to support that race was the predominant factor: *see* SAC ¶ 127 - 133. Then, out of all of those citations, Defendant proffers that the *real* predominant reason was to "keep[] the community togoether". But as the SAC alleges, this is simply pretext for race because as the board members state, these "commuities" they are trying to keep together are racially homogeneous: *see* SAC ¶ 128[10], 130[11]

# VIII   PLAINTIFF STATES A CLAIM UNDER THE FLORIDA CONSTITUTION

Defendant argues that Mr. Warner cannot state a claim under FLA. CONST. art. IX, § 1 because a) the claim is his child's and he cannot represent his child *pro se*; and b) does not it does not provide for a private cause of action.

---

[10]"SO MAP F ACTUALLY UNITES HILLSBOROUGH COUNTY'S HISPANIC COMMUNITY EVEN BETTER THAN THE CURRENT MAP"

[11]"I WANT TO KEEP THE HISPANIC COMMUNITY TOGETHER".

It is ironic that Defendant cites *Bush v. Holmes*, 919 So. 2d 392 (Fla. 2006) for the proposition that a private party cannot challenge the constitutionality of a state law under FLA. CONST. art. IX, § 1, because that exact case was about private party parents successfully challenging the constitutionality of a state law under FLA. CONST. art. IX, § 1:

> "Various parents of children in Florida elementary and secondary schools and several organizations (hereinafter collectively referred to as the plaintiffs) filed complaints in the circuit court challenging the constitutionality of the OSP under article I, section 3, article IX, section 1, and article IX, section 6 of the Florida Constitution" *Id*

> "Article IX, section 1(a) is a limitation on the Legislature's power because it provides both a mandate to provide for children's education and a restriction on the execution of that mandate." *Id*

> "Because we conclude that section 1002.38 violates article IX, section 1(a) of the Florida Constitution, we disapprove the First District's decision in Holmes I. We affirm the First District's decision finding section 1002.38 unconstitutional in Holmes II" *Id*

To accept Defendant's argument, this court would have to believe that the Florida Supreme Court issued an opinion on a matter of which it did not have jurisdiction.

## IX   CONCLUSION

While Defendant presents this action as "novel", represents that the sky would fall down if the Court finds liability, and generally airs grievances about the scope of the FHA, at it's core this case is really just another government discriminatory zoning case which is bread and butter for the FHA. This court need not try to limit the scope of the FHA, because the Supreme Court has already done that several times (most recently in *Miami*). That Court painstakingly deliberated on the guard rails for the FHA (as recently as *Miami*) and it is not for the Defendant or this court to second guess their judgment.

The fact is Plaintiff plead a prima facie case that Defendant is engaging in discriminatory zoning practices that are causing and/or perpetuating housing segregation in

Hillsborough County, and Plaintiff has standing to sue them for that. No amount of Defendant's bufuddling arguments will change that.

And this case is clearly one of public importance that invokes important civil rights which should be adjudicated on the merits, not dismissed on trivial procedural grounds or though the application of an ambiguous, unenforceable release that goes against public policy.

And lastly, it is apparent that Defendant's brief (and previous briefs) is raising multiple arguments that are completely unsupported in fact or law including misrepresenting cited case law. Such behavior are improper litigation tactics that frustrate the efficient administration of justice. Rule 11 is not an effective deterrent in this regard because the sanction—the awarding of attorney fees—is not available when the opposing party is *pro se*. It is my hope that the court puts the kibosh on this abusive litigation behavior or grants Plaintiff leave to add an eighth amendment claim.

For the foregoing reasons, the Court should deny Defendant's Motion to Dismiss.

7-31-2023

Date

Signature

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM