# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County Florida

Case Number 8:23-CV-181-SDM-JSS

## Plaintiff's Reply to Defendant's Response to Motion for Preliminary Injunction

    Mr. Warner did not amend the motion for preliminary injunction (the previous one was struck), and in any event Mr. Warner interpreted the order to mean do not file for an injunction on behalf of the child which is inline with the rest of the order.

    Plaintiff did not delay in filing for a preliminary injunction with regards to Count III, as he filed the motion the day after the School Board promulgated the school boundary change at issue. The motion was promptly refiled after the court denied it without prejudice it. The court did not need to lift the stay because it only applied to a specific motion in a different case.

# I  Settlement Release does not Apply

Defendant misrepresents the release as "broad" and "extremely broad", when the plain language only releases claims "specifically related J.W.'s education, services, **and** educational program" (emphasis mine). The conjunctive "and" means all three must be present which the School Board did not and can not allege. The release only covers claims that accrued on or before March 15, 2022.

Defendant raises the nonsensical argument that nothing has changed between the settlement release date and present with regards to the schools assigned to his home, therefore it is released. This argument fails because Mr. Warner and J.W. never resided in *north tampa* during any time periods covered by the release, so it is impossible for the release to cover claims related to J.W.'s assignment to *north tampa* schools. Additionally, the challenged Carrollwood K-8 school boundary was created on May 9, 2023—more than a year after the release date.

## 1.  Release is Unenforceable

In addition to being knowingly and voluntarily signed, a valid agreement also must: (1) offer some sort of consideration in exchange for the waiver of the right to sue; (2) not require the party to waive future rights; and (3) comply with applicable state and federal laws.

## 2.  Civil Rights Waiver was not knowingly, voluntarily, and intelligently made

Waiver of civil rights claims are closely scrutinized. *Morey v. McDonald*, CASE NO.: 8:16-cv-3232-T-23AEP, at *6 (M.D. Fla. June 29, 2017) ("The waiver of a Title VII claim is closely scrutinized, and in determining whether a waiver is "knowingly" and "voluntarily" signed, the "totality of the circumstances" are examined. *Puentes v. United Parcel Service, Inc.*, 86 F.3d 196, 198 (11th Cir. 1996).").

Federal Employment discrimination, housing discrimination, and educational discrimination law are all like Clay County kissing cousins[1].

> "In determining whether a release was knowingly and voluntarily entered, the factors that guide a court include: the plaintiff's education and business experience; the amount of time the plaintiff considered the agreement before signing it; the clarity of the agreement; the plaintiff's opportunity to consult with an attorney; the employer's encouragement or discouragement of consultation with an attorney; and the consideration given in exchange for the waiver when compared with the benefits to which the employee was already entitled." Beadle v. City of Tampa, 42 F.3d 633, 635 (11th Cir. 1995)

The *Beadle* factors challenged here are the lack of consideration given to Mr. Warner in exchange for the release, and the lack of clarity of the agreement with regard to the scope of the release.

### 3. THE RELEASE LACKS CLARITY OF THE SCOPE

To the extent that the Court finds that the claims are covered by the release, the release is unenforceable because the scope of the release was not clear and unambiguous to Mr. Warner. The words "specifically related to J.W.'s education..." would be superfluous and meaningless if the court extends that to practically any claim against the School Board by virtue that they always have some connection to J.W.'s education.

The release itself gives examples of the types of claims that the parties expected to be released: "all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services". These are all claims or relief associated with I.D.E.A. and Section 504 litigation which is what the underlying litigation was about. Nothing in the agreement either expresses or implies that the release went beyond I.D.E.A. and Section 504 claims, much less to housing dis-

---

[1] The Supreme Court and several lower courts have relied on Title VII precedents to interpret Title VIII. *see DiCenso v. H.U.D.*, 96 F.2d 1004, 1008-09 (7th Cir. 1996); *Huntington Branch of the N.A.A.C.P. v. Town of Huntington*, 844 F.2d 926, 935 (2d Cir.), aff'd per curiam, 488 U.S. 15 (1988); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 558 F.2d 1283, 128889 (7th Cir. 1977), cert. denied, 434 U.S. 1025 (1978);

crimination claims, voting map challenges, and racial discrimination challenges to school assignment maps.

The nonsensical interpretation of the release that Defendant is asking this court to adopt would also preclude Mr. Warner from bringing a premise liability claim against the school board if he had a slip-and-fall at J.W.'s school. It would render the words "specifically related to J.W.'s education" meaningless.

The original draft release prepared by the School Board did contain a broad release for both Mr. Warner and J.W., however Mr. Warner refused to sign it and indicated to the School Board that he was unwilling to release any of his claims, and was only willing to release disability claims related specifically to J.W.'s education. In response, the School Board amended the release to include the phrase "specifically related J.W.'s education, services, and educational program" and then specifically listed out a series of educational disability related claims that the parties intended to release. Discovery is required to flush out the facts related to this, as such release cannot be applied at the 12(b) stage, however the Court is free to rule it does *not apply* based on other arguments presented.

### 4. NO CONSIDERATION GIVEN TO MR. WARNER

All consideration in the agreement was given to Mr. Warner's child, J.W., therefore the release is only enforceable on J.W., *not* Mr. Warner as there is no valid contract with Mr. Warner.

