# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of Hillsborough County Florida

Case Number 8:23-CV-181-SDM

## Plainitff's Objections to Magistrate Report and Recommendation on Defendant's Motion to Dismiss and Plaintiff's Motion for Preliminary Injunction

Mr. Warner objects to certain parts of the Report and Recommendation (Doc. 72), and respectfully asks the court to issue final judgment as to the due process claim pursuant Rule 54(b), if the court dismisses the count. As the court may recall, one of the reasons Mr. Warner gave for initially filing two separate actions was because the claims related directly to his child's school placement were time sensitive. If the court does not issue final judgment on the due process claim, then Mr. Warner will

1

not likely be able to seek review on that count while his child is still in middle school[1].

It is Mr. Warner's hope that the court does not experience a total eclipse of the heart by denying him meaningful review of his school placement due process claims.

## Count I - FHA: Making Housing Unavailable

The report erred in recommending that Count I be dismissed "Given the absence of authority to affect the availability of housing, Defendant's actions do not fall within the scope of § 3604(a) of the Fair Housing Act." and because "Defendant does not allegedly control the availability of housing, nor can Defendant make housing more or less available" because "The conduct Plaintiff challenges is too remote to support § 3604(a) liability".

This is in effect challenging the implied element of causal proximity. But the standard here is not "authority" or "control", but forseeability [2] and/or the "first step" analytical framework borrowed from antitrust case law[3].

The report erred by failing to engage in any forseeability or first step analysis. All

---

[1] Mr. Warner can already immediately appeal the other school placement count (EEOA claim).

[2] see City of Miami v. Bank of Am. Corp., 800 F.3d 1262, 1282 (11th Cir. 2015) ("As we've noted, damages claims arising under the FHA have long been analogized to tort claims. Thus, we look to the law of torts to guide our proximate cause analysis in this context. We agree with the City that the proper standard, drawing on the law of tort, is based on foreseeability. See Dobbs, Hayden & Bublick, supra, § 199, at 686 ('Professional usage almost always reduces proximate cause issues to the question of foreseeability. The defendant must have been reasonably able to foresee the kind of harm that was actually suffered by the plaintiff ...'); see also Pac. Shores Props., 730 F.3d at 1168 & n. 32 (noting in the FHA context that 'the doctrine of proximate cause serves merely to protect defendants from unforeseeable results' of their unlawful conduct, and that defendants are 'liable for foreseeable ... effects of discrimination.').")

[3] see Bank of Am. Corp. v. City of Miami, 137 S. Ct. 1296, 1306 (2017) ('What falls within that 'first step' depends in part on the 'nature of the statutory cause of action,' Lexmark, supra, at ----, 134 S.Ct., at 1390, and an assessment " 'of what is administratively possible and convenient,"')

of the cases the report cites to support were either not on point or it's position were disturbed—if they applied at all—by the various Miami opinions.

The manipulation of property values was forseeable because it is common knowledge that 1) higher quality schools assigned to a home increase it's property value, and lower quality schools assigned decrease, 2) that African-Americans and minorities have significantly less household income that white households, and 3) that gerrymandering the school assignment boundaries to exclude minorities from certain schools would cause a shift in racial housing patterns by pricing minorities out of certain white neighborhoods and pricing them in to concentrated minority neighborhoods.

It is well established in the antitrust context that the "first step" are the direct buyers. *see Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977). Plaintiff is indisputably the direct home buyer as he purchased a home in October 2022, and he alleges that he was priced out of *south tampa* regarding that home purchase. SAC ¶ 113, 114.

Even if this court finds that the causal chain goes beyond the first step, the Eleventh Circuit on remand from *Miami* none-the-less went beyond the first step again in *City of Miami v. Wells Fargo & Co.*, 923 F.3d 1260 (11th Cir. 2019) (opinion was vacated as moot after the parties settled) and found causal proximity based on forseeability, as the court should do here.

Mr. Warner requests that the court issue specific findings on forseeability and the

*Miami* "first step", to perfect the record.

