# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# TAMPA DIVISION

BLAKE WARNER and J.W.,

      Plaintiffs,

v.                                                            Case No. 8:23-cv-00181-SDM-JSS

THE SCHOOL BOARD OF
HILLSBOROUGH COUNTY
FLORIDA,

      Defendant.

_____/

## ANSWER AND AFFIRMATIVE DEFENSES
## TO AMENDED VERIFIED COMPLAINT

Defendant School Board of Hillsborough County, Florida ("School Board"), answers the numbered paragraphs of the Third Amended Verified Complaint (Dkt. 79) (the "Third Amended Complaint") by Plaintiff Blake Warner ("Plaintiff")[1] and states:

The School Board denies any wrongdoing. The School Board denies all allegations by Plaintiff, except as specifically set forth below. Further, legal conclusions do not require a response; to the extent a response is required,

---

[1] In the original Complaint, Plaintiff included his minor child (J.W.) as a co-plaintiff. In light of the Amended Verified Complaint, the School Board understands that J.W. is no longer a party to this action. To the extent J.W. raises any allegations or claims in this action, they are denied.

Plaintiff's legal conclusions are denied. The School Board denies any allegations either express or implied in the headings, subheadings, and defined terms in this Answer. The use of certain headings, subheadings, and defined terms from the Amended Complaint, is for ease of reference only and is not to be construed as an admission by the School Board.

Additionally, the School Board denies in its entirety the "Introduction" section preceding the numbered allegations in Plaintiff's complaint, including the website referenced therein, and further denies that Plaintiff is entitled to any relief.

## Responses to Individual Paragraphs

1.      **Mr. Warner is African-American.**

Response:   Without knowledge, therefore denied.

2.      **Mr. Warner has continuously resided in Hillsborough County since 2016.**

Response:   Without knowledge, therefore denied.

3.      **Mr. Warner has been a registered voter in Hillsborough County since 2016, and has previously resided in District 1 until late 2022, and currently resides in District 3.**

Response:   Without knowledge, therefore denied.

4.      **Defendant The School Board of Hillsborough County, Florida operates, controls and supervises all free public schools within Hillsborough County pursuant Art. IX § 4 and Fla. Stat. § 1001.42.**

Response: Admitted that the School Board operates, controls, and supervises the free public schools in Hillsborough County. The remainder of

76914771;3

this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves.

5. **As laid out below, the HCSB has a pattern and/or practice of assigning students to further away schools that they know will result in racial segregation.**

Response:   Denied.

6. **This court has jurisdiction pursuant 28 U.S. Code § 1331, 1343, 2201, and 2202, and 42 U.S. Code § 1983.**

Response:  Admitted only that the School Board does not contest the Court's jurisdiction. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

7. **Venue is proper pursuant 28 U.S.C. § 1391 because Defendant reside in the Middle District of Florida, and all events giving rise to Mr. Warner 's claims occurred in the Middle District of Florida.**

Response:   Admitted only that the School Board does not contest venue in this matter. Denied that Plaintiff experienced any "events" that entitle him to the sought-after relief. The remainder of this paragraph is a legal characterization that requires no factual response, as the cited laws speak for themselves. Otherwise denied.

8. **For the purposes of this complaint, the following regions are defined as follows:**

Response:   This paragraph does not set forth any allegations, but rather appears to be a general introduction for the following paragraphs. To the extent this paragraph is deemed to set forth an allegation, denied.

9. *South Tampa* **is defined as the area between Gandy Boulevard and Kennedy Boulevard.**

Response:  Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

3

10. ***West Tampa*** **is defined as the area between Kennedy Boulevard and Busch Boulevard/Linebaugh Avenue, and west of I-275.**

Response:  Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

11. ***East Tampa*** **is defined as the area between Kennedy Boulevard and Fletcher Avenue, and east of I-275.**

Response:  Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. Otherwise denied.

12. ***South Tampa***'**s population is predominantly White.** ***see*** **Exhibits A and B.**

Response:  Without knowledge, therefore denied.[2]

13. ***West Tampa's*** **population is predominantly Hispanic. see Exhibits A and C.**

Response:  Without knowledge, therefore denied.

14. ***East Tampa's*** **population is predominantly African-American. see Exhibits A and D.**

Response:  Without knowledge, therefore denied.

15. **The racial demographics rapidly change at Kennedy Boulevard. Kennedy is generally the demarcation point between affluent whites and minorities.**

Response:  Without knowledge, therefore denied.

---

[2]   First, Plaintiff does not authenticate or explain the origin or modification of his exhibits. Second, the School Board does not dispute any official census data, but does not have any independent knowledge to admit or deny Plaintiff's allegations. All remaining paragraphs involving purported exhibits and/or population data are further denied for those same reasons.

76914771;3

16.    **Compactness is a quantitative measure of a boundary's shape and how tightly packed, or compact, the boundary is.**

Response:  Admitted only that Plaintiff is purporting to use the term "Compactness" to have the definition alleged in this paragraph, and that definition apparently holds the stated meaning to Plaintiff. Otherwise denied.

17.    **The compactness of a boundary is a critical measure when evaluating if a boundary is discriminatory. A map that is not compact may be considered gerrymandered.**

Response:  This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. To the extent this paragraph is deemed to suggest the School Board engages in unlawful discrimination, denied.