## II PLAINTIFF'S SECOND AMENDED COMPLAINT DOES NOT VIOLATE THE COURT'S ORDER

Mr. Warner interprets the Court's order to forbid him from doing the following *pro se*: a) directly representing the child; b) asserting *jus tertii* standing; and c) bringing any of the child's claims as a natural or plenary guardian.

Mr. Warner does not interpret the order from preventing him from raising any

4

claims that are independently his own, regardless if they implicate the rights of his child. To that end, Fla. Stat. § 1014.04 "The Parental Bill of Rights" gives Mr. Warner the independent right to direct the education of his minor child, and the right to apply to enroll his minor child in a public school. Additionally, Mr. Warner has a fundamental right under the Fourteenth Amendment to make decisions concerning the care, custody, education, and control of his child. *see Troxel v. Granville* (2000).

The relevant EEOA provisions read together (emphasis mine):

> "An *individual* denied an equal educational opportunity, as defined by this subchapter may institute a civil action" § 1706

> "No State shall deny equal educational opportunity to an *individual* on account of his or her race ... by—" § 1703

> "the assignment ... of a *student* to a school, other than the one closest to his or her place of residence ..." § 1703(c)

The *individual* is not the same person as *student*. The articles *an* and *a* are indefinite articles which indicates that the identities are not known to the reader. When indefinite articles are used in repetition, they do not refer to the same person.

If the legislature intended for both nouns ("individual" and "student") to refer to the same purpose, they would have omitted the second article:

> "No State shall deny equal educational opportunity to *an* individual on account of his or her race ... by the assignment ... to a school, other than the one closest to his or her place of residence ..."

or added the definite article *the*:

> "No State shall deny equal educational opportunity to *an* individual on account of his or her race ... by the assignment ... of *the* student to a school, other than the one closest to his or her place of residence ..."

To the extent that there is any ambiguity here, it has long been a "familiar canon of statutory construction that remedial legislation should be construed broadly to effectuate its purposes." *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967). Liberally construing statutory standing here would clearly effectuate the purpose of the EEOA: to eliminate segregation in the public school system.

5

What practically limits who can bring a 1703(c) claim is Article III standing. Mr. Warner suffered a particularized injury by this assignment in the form diminution of property values, increased transportation costs, and loss of community.

With regards to the "educational opportunity" that Mr. Warner was denied, as argued below, Mr. Warner has a clearly established right under federal and state law to enroll his child in a public school. Unlawfully assigning his child to a different school denies him that educational opportunity.

## III  Plaintiff plead a claim under the EEOA

Defendant argues that the EEOA claim must fail because "Plaintiffs' own complaint admits they would not be sorted based on race ... but rather by 'home address' and by the existing boundaries."[2], however the complaint pleads that assigning by address is pretext for racial discrimination. It is a moot point in any event, as intent is not required to be plead under § 1703(c) as it is a disparate impact cause of action. Put simply, Plaintiff does not need to allege or prove de-jure segregation or intent to sustain a § 1703(c) claim, only that he was assigned to a further away school that resulted in a greater degree of racial segregation which the SAC pleads.

The School Board maintains that 1704(c) is only actionable if students are "wholly or substantially separated . . . on the basis of race, color, sex, or national origin". *U.S. v. Hinds County School Board* 560 F.2d 619 (5th Cir. 1977). Assuming this is true, the SAC plead that Carrollwood K-8 is 41.78% white, and bordering Adams Middle School is 7.05% white. SAC ¶ 189, 191. A 592% increase in black assignment to bordering Adams Middle School is "substantial" by any measure. The further SAC further plead that this disparity was caused by gerrymandering the assignment boundary by assigning students to further away schools.

---

[2]unsurprisingly without citation.

## PLAINTIFF DOES NOT NEED TO ALLEGE THAT HIS ASSIGNED SCHOOL WAS CHANGED

Defendant asserts (without citation) that "Plaintiffs do not allege there have been material changes to the assignment for their residence, which is the predicate for their claim". The EEOA does not state that a student must be *re-assigned* to a further away school, only *the assignment of a student to a school other than the one closest to his or her place of residence*. The claim is that once Carrollwood K-8 was created, Plaintiff was no longer assigned to the closest school. Accepting Defendant's completely unsupported position would lead to the absurd result of school boards being allowed to open new schools and then only assign students in predominantly white neighborhoods to them[3].

Defendant cites no authority for the notion that the School Board is immune from EEOA claims once the school system has been declared unitary in an unrelated action (*Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cty., Fla.*, 244 F.3d 927 (11th Cir. 2001)) if the school assignment boundaries are not materially changed. Assuming the School Board is trying to invoke § 1707, that is an affirmative defense that they must plead and prove, not an element of a § 1703(c) claim. Such an argument would be frivolous given the breadth of the boundary changes the School Board promulgated this year (let alone the last twenty years).

| | |
|---|---|
| 7-31-2023 | /s/ Blake Warner |
| Date | Signature |
| | Blake Warner, *pro se* |
| | 2211 S Village Ave |
| | Tampa, FL 33612 |
| | E-Service: BLAKE@NULL3D.COM |

---

[3] Which is funny enough, what they are doing with Carrollwood K-8.