## COUNT II - FHA: DISCRIMINATION IN SERVICES

The report erred in finding "that Defendant's provision of education services, including determining school attendance zones in Hillsborough County, is not a 'housing-related service that is directly connected to the sale or rental of a dwelling' under § 3604(b)".

*State Conf. of the NAACP v. City of LaGrange, Ga.*, 940 F.3d 627 (11th Cir. 2019) held that § 3604(b) is not limited in application only to housing providers, but extends to third-party providers of services *connected to housing*.

La Grange imparted a two part test to determine if services are actionable under the FHA: 1) the services must be "closely tied" to the sale or rental of a dwelling and 2) those services are essential to the habitability of the dwelling.

The report did not correctly apply the "closely tied" analysis, but instead erroneously relied on a more stringent "direct control" analysis. The school board directly ties educational opportunity to housing through residential assignment policies that assign homes to schools via school attendance zones. Families with young children are heavily steered into and away from specific neighborhoods based on the school board's discretionary assignment of schools to those neighborhoods, which

4

makes that conduct "closely related" to the sale or rental of dwellings. At it's heart, the SAC is alleging a discriminatory governmental zoning practice which existing binding case law supports *see* Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project, Inc., 135 S. Ct. 2507, 2520 (2015) ("Indeed, Congress rejected a proposed amendment that would have eliminated disparate-impact liability for certain zoning decisions. See H.R. Rep., at 89–93."); Jackson v. Okaloosa County, 21 F.3d 1531 (11th Cir. 1994); Huntington Branch, Naacp v. Town of Huntington, 689 F.2d 391 (2d Cir. 1982); and Schwarz v. Treasure Island, 544 F.3d 1201 (11th Cir. 2008).

While the report did not issue any findings with regards to the second prong, water is just as essential to the habitability of a dwelling as schools are to families with school aged children. After all, you do not actually *need* running water when you can just shit in a bucket, anymore than underserved minorities actually *need* to be taught how to read when you can just assign them to Just Elementary or Adams Middle School.

The school board would likely violate the FHA if they totally denied an education to children located in specific neighborhoods, yet that is exactly what they do when the disparity is so great—as alleged in the SAC—that functionally results in the total exclusion from that process of children located in residential real estate that the school board has gerrymandered into failing schools through exclusionary assignment boundaries.

## Count III - EEOA

The relevant EEOA provisions read together (emphasis mine):

> "An *individual* denied an equal educational opportunity, as defined by this subchapter may institute a civil action" § 1706

> "No State shall deny equal educational opportunity to an *individual* on account of his or her race ... by—" § 1703

> "the assignment ... of a *student* to a school, other than the one closest to his or her place of residence ..." § 1703(c)

Under plain English construction, the use of the indefinite article "a" when referring to the "student" in relation to the "individual" means that they are not necessarily the same person. If the legislature meant for the "individual" and the "student" to be the same person, they would have used a definite article such as "the".

The eleventh circuit has interpreted the article "a" to be synonymous for "any"[4]. Applying this principle, the phrase becomes:

> "No State shall deny equal educational opportunity to an individual on account of his or her race ... by the assignment ... of *any* student to *any* school, other than the one closest to his or her place of residence ..."

The plain reading of this clearly indicates that the individual and the student do not have to be the same individual. To the extent that the court finds they are the same, then Mr. Warner objects to the report's finding that the statute is not ambiguous,

---

[4]"'In common terms, when 'a' or 'an' is followed by a restrictive clause or modifier, this typically signals that the article is being used as a synonym for either 'any' or 'one.'" United States v. Alabama, 778 F.3d 926, 932 (11th Cir. 2015)

and maintains that any ambiguity be resolved in his favor to effect the purpose of the statute: to root out racial discrimination in housing.

Pretexual address discrimination is discrimination against both the parent and the child, because it is the parent who decides where the family lives, not the child.

For example, is it discrimination if black parents living in a predominantly black neighborhood adopt a white child, and the school board assigns that white child to a further away majority-minority school? Conversely, is it discrimination for a black child who is adopted by wealthy white parents living in a wealthy white suburb to be assigned to a further away majority-minority school by their address? To ask the question is to answer it.