18.    **All of the compactness measures and boundaries provided here are approximate, and are subject to change as more data becomes available before trial.**

Response:  Admitted only to the extent that Plaintiff admits no purported data in the Third Amended Complaint is accurate. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. To the extent this paragraph is deemed to suggest the School Board engages in unlawful discrimination, denied.

19.    **All of the Hillsborough County school statistics cited here and attached are approximate and based on imperfect data, such as some schools missing and non-exact boundary definitions. These statistics and graphs will change slightly and improve as more data becomes available through discovery.**

Response:  Admitted only to the extent that Plaintiff admits no purported data in the Third Amended Complaint is accurate. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. To the extent this paragraph is deemed to suggest the School Board engages in unlawful discrimination, denied.

76914771;3

20.     **The School Board only has three high schools which have reasonably compact boundaries:**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Additionally, this paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

21.     **Two of the top three *least* compact high schools are majority-negro schools:**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Additionally, this paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

22.     **Nearly all of the School Board's school boundaries are gerrymandered. *See* Exhibits X, Y, and Z. There is only one reasonably compact Middle School: Shields Middle School. The rest are gerrymandered.[3]**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Additionally, this paragraph purports to include and rely upon exhibits that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

23.     **The top three *least* compact middle schools are: Randall Middle School, Memorial Middle School, and Barrington Middle School:**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Additionally, this paragraph purports to include and rely upon pictures that Plaintiff does not

---

[3]     The final two sentences of this paragraph break onto a new, unnumbered paragraph. For clarity, the School Board interprets them as being part of paragraph twenty-two of the Third Amended Complaint.

properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

24.     **A "Local Student" is a student who resides closest to that school. A "Foreign Student" is a student who [] resides closer to a different school. In a perfectly compact map, a foreign student would never be assigned because they would always be assigned to their closest school where they are a local student.**

Response:  Admitted only that Plaintiff is purporting to use these definitions in the complaint, and those definitions apparently hold the stated meanings to Plaintiff. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

25.     **The Local Student Exclusion Ratio ("LS Exclusion") represents the percent of local students who are not assigned to that school. A LS Exclusion ratio of 0.2 means that 20% of the local students are assigned to a different more geographically distant school.**

Response:  Admitted only that Plaintiff is purporting to use this definition in the complaint, and this definition apparently holds the stated meaning to Plaintiff. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

26.     **The green area represents the area of local students [that] are actually assigned to that school.**

Response:   Without knowledge, therefore denied.

It appears that this paragraph purports to describe the pictures Plaintiff included in prior paragraphs of the Third Amended Complaint. To the extent that is the proper reading of this paragraph, this paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

76914771;3

27.     **The red area in the graphs represents local students who are excluded from that school. The LS Exclusion ratio is calculated as:** *LER = area (red) / area (green) + area (red)*

Response:  This paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Moreover, this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

28.     **The Foreign Student Inclusion Ratio ("FS Inclusion") represents the percent of assigned students who are foreign students. A FS Exclusion ratio of 0.4 means that 40% of the assigned student population are foreign students.**

Response:  Admitted only that Plaintiff is purporting to use this definition in the complaint, and this definition apparently holds the stated meaning to Plaintiff. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

29.     **The yellow area represents the foreign students. The FS Inclusion ratio is calculated as:** *FIR = area (yellow) / area (green) + area (yellow)*

Response:  This paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Moreover, this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

30.     **The displacement ratio represents that ratio between excluded local students and included foreign students. For example, a displacement ratio of 12:1 indicates that 12 local students lost their seat at that school for every 1 foreign student that was assigned. A high displacement ratio indicates that a school is trying hard not to assign local students and still fill capacity. A great example of this is**

**A-rated Fishkawk [sic] Elementary which borders C-rated Pinecrest Elementary:**

Response: This paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Moreover, this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

31. **The Displacement ratio is calculated as: $D = area\ (red)\ /\ area\ (red) + area\ (yellow)$**

Response: Admitted only that Plaintiff is purporting to use this definition in the complaint, and this definition apparently holds the stated meaning to Plaintiff. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

32. **Accuracy is a percent of how close the assigned boundary is to be a perfectly compact boundary (closest school boundary). With 1.0 being perfectly accurate and 0.0 being not accurate at all. This is the closest single number to a measure of compactness used in this document.**

Response: Admitted only that Plaintiff is purporting to use this definition in the complaint, and this definition apparently holds the stated meaning to Plaintiff. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

33. **Accuracy is calculated as: $A = area\ (green)\ /\ area\ (red) + area\ (yellow) + area\ (green)$**

Response: Admitted only that Plaintiff is purporting to use this definition in the complaint, and this definition apparently holds the stated meaning to Plaintiff. The remainder of this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

34.    **Utilization is the school utilization percent, and is from the School Board's last published 40-day enrollment numbers.**

Response:  Admitted only that Plaintiff is purporting to use this definition in the complaint, and this definition apparently holds the stated meaning to Plaintiff. Otherwise denied.

35.    **Minorities represents the percent of the school's student[s] that are minorities.**

Response:  Admitted only that Plaintiff is purporting to use this definition in the complaint, and this definition apparently holds the stated meaning to Plaintiff. Otherwise denied.

36.    **Coincidentally, all of the compact school boundaries beset on two or more sides by natural borders or the county line. They are not compact due to the diligent efforts of the school board, they are compact only because the board did not have much discretion to screw it up.**

Response:   Denied.