When someone kidnaps the child of wealthy parents, then demands a large ransom, no one makes the nonsensical argument that only the child was harmed: the child was targeted because of the parent. In the instant case, the school board targeted Mr. Warner, and due to a plain reading of the EEOA statute's expansive language—or alternatively any ambiguity resolves in his favor—Mr. Warner can indepdenently state an EEOA claim on his own behalf.

Coupled with the fact that Mr. Warner's child has no right or ability to enroll himself in school—that right is exclusively Mr. Warner's—makes clear that Mr. Warner was denied an educational opportunity: the ability to apply to enroll his child in a

7

public school. Especially when those educational opportunities are inexorably intertwined with where Mr. Warner decides to live.

Mr. Warner was denied an equal educational opportunity on account of his race by assigning his child to a further away failing minority-majority school in violation of the EEOA.

## Preliminary Injunction - EEOA

Mr. Warner objects to the report's finding that he has not shown a substantial likelihood of success because he failed to state the EEOA claim that the injunction was based on. Mr. Warner maintains that he has stated a valid claim, and reincorporates the previous argument made in the "Count III - EEOA" section.

## Count VI - Due Process

The report erred in concluding that Mr. Warner did not have a liberty interest in applying to enroll his child through the school choice program, and failing to address *at all* whether Florida Law created a constitutionally protected property interest. Mr. Warner did not sue the school board because they violated state law, he sued them because they denied him a property interest that is protected by the fourteenth amendment (applying to enroll his child in school through the state school choice law, and putting him on a wait list).

1. **LIBERTY INTEREST**

There is a protected liberty interest "of parents and guardians to direct the upbringing and education of children under their control." *Pierce v. Society of Sisters*, 268 U.S. 510, 534-35 (1925).

> "Corresponding to the right of control, it is the natural duty of the parent to give his children education suitable to their station in life ..." *Meyer v. Nebraska*, 262 U.S. 390, 400 (1923)

> "in Meyer v. Nebraska, 262 U.S. 390, 399, 401 (1923), we held that the 'liberty' protected by the Due Process Clause includes the right of parents to 'establish a home and bring up children' and 'to control the education of their own.' Two years later, in Pierce v. Society of Sisters, 268 U.S. 510, 534-535 (1925), we again held that the 'liberty of parents and guardians' includes the right 'to direct the upbringing and education of children under their control.'" *Troxel v. Granville*, 530 U.S. 57, 65 (2000)

Consistent with the fundamental rights of parents to be actively involved in the education of their children, the Florida legislature created public school choice and the parental bill of rights to provide parents and children a right to shape their education through inter-district transfer.

In *Pierce v. Society of Sisters*, 268 U.S. 510, a unanimous U.S. Supreme Court invalidated an Oregon law that required parents to send their children to public schools. The Court ruled that parents have the constitutional right, under the due process clause of the fourteenth Amendment, to direct their children's educational as well as moral development, which includes sending their children to a school of their choice – even a private religious one.

9

Additionally, the fourteenth amendment guarantees "the right of the individual to ... acquire useful knowledge ..."[5]. The complaint alleges that the school Mr. Warner's child was assigned to was a failing majority-minority school with poor educational outcomes and poor literacy rates, and that the school Mr. Warner attempted to choice his child into was a highly rated majority-white school with excellent educational outcomes and literacy rates. The disparity in educational outcomes and literacy rates between the schools *on their own* trigger due process protections under the fourteenth amendment because they deprive students assigned to those failing schools of acquiring "useful knowledge"[6].

## 2. Property Interest

Mr. Warner has a protected property interest in enrolling his child in public school because the state has created a legitimate interest in participating in the open enrollment process, and denying participating to a student who is attempting to flee an assigned failing minority-majority school is not de-minimus[7] [8].