37.    **Significant amounts of red and yellow areas are strong indicators of gerrymandering.**

Response:  This paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Moreover, this paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

38.    **Blake and Middleton are the two negro high schools in Tampa; the high degree of non-compactness in these boundaries, combined with the nearby white neighborhoods that are not assigned to these schools suggests that race was the predominant factor when drawing these boundaries.**

Response:   Denied.

39.    **All of the *south Tampa* school boundaries correspond nearly perfectly to the Home Owners' Loan Corporation ("HOLC")**

76914771;3

maps which was created by the federal government in 1933 which racially segregated housing. *See* **Exhibit G and H.**

Response:  This paragraph purports to include and rely upon exhibits that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

40.    **The three *south Tampa* elementary schools which border *West Tampa*–Grady, Mitchell, and Gorrie–currently have utilization rates of 118%, 111%, and 107%, respectively. *see* Exhibits E.**

Response:  This paragraph purports to include and rely upon pictures and exhibits that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

41.    **The three *West Tampa* elementary schools which border *South Tampa*–Tampa Bay Boulevard, West Tampa, and Just–currently have utilization rates of 63%, 84%, and 41%, respectively. *see* Exhibits E.**

Response:  This paragraph purports to include and rely upon pictures and exhibits that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

42.    **The bordering *south tampa* schools are extremely over utilized, while the bordering *west tampa* are extremely underutilized. The obvious solution is to shift the school boundaries southward, sending some of the white students from over-utilized *south tampa* to underutilized—majority minority— *west Tampa* to balance out the utilization. Rather than do this, the HCSB closed a minority school and left the bordering *south tampa* schools at a staggering 100–119% utilization despite their stated goal to reduce utilization to the 80% range. The HCSB will not lower those utilization rates to the 80% range, because that would mean sending white students to bordering minority schools.**

Response:  Denied.

43.    **Plant is over capacity, yet 44% of it's [sic] students should not even be assigned there. The 44% are distant predominantly white**

**students who would otherwise be assigned to minority schools Jefferson and Blake. It makes no sense why the school board would go out of its way to assign distant students to a school that is over capacity.**

Response:  This paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

44.   **The following map shows the locations and boundaries for Plant High School (orange), Jefferson High School (yellow), and Blake High School (purple):**

Response:  This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Therefore, denied.

45.   **Plant High School is nearly *twice* as far from Davis Island as Blake High School is by ground transportation, yet students in that affluent white enclave are not assigned to Blake, a predominantly African-American school.**

Response:  The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

46.   **Similarly, the neighborhoods of Westshore Palms, North Bon Air, Beach Park, and Oakford Park are at least twice as close to Jefferson High School than Plant, and in some cases literally across the street from Jefferson, yet those white students are assigned to Plant and the school district is unable to give a cognizable reason why.**

Response:  The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

47.   **The reason for the odd shape of the boundaries becomes clear when you overlay those boundaries over a map of the racial demographics, as illustrated in the following image:**

Response:  This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent

76914771;3

there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

48. **The most egregious part is that Plant is overpopulated, and yet they still will not send those white students to predominantly minority Jefferson High School and Blake High School. The following image shows just how maladjusted the current Plant High School boundaries are, when overlaid with the boundaries for the closest high schools. The shaded area highlight portions of Plant High School's current boundary that are closer to Jefferson High School and Blake High School:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

49. **The situation with Coleman Middle School is similar to Plant High School: Coleman's boundary is artificially kept lower to exclude assigning the large African-American population directly to their north, despite them being significantly closer to Coleman than Pierce.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

50. **Madison to the South of Coleman, is exerting pressure to move Coleman's boundaries up. But to avoid doing this, the School Board closed Monroe, to avoid sending white students to minority schools directly to the north.**

Response:   Denied.

51. **The following image shows the locations of Coleman, Pierce, and Madison, overlayed over a map of race. The black lines represent the border for the closest school:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

13

52.   **On May 9, 2023, Defendant promulgated a format change for Car[r]olwood Elementary, converting it from kindergarten through fifth grade ("K-5") to kindergarten through eighth grade ("K-8") effective August 2023 with the 2023–2024 school year for the sixth grade.** *See* **Exhibit J.**

Response:  The School Board admits the school boundary lines and assignments are public record and speak for themselves. Otherwise denied.

53.   **J.W. is starting the sixth grade for the 2023–2024 school year.**

Response:   Admitted.

54.   **Defendant assigned Plaintiff's child J.W. to Adams Middle School–located at 10201 N Blvd, Tampa, FL 33612.**

Response:   Denied.

55.   **Carrollwood K-8 is located at 3516 McFarland Rd, Tampa, FL 33618.**

Response:   Admitted.

56.   **Both Adams Middle School and Carrollwood K-8 are operated by Defendant.**

Response:   Admitted.