The Goss court adopted the Roth two-step analysis for determining whether a

---

[5] *see Meyer v. Nebraska*, 262 U.S. at 399

[6] *see* Buchanan v. City of Bolivar, 99 F.3d 1352, 1359 (6th Cir. 1996) ("Perkins may not have procedural due process rights to notice and an opportunity to be heard when the sanction imposed is attendance at an alternative school absent some showing that the education received at the alternative school is significantly different from or inferior to that received at his regular public school. See, e.g., C.B. v. Driscoll, 82 F.3d 383, 389 n. 5 (11th Cir. 1996); Doe v. Bagan, 41 F.3d 571, 576 (10th Cir. 1994); *Zamora v. Pomeroy*, 639 F.2d 662, 669-70 (10th Cir. 1981).")

[7] "the State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process Clause" *Goss v. Lopez*, 419 U.S. 565, 574 (1975)

[8] "The Court's view has been that as long as a property deprivation is not de minimis, its gravity is irrelevant to the question whether account must be taken of the Due Process Clause" *Id.* at 576

property interest in protectable under the due process clause in the educational context[9].

Under Roth, the first step turns on whether Mr. Warner has legitimate claim:

"To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Board of Regents v. Roth, 408 U.S. 564, 577 (1972)

State law—such as the laws at issue—create legitimate claims of entitlement[10]

Florida's Parental Bill of Rights explicitly gives Mr. Warner the right to apply to *any* public school:

"The right, pursuant to s. 1002.20(2)(b) and (6), to apply to enroll his or her minor child in a public school or, as an alternative to public education, a private school, including a religious school, a home education program, or other available options, as authorized by law." Fla. Stat. § 1014.04(1)(c)

The Florida open enrollment law reinforces that right, and grants the following rights that were denied to Mr. Warner:

"each district school board or charter school shall allow a parent from any school district in the state whose child is not subject to a current expulsion or suspension to enroll his or her child in and transport his or her child to any public school, including charter schools, that has not reached capacity in the district, subject to the maximum class size pursuant to s. 1003.03 and s. 1, Art. IX of the State Constitution. The school district or charter school shall accept the student, pursuant to that school district's or charter school's controlled open enrollment process, and report the student for purposes of the school district's or charter school's funding pursuant to the Florida Education Finance Program." Fla. Stat. § 1002.31(2)(a)

---

[9] "whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." *Id.* 575-76 (quoting *Board of Regents v. Roth*, supra, at 570-571.)

[10] "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law" *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972)

11

"Allow parents to declare school preferences, including placement of siblings within the same school." Fla. Stat. § 1002.31(2)(b)

"Provide a lottery procedure to determine student assignment and establish an appeals process for hardship cases." Fla. Stat. § 1002.31(2)(c)

"Require school districts to maintain a wait list of students who are denied access due to capacity and notify parents when space becomes available." Fla. Stat. § 1002.31(2)(j)

"Maintain socioeconomic, demographic, and racial balance." Fla. Stat. § 1002.31(2)(e)

"Require schools to accept students throughout the school year as capacity becomes available." Fla. Stat. § 1002.31(2)(k)

While the report is correct that there is no on-point binding precedent on this issue, the eighth circuit came in on-point by all but finding that non-discretionary school choice laws create a protected property interest under the due process clause in *Stevenson v. Blytheville Sch. Dist. #5*, 800 F.3d 955 (8th Cir. 2015). The Plaintiffs in that case only lost because the court found the Arkansas school choice law at issue was discretionary, so there was no legitimate expectation or right to it. The Florida laws at issue suffer from no such infirmary.

The *Florida* law at issue is a *non-discretionary* open enrollment statute and the "Parental Bill of rights", both of which create enforceable rights.

The school board failed to give Mr. Warner *any* process regarding the denial of any of these property interests, let alone adequate process.

12

### 3. Amendment is not futile

Mr. Warner objects to the reports recommendation that the due process claim be dismissed with prejudice. Even if the court finds that Mr. Warner does not have a protected liberty interest or property interest, the claim should not be dismissed *with prejudice* because he could bring a mandamus action in state court[11].

|  |  |
|---|---|
| 4-8-2024 | /s/ Blake Warner |
| Date | Signature |

Blake Warner, *pro se*

2211 S Village Ave

Tampa, FL 33612

E-Service: BLAKE@NULL3D.COM

---

[11] This court has already ruled that Mr. Warner cannot bring a mandamus action against state actors in federal court