57.   **Carrollwood K-8 has a non-compact boundary:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiffs do not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

58.   **The children it includes in the yellow and green areas are significantly more White than the excluded red areas.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

76914771;3

59.    **The Yellow area represents a white golf course neighborhood.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

60.    **The children it excludes to the south of Gunn Highway and Busch Boulevard are predominantly Latino and African-American.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

61.    **The children it excludes to the east are significantly more likely to be African-American or Latino than the children it included in the green and yellow areas.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

62.    **Mr. Warner resides in the red area, and is geographically significantly closer to Carrollwood K-8 than the yellow area, yet his child is assigned to Hill Middle School.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

63.    **Mr. Warner has to drive past Carrollwood K-8, past the students in the yellow area, to reach Hill Middle School.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

64.     **Hill Middle School is down the street from the students in the yellow area, yet they are assigned to more distant Carrollwood K-8.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

65.     **Hill has a non-compact boundary:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

66.     **Hill's assignment boundary is being manipulated to protect two bordering white schools: A-rated Carrollwood K-8 and A-rated Martinez Middle School. Nearby affluent white students who should be assigned to Hill, are instead assigned to Martinez and Carrollwood. To fill those student seats back up, they gerrymandered the boundary to pull in distant minority neighborhoods that the A-rated schools do not want. The result is a significantly higher concentration of minorities at Hill, and a decrease of minority enrollment at Martinez and Carrollwood.**

Response:   Denied.

**[UNNUMBERED PARAGRAPH] Lake Magdalene's boundary was just changed for the 2024–2025 school year. They reassigned a large swath of white students from Miles Elementary to Lake Magdalene, despite those students being significantly closer to Miles. Miles is a low performing minority school, and the reassignment of these white students only further concentrated minorities there. The school board gerrymandered the Miles boundary so hard, that it now resembles a penis and testicles:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

76914771;3

67.   **The School Board juiced the numbers it told the public on it's boundary website to try to justify changing Miles' boundary. The website indicates that Miles' utilization is around 109% to justify relocating a large portion of it's white students to Lake Magdalene away from predominantly minority Miles. Yet the numbers the School Board reports to the state indicates that Miles' utilization is 81%. Miles is not over capacity, the School Board lied to segregate it:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

68.   **Gaither has a non-compact boundary:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

69.   **Mr. Warner resides on the edge of the Gaither red area, yet his home is assigned to Chamberlain High School. In 2022, Gaither's enrollment was 62.9% minority, in contrast to Chamberlain's 88.1%.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

70.   **Gaither has a non-compact boundary.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

71.   **Mr. Warner resides on the edge of the green and yellow area that borders Gaither's boundary. There was a huge red area of students that were much closer than Mr. Warner, yet they excluded**

them and assigned him there instead to dilute minority enrollment at Gaither.

Response:  This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

72.  **The School Board promulgated controversial district wide boundary changes for the 2024–2025 school year on June 20, 2023 with a 4-3 vote, over the objections of minority members who were opposed to the disproportionate negative impact that the changes would have African-American and Hispanic communities.**

Response:  The School Board admits the school boundary lines and its decisions are public record and speak for themselves. Otherwise denied.

73.  **The white board members (along with a Moroccan), with an additional seat obtained through illegal gerrymandering, overrode the minority members to cram through the changes in a sharply divided 4-3 vote.**

Response:  The School Board admits the school boundary lines and its decisions are public record and speak for themselves. Otherwise denied.

74.  **Every time the School Board creates a K-8, they always make the 6-8 boundary the exact same as the PK-5 unless 6-8 is school choice enrollment only.**

Response:  The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

75.  **This is done because elementary boundaries are significantly smaller than middle school, so its easy to segregate.**

Response:  The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

76.  **Each and every time the school board creates a K-8, it is due to community pressure to segregate: either to pack white kids in, or pack black kids in.**

Response:  Denied.

76914771;3

77.    **Sulphur Springs K-8 packs poor performing minorities into a small school.**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

78.    **Carrollwood K-8, Maniscalo K-8, and Lutz K-8 were all designed to segregate and isolate affluent white families from having their children assigned to nearby minority middle schools.**

Response:   This paragraph purports to include and rely upon pictures that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

79.    **The school board also plays games by not assigning children to certain schools, even if those children live across the street.**

Response:   Denied.

80.    **As an African-American who has been the subject of discrimination throughout his life, Mr. Warner is particularly sensitive to discriminatory practices. Mr. Warner was insulted and emotionally distressed by the knowledge that school aged students in his community–including his child–were being discriminated against because of their race... in the year 2023.**

Response:   Without knowledge, therefore denied. Further denied to the extent this paragraph includes any suggestion the School Board engaged in unlawful discrimination.

81.    **Mr. Warner was and is saddened, angered, and insulted by the fact that the HCSB continues to operate a segregated school system.**

Response:   Without knowledge, therefore denied. Further denied to the extent this paragraph includes any suggestion the School Board engaged in unlawful discrimination.

82.    **Defendant's unlawful conduct proximately caused Mr. Warner to suffer the aforementioned emotions, which have**

manifested into stress, unpleasant rumination, mental strain, and feelings of indignity, hopelessness and anxiety about race discrimination in housing and the school system.

Response:   Denied.

83.   **Between August 2017 and October 2022, Mr. Warner continuously resided in _south tampa_ at residences assigned to A-rated schools Plant High School, Wilson Middle School, and Mitchell Elementary.**

Response:   Without knowledge, therefore denied.

84.   **The current school boundaries are arbitrary and drawn to exclude minorities from higher performing majority-white public schools.**

Response:   Denied.

85.   **The current school boundaries disproportionately affect racial minorities by isolating them into under-performing schools, while the isolated white students excel in A-Rated schools.**

Response:   Denied.

86.   **This further harms the minority communities throughout Hillsborough County because their property values are decreased, while the property values increase in the segregated white neighborhoods.**

Response:   Denied.

87.   **The value of Mr. Warner's house is depressed due to the gerrymandered schools assigned to his residence.**

Response:   Denied.

88.   **Due to HCSB's manipulation of property values, Mr. Warner was priced out of _south tampa_ and had to relocate . . . to _no[r]th tampa_ where he was assigned to failing schools.**

Response:   Denied.

89.    **This increased segregation in both *south tampa* and *north tampa*.**

Response:   Denied.

90.    **Had The School Board assigned all students to their closest school, property values in area of *south tampa* that Mr. Warner resided would have decreased, and he would have purchased a home there.**

Response:   Denied.

91.    **This move resulted in a loss of community for Mr. Warner.**

Response:   Denied.

92.    **Mr. Warner spent much of his childhood in *south tampa*. He attended Tinker Elementary, Monroe Middle School, and Robinson High School there.**

Response:   Without knowledge, therefore denied.

93.    **Mr. Warner is further injured by being forced to compete in a race-based school enrollment system to enroll his minor child in one of the HCSB's public schools.**

Response:   Denied.

94.    **Not only did the school board segregate the students, they segregated themselves. They drew district map boundaries that correspond directly to race: the Hispanic population is almost exclusively located in district 1, the African-American population in district 5, and white population into districts 2, 3, and 4.**

Response:   Denied.

95.    **46% of Hillsborough County's population is non-Hispanic white, yet the board managed to gerrymander the districts to give white constituents a super majority, therefore more voting power.**

Response:   Denied.

96.    **The School Board then used this slim white majority to cram      through      unpopular      rebaundary      decisions      that**

76914771;3

disproportionately harmed minority communities in District 5, such as the controversial closing of Just Elementary along a slim 4-3 vote.

Response:   The School Board admits its decisions are public record and speak for themselves. Otherwise denied.

97.   **This image shows the racial map overlaid with the district boundaries shown in blue lines:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

98.   **The School Board has seven (7) board members, five of which are elected by constituents in their respectively geographically defined voting districts, two (2) at-large county wide districts.**

Response:   Admitted.

99.   **The School Board promulgates their own voting district maps.**

Response:   The School Board admits it last approved a district map on December 16, 2021, for the election of school board members. Otherwise denied.

100.   **A new district map was promulgated on December 16, 2021. *See* Exhibit R.**

Response:   Admitted.

101.   **The School Board held a special meeting called on Dec 10, 2021, to discuss redistricting. At that meeting, the board members made the following statements:**

Response:   The School Board admits that its meeting minutes are public record and speaks for themselves. Otherwise denied.

[Paragraphs 102 to 109 purport to include statements from members of the School Board. For purposes of conciseness, those statements are not copied here in their entirety.]

Response:   The School Board admits that its meeting minutes are public record and speaks for themselves. Otherwise denied, including any suggestion the School Board engaged in unlawful discrimination.

110.  **The black population percentage for Hillsborough County is approximately 18%.**

Response:   The School Board does not dispute publicly available census data, but is without independent knowledge, and therefore denies, Plaintiffs' allegations regarding population percentages within Hillsborough County. Otherwise denied.

111.  **The school board used race as the predominant factor when drawing the map to concentrate African-American voters into District 5, and Hispanic voters into District 1.**

Response:   Denied.

112.  **This artificially created high concentrations of White voters in Districts 2, 3, and 4.**

Response:   Denied.

113.  **Districts 2, 3, and 4 all elected White representatives.**

Response:   The School Board admits that its makeup is public record and speaks for itself. Otherwise denied.

114.  **Some board members were motivated to maximize their chances of re-election.**

Response:   Without knowledge, therefore denied.

115.  **Specifically, Henry Washington desired to pack a high concentration of African-American voters into District 5 to maximize his chances of re-election.**

Response:   Without knowledge, therefore denied.

116. **Stacy Hahn and Melissa Snively were all too happy to accommodate Henry Washington's desire, to keep African-Americans out of their district to maximize their own chances of re-election.**

Response:   Denied.

117. **The push to pack Hispanics into District 1 kept them out of White districts 2, 3, and 4.**

Response:   Denied.

118. **Race-based considerations were not simply a factor when redrawing district lines, they were the predominant factor.**

Response:   Denied.

119. **The board members were actually bragging about whose map could pack the most minorities into isolated districts.**

Response:   Denied.

120. **When they weren't referencing voters explicitly by race, they did so through pretextual phrases such as "keeping the community together".**

Response:   Denied.

121. **The United States Census reports the following racial demographics for Hillsborough County: 18.5% African American, 30.5% Hispanic, 46% White non-Hispanic.**

Response:   The School Board does not dispute publicly available census data, but is without independent knowledge, and therefore denies, Plaintiffs' allegations regarding population percentages within Hillsborough County. Otherwise denied.

122. **The county is majority African-American and Hispanic, yet the majority of the School Board seats went to White candidates.**

Response:   The School Board does not dispute publicly available census data, but is without independent knowledge, and therefore denies, Plaintiffs' allegations regarding population percentages within Hillsborough County. Otherwise denied.

123.   **The School Board achieved this result by diminishing the influence of African-American and Hispanic voters by packing them into their own respective districts.**

Response:   Denied.

124.   **Racial gerrymandering "reinforces racial stereotypes and threatens to undermine our system of representative democracy by signaling to elected officials that they represent a particular racial group rather than their constituency as a whole.". Shaw v. Reno, 509 U.S. 630, 650 (1993).**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

125.   **At the time of the last election, Mr. Warner resided in White District 2 and had his vote diluted. He currently resides in District 3, and again has his voted diluted.**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

126.   **The School Board ensured that a Hispanic board member was not even elected to the Hispanic district they just packed, by rejecting any maps that placed Member Combs' home outside of District 1 so that she would continue to be eligible to run for the District 1 seat. Member Combs is not Hispanic.**

Response:   Denied.

127.   **The Polsy-Popper score is a commonly used measure of compactness for voting maps that compares the boundary shape to a square that has the same perimeter as the boundary by calculating the area ratio between the two. It quantifies how contorted the boundary is. It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

128. **None of the five districts are compact as measured by the approximate polsy-popper scores:**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

129. **The Reock score is another commonly used measure of compactness for voting maps that compares a boundary shape to the minimum-bounding square by calculating the ratio of the boundaries occupied space within that minimum-bound square. It quantifies how stretched out the boundary is. It is expressed as a ratio between 0.0 and 1.0, with 1.0 being the most compact.**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

130. **None of the five districts are compact as measured by the approximate Reock scores:**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves. Otherwise denied.

131. **The fact that the school boundaries correlate nearly 1-to-1 directly to race.**

Response:   Denied.

132. **The fact that the school board explicitly used race to draw the district maps to segregate.**

Response:   Denied.

133. **The fact that the HCSB has a history of refusing to desegregate.**

Response:   Denied.

134. **The fact that the HCSB was notified several times that they were in violation of the EEOA, and provided racial maps and other evidence in support of that assertion, yet the HCSB ignored it and pressed forward with racial segregated maps and proposals.**

Response:   Denied.

135.   **The fact that Blake High School was the negro High School in the 50's before desegregation, and it remains a segregated negro High School in 2023 due to the obvious gerrymandering of Blake High School.**

Response:   Denied.

136.   **The fact that white students across the street from Jefferson High School are not assigned to Jefferson High School.**

Response:   The School Board admits the school boundary lines are public record and speak for themselves. Otherwise denied.

137.   **The affluent white residents of *south tampa* wield tremendous political influence in relation to the other parts of Hillsborough County.**

Response:   Without knowledge, therefore denied.

138.   **Those affluent white *south tampa* residents are currently exerting tremendous pressure on the HCSB to not implement certain proposed school boundary changes that would assign some of their homes to Jefferson High School, despite their homes being geographically closer to Jefferson, because generally they do not want their children attending Jefferson High School (a low performing minority school) and because their property values will drop if their homes are reassigned from A-rated Plant High School to C-rated Jefferson High School.**

Response:   Without knowledge, therefore denied.

139.   **Superintendent Addison Davis has capitulated to this political pressure from the community, and has expressed assurances to certain school board members that he will not submit the proposal that reassigns white students to Jefferson High School, while publicly stating that no decision has been made:**

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

140.   **The school board members are poised to approve yet another racially segregated map, despite knowing full and well that**

those maps are racially segregated, because they lack the political courage to overcome that political pressure from *south tampa* residents:

Response:   This paragraph purports to include and rely upon a picture that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as pictures, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

141.   **School Board Member Stacy Hahn's comments about "fighting everyday" to keep District 2 (white) family's in District 2 schools (white).**

Response:   Denied.

142.   **A discriminatory purpose, not any legitimate reason, was a motivating factor behind Defendant's aforementioned discriminatory actions and/or omissions.**

Response:   Denied.

143.   **On or about January 11, 2023, Stacy Hahn gave a news interview with New Channel 8 WFLA.**

Response:   This paragraph purports to include and rely upon a link that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as links, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

144.   **This interview was broadcast on public television as well as printed on WFLA's website.**

Response:   This paragraph purports to include and rely upon a link that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as links, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

145.   **Stacy Hahn knew when she agreed to this interview, that it would be published and/or printed on television and/or the WFLA website.**

Response:   This paragraph purports to include and rely upon a link that Plaintiff does not properly explain nor authenticate. And to the extent there

76914771;3

are exhibits such as links, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

146. **During this interview, Stacy Hahn stated "I can tell you that I am fighting every day to make sure District 2 families stay in District 2 schools,".**

Response:   This paragraph purports to include and rely upon a link that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as links, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied.

147. **There is no legal basis for District 2 families to stay in District 2. School boundaries routinely cross those arbitrary Districts, whose sole purpose is for electing school board members, not for school boundaries.**

Response:   Denied.

148. **"District 2" is the racially gerrymandered Caucasian district that Stacy Hahn represents. "District 2"'s population is predominantly white.**

Response:   Denied.

149. **District 1's population is predominantly minority and borders District 2 to the north.**

Response:   Without knowledge, therefore denied.

150. **Stacy Hahn's statement is dog whistling, telling white residents in South Tampa that she is fighting hard not to send their white children to a minority dominated schools in District 1.**

Response:   This paragraph purports to include and rely upon a link that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as links, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied, including any suggestion the School Board engages in unlawful discrimination.

151.  **Stacy Hahn's statement indicates a preference for white people to live and attend white schools in District 2, and consequently for minority students to attend schools in District 1.**

Response:   This paragraph purports to include and rely upon a link that Plaintiff does not properly explain nor authenticate. And to the extent there are exhibits such as links, those documents are the best evidence of their own contents and speak for themselves. Otherwise denied, including any suggestion the School Board engages in unlawful discrimination.

### Count I: 42 U.S.C. § 1983: Equal Protections – School Assignment Maps[4]

152.  **Plaintiff re-alleges and incorporates by reference ¶ 1–151.**

Response:   The School Board restates its responses to paragraphs 1–151 above.

153.  **The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves.

154.  **Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves.

155.  **As alleged in detail above, race was the predominant factor in the design of school assignment maps. Race predominated over all other boundary drawing criteria when each of the school assignment boundaries was drawn.**

Response:   Denied.

156.  **Map-drawing in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial**

---

[4]   The School Board reiterates that the headings are included solely for convenience, and it affirmatively denies all allegations that might be deemed to exist within them.

76914771;3

decision-making, is presumptively invalid under the Equal protection clause.

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves.

157.   **The school board intentionally failed to assign white students to majority-minority schools that were closer to their residence.**

Response:   Denied.

158.   **The school board intentionally failed to assign minority students to majority-white schools that were closer to their residence.**

Response:   Denied.

159.   **Consequently, the school assignment boundaries do not survive strict scrutiny.**

Response:   Denied.

160.   **Therefore, the school assignment boundaries violate Mr. Warner's rights under the Equal Protection Clause and 42 U.S.C. § 1983.**

Response:   Denied.

### Count II: 42 U.S.C. § 1983: Equal Protections – District Map *Shaw* Gerrymandering

161.   **Plaintiff re-alleges and incorporates by reference ¶ 1–151.**

Response:   The School Board restates its responses to paragraphs 1–151 above.

162.   **The Fourteenth Amendment to the U.S. Constitution provides in relevant part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves.

76914771;3

163.   **Under the Fourteenth Amendment's Equal Protection Clause, a racial classification is prohibited unless it is narrowly tailored to serve a compelling state interest.**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves.

164.   **As alleged in detail above, race was the predominant factor in the design of all of the non-at-large districts. Race predominated over all other redistricting criteria when each of these districts was drawn.**

Response:   Denied.

165.   **The use of race as the predominant factor in creating the districts was not narrowly tailored to advance any compelling state interests, including compliance with the Voting Rights Act.**

Response:   Denied.

166.   **Map-drawing in which race predominates, subordinating traditional, race-neutral redistricting considerations to racial decision-making, is presumptively invalid under the Equal Protection Clause.**

Response:   This paragraph is a legal characterization that requires no factual response, as any sources of law speak for themselves.

167.   **Consequently, the districts do not survive strict scrutiny.**

Response:   Denied.

168.   **Therefore, the districts violate Mr. Warner's rights under the Equal Protection Clause and 42 U.S.C. § 1983.**

Response:   Denied.

::: 

**The School Board further denies all allegations contained in the "Relief" paragraphs at the end of Plaintiff's complaint, and further denies that Plaintiff is entitled to any claimed relief.**

76914771;3

## AFFIRMATIVE DEFENSES

Without conceding that the School Board bears the burden of proof as to any issue, and without conceding liability, the School Board asserts the following defenses to Plaintiff's complaint:

### FIRST DEFENSE

The Eleventh Circuit previously declared the Hillsborough County school system unitary, ceasing federal judicial supervision of the Hillsborough County school system. *See Manning ex rel. Manning v. Sch. Bd. of Hillsborough Cnty., Fla.*, 244 F.3d 927, 947 (11th Cir. 2001). Plaintiff's claims fail to the extent they seek relieve inconsistent with *Manning* and to the extent Plaintiff challenges school boundary lines in place or demographic shifts that began to occur, prior to the *Manning* opinion.

### SECOND DEFENSE

The Plaintiff has not suffered any harm because he received his preferred and requested school assignment, and retains the ability to request other school assignments if desired.

### THIRD DEFENSE

Plaintiff's claims are barred by release, discharge, and waiver. Plaintiff previously executed a Settlement Agreement with the School Board. Because the Settlement Agreement is confidential, the School Board attached a mostly-

redacted version as **Exhibit 1**.[5] Pursuant to the Settlement Agreement, Plaintiff received a specific school assignment for his minor child. Additionally, the Settlement Agreement includes a broad release where Plaintiff agreed as follows:

> **5. <u>Release of the School Board and District</u>:** For and in consideration of the required acts and promises set forth in this Agreement, the **Parent hereby knowingly and voluntarily releases and discharges the School Board and District from any and all claims, demands, causes of action, complaints or charges, known or unknown** specifically related J.W.'s education, services, and educational program in the District **through the date of the execution of this Agreement**.
>
> This shall include, but not be limited to, all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services, reimbursements, or claims for expenses, costs, fees, attorneys' fees, **and all losses of any kind whatsoever related specifically to J.W.'s education**, **which the Parent has or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of this Agreement**.
>
> The Parent understands that this **release shall also cover any claims, if any, that may belong independently to J.W. related to his educational services and program**. The claims described in this paragraph shall be collectively referred to as "Released Claims" herein. The Parties jointly agree that the

---

[5]   Because the Settlement Agreement is confidential, the School Board attaches a mostly-redacted version as Exhibit 1. The parties had previously agreed to these redactions, and the School Board previously filed a copy with an earlier answer. The court received an unredacted version of the agreement following Docket 54, granting the joint motion to file under seal.

release in this paragraph shall not act to impair the enforceability of this Agreement or a waiver of the Parties' respective rights to take action to enforce this Agreement. The Parties further agree that this release shall not cover any claim that is not regarding J.W.'s education or any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement. To that end, the School Board and District acknowledge that no provision in this Agreement may be construed as relieving them of any obligation they may have under federal or state law to provide J.W. a FAPE for any time after the execution of this Agreement.

*See* Settlement Agreement, ¶ 5 (emphasis added).

Because of the release he executed, and the fact he voluntarily moved to his current address following the execution of the Settlement Agreement, Plaintiff's claims fail as a matter of law.

## FOURTH DEFENSE

Any purported imbalances are naturally attributable to the intervening acts of third parties, specifically the natural flow of people within a community (particularly one growing as quickly as Tampa) and are not attributable to any purported actions by the School Board.

## FIFTH DEFENSE

By affirmatively requesting and receiving their preferred school placements, the Plaintiff waived any ability to sue based on the purported placements.

## SIXTH DEFENSE

The School Board at all relevant times has acted reasonably, properly, lawfully, and in good faith.

## SEVENTH DEFENSE

The relief sought by Plaintiff is unreasonable and constitutes an undue hardship on the School Board.

## EIGHTH DEFENSE

During the pendency of this case, Plaintiff specifically sought and received a school choice placement for his child. Between the placement at Coleman for which he bargained through the Settlement Agreement referenced above, the school available through the home address where he voluntarily moved after releasing all claims against the School Board, and the placement he received during this litigation through his successful school choice application, Plaintiff has not suffered any damages nor can he claim that he has experienced any unlawful acts by the School Board.

## NINTH DEFENSE

Plaintiff fails to allege or prove that a "policy or custom" is the "moving force" of any alleged constitutional violation, as required by *Monell v. Department of Social Services*, 436 U.S. 658 (1978), and has otherwise failed to demonstrate the necessary prerequisites to hold the School Board directly liable for any purported misconduct. Plaintiff's complaint alleges purported

improper acts by particular actors within the School Board (which has individual member turnover).

## TENTH DEFENSE

As noted by authorities such as *D.L. ex rel S.L. v. Hernando County Sheriff's Office*, 620 F. Supp. 3d 1182 (M.D. Fla. 2022), and the sources of authority cited in that decision, the School Board is not liable for the types of monetary damages Plaintiff now tries to claim.

## ELEVENTH DEFENSE

Plaintiff lacks standing to sue.

## TWELFTH DEFENSE

Plaintiff's claims fail to the extent Plaintiff challenges maps drawn to address political ramifications. *See Alexander v. S.C. State Conference of the NAACP*, 144 S. Ct. 1221, 1233 (2024) ("Legislators are almost always aware of the political ramifications of the maps they adopt, and claims that a map is unconstitutional because it was drawn to achieve a partisan end are not justiciable in federal court.").

## THIRTEENTH DEFENSE

Plaintiff's claims fail to the extent they rely on awareness of racial demographics because redistricting bodies will almost always be aware of racial demographics, and in fact, are often required to look at race in drawing maps to comply with the Voting Rights Act and other laws. *See Miller v.*

*Johnson*, 515 U.S. 900, 916 (1995). The race-based sorting, if any, served a compelling interest and was narrowly tailored to that end. *See Alexander*, 144 S. Ct. at 1233; *Cooper v. Harris*, 581 U.S. 285, 292 (2017) (quoting *Bethune-Hill v. Va State Bd. Of Electors*, 580 U.S. 173, 193 (2017)). Moreover, any racial considerations were subordinated to race-neutral districting principles. *See Miller*, 515 U.S. at 916-17.

## RESERVATION OF RIGHTS

The School Board reserves the right to assert additional affirmative defenses and to supplement its current affirmative defenses as discovery warrants.

::::

Having fully answered the Plaintiff's complaint, the School Board requests the court enter an order:

(a)    Dismissing the complaint against the School Board with prejudice;

(b)    Ordering that the Plaintiff take nothing by this action;

(c)    Awarding the School Board its costs and attorney's fees associated with this litigation, pursuant to 42 U.S.C. § 1988(b), 42 U.S.C. § 3613(c)(2), or otherwise; and

(d)    Awarding the School Board such other and further relief as the Court deems just and proper.

38

Respectfully submitted,

/s/ *Jason L. Margolin*

**Jason L. Margolin, Esq.**
Florida Bar No. 69881
jason.margolin@akerman.com
judy.mcarthur@akerman.com
**Benjamin Robinson**
Florida Bar No. 1045169
benjamin.robinson@akerman.com
judy.mcarthur@akerman.com
AKERMAN LLP
401 E. Jackson Street, Suite 1700
Tampa, Florida 33602
(813) 223-7333 / Fax: (813) 223-2837
*Counsel for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of July, 2024, I filed the foregoing using the Court's CM/ECF System, which will send a true and correct copy to all counsel of record.

/s/ *Jason L. Margolin*
Counsel for Defendant

76914771;3