## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

BLAKE ANDREW WARNER,

      Plaintiff,

v.                                Case No.: 8:23-cv-181-SDM-LSG

SCHOOL BOARD OF HILLSBOROUGH
COUNTY, FLORIDA,

      Defendant.

_____/

## REPORT AND RECOMMENDATION

The *pro se* plaintiff Blake Warner files a third amended complaint alleging racial disparity in the Hillsborough County School Board's school assignment and voting district boundaries. This report evaluates not the substance of Warner's civil rights claims (in other words, whether Warner states a claim under 42 U.S.C. § 1983) but whether Warner has the legal right to assert those claims. As explained in this report, Warner's March 15, 2022, settlement agreement with the defendant prevents Warner from pursuing the claims in his third amended complaint because he released or otherwise promised not to assert such claims. Accordingly, I recommend an order granting summary judgment in favor of the School Board.

## I.     BACKGROUND AND PLEADINGS

On March 15, 2022, Blake Warner settled an administrative case against the School Board involving his minor child, J.W. Doc. 82-1. The settlement agreement

covers "any and all purported claim[s] raised in the matter of *J.W. v. Hillsborough County School District*, pending before the Division of Administrative Hearings under Case Numbers 21-002537 and 21-002910." Doc. 82-1. The settlement contains a release saying, in part, that Warner "knowingly and voluntarily releases and discharges the School Board and District from any and all claims, demands, causes of action, complaints or charges, known or unknown specifically related [to] J.W.'s education, services, and educational program in the District through the date of execution of this Agreement." Doc. 82-1 at ¶ 5. The release also covers any claim "that may belong independently to J.W. related to his educational services and program." Doc. 82-1 at ¶ 5. Finally, the settlement contains an agreement not to sue, in which Warner agrees "not to maintain, argue, institute, or file any of the Released Claims in any . . . legal forum" and not to file "any other court actions, agency action/process or other legal proceedings of any type . . . that are connected in any way to or by virtue of or related to any other facts, acts, or events occurring in whole or in part on or before" the effective date of the agreement. Doc. 82-1 at ¶ 6.

On January 26, 2023, Warner sued the School Board on behalf of himself and J.W. and alleged violations of the Equal Educational Opportunities Act, 20 U.S.C. § 1706; the Fair Housing Act, 42 U.S.C. § 3601, et seq.; and 42 U.S.C. § 1983. Doc. 1. Warner alleged that the School Board created school assignment and voting district maps based on race. Doc. 1 at ¶ 22–36, 37–44. According to Warner, these racially drawn boundaries prevent students from attending the schools closest to their homes and result in white students attending predominantly white, affluent schools

and minority students attending predominantly minority, less affluent schools. Doc. 1 ¶ 18–36. The boundaries cause inflated home values in south Tampa and depress home values in other neighborhoods. Doc. 1 ¶ 52–54. This affected J.W., who was assigned to Mitchell Elementary, even though he resided closer to Gorrie Elementary, and was assigned to Plant High School, despite residing closer to Blake High School. Doc. 1 at ¶ 10. At the time of the initial complaint, J.W. attended Mitchell Elementary and "intend[ed] to attend Coleman Middle School and Plant High School." Doc. 1 at ¶ 4. These schools, according to Warner, "are unlawfully segregated, depriving [J.W.] of both an equal educational opportunity and the opportunity to attend racially integrated schools." Doc. 1 at ¶ 60. Warner alleged that, because of the School Board's unlawful conduct, he and J.W. had to move to north Tampa. Doc. 1 at ¶ 58. The complaint's five counts included (1) two counts on behalf of J.W. under the EEOA; (2) one count on behalf of Warner and J.W. under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause; and (3) two counts under the Fair Housing Act. Doc. 1 at ¶ 91–98.

The School Board moved to dismiss and for a more definite statement, which motion was denied after oral argument. Doc. 14 at 3–5, 7; Docs. 24, 25. Thereafter, Warner filed an amended complaint containing substantially the same allegations, asserting two counts under the Fair Housing Act, and removing all mention of J.W. Doc. 29. Warner contemporaneously filed a separate action on behalf of J.W. in which he alleged that the School Board's boundaries unlawfully prevented J.W. from attending the school closest to his home. Doc. 37; *see Warner v. Sch. Bd. of Hillsborough*

*Cnty., Fla.*, No. 8:23-cv-1029-SDM-SPF (M.D. Fla filed May 10, 2023). A July 5, 2023, order finds that the claims in both actions "appear premised on a common aggregate of facts . . . the alleged segregation of the schools in Hillsborough County." Doc. 37 at 2. The order explains that Warner cannot split claims that arise from the same transaction or series of transactions and that Warner cannot sue *pro se* on behalf of J.W. Doc. 37 at 3–4. The order dismisses the case and directs Warner to assert his claims against the School Board in this, earlier-filed action. Doc. 37 at 4.

Accordingly, Warner filed a second amended complaint, which removes the counts on behalf of J.W. but includes allegations about J.W.'s school assignment. Doc. 38 ¶ 7–9, 71, 184–93; 202–18. In particular, Warner alleged that the school choice program violated his right to due process because he was unable to apply for J.W. to attend Carrollwood K-8. Doc. 38 at ¶ 202–18. The amended pleading further alleges that "the educational welfare/placement of J.W. is closely tied to Mr. Warner's Fourteenth Amendment fundamental rights and his ability to advocate for J.W.'s rights." Doc. 38 at ¶ 8–9. However, the substance of his second amended complaint—challenging the School Board's assignment and voting district boundaries—is largely the same as his original complaint but with more substantive counts, including two counts under the Fair Housing Act, one count under the EEOA, two claims under Title VI or the Civil Rights Act, two counts under Section 1983, and two counts under the Florida Constitution. Doc. 38 at ¶ 180–237.

The School Board moved to dismiss and argued (1) that the March 15, 2022, settlement agreement prohibits Warner's claims; (2) that Warner's complaint failed

to state a claim; and (3) that, even though Warner removed claims on behalf of J.W., Warner was still pursuing *pro se* claims belonging to J.W. Doc. 45. After oral argument on the motion, a report agrees in large part with the School Board and recommends dismissing (1) the Fair Housing Act claims for failure to state a claim; (2) the EEOA and Title VI claims because Warner possesses no right to sue on behalf of J.W. under those statutes;[1] (3) the due process claim under Section 1983 for failure to state a claim; and (4) the Florida Constitution claims for lack of a private right of action. Docs. 66, 72. The report finds, however, that Warner states a claim in count seven under Section 1983 for a violation of his right to equal protection based on purportedly racially gerrymandered school assignment and voting district boundaries. Doc. 72. As for the settlement agreement, the report finds that the agreement is neither undisputed nor central to Warner's claims and recommends against dismissing the complaint based on the settlement agreement "at this early stage." Doc. 72 at 7–8. A later order adopts the report and recommendation, dismisses all counts except count seven, and gives Warner leave to amend. Doc. 78.

Based on that order, Warner filed a third amended complaint containing two counts under 42 U.S.C. § 1983. Doc. 79. Warner alleges that the school assignment and voting district maps in Hillsborough County violate his right to equal protection under the Fourteenth Amendment. Doc. 79. Specifically, Warner claims that race is the "predominant factor" in the design of the maps, which are "drawn to exclude

---

[1] The report explains that J.W. could assert those claims through counsel. Doc. 72 at 23, 26.

minorities from higher performing majority-white public schools." Doc. 79 at ¶ 84, 156. In other words, Warner asserts that the maps result from racial gerrymandering.[2]

The School Board moves under Rule 12(c), Federal Rules of Civil Procedure, for judgment on the pleadings based on the settlement agreement. Doc. 86. Warner moves to strike the School Board's third affirmative defense, which relies on the settlement agreement. Doc. 85. Because the agreement is neither central to the third amended complaint nor undisputed, a November 18, 2024, order, announces an intent to treat the motion as one for summary judgment under Rule 56 and provides the parties until December 2, 2024, to present all material pertinent to the motion. *See* Doc. 72 at 6–8; Docs. 79, 103. Warner moves to stay the consideration of summary judgment until after discovery. Doc. 106.

## II.    DISCUSSION

### A. The School Board's motion for judgment on the pleadings should be converted to a motion for summary judgment and decided.

Under Rule 12(d), Federal Rules of Civil Procedure, if a party presents and the court considers a matter outside the pleadings on a Rule 12(b)(6) or 12(c) motion, "the motion must be treated as one for summary judgment under Rule 56." A matter is outside the pleadings if the item is neither central to the claim nor undisputed. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (finding a document "central"

---

[2] *See Rucho v. Common Cause*, 588 U.S. 684, 696–97 (2019) (explaining the history and origin of the term "gerrymander").

because the document was a "necessary part of" a party's "effort to make out a claim."); *Horsely v. Feldt*, 304 F.3d 1125, 1134–35 (11th Cir. 2002) (explaining that "undisputed" means "that the authenticity of the document is not challenged."). Here, although the parties dispute the meaning and enforceability of the agreement, no party challenges its authenticity. Thus, the agreement is "undisputed." *Horsley*, 304 F.3d at 1134. However, the settlement agreement is not central to the third amended complaint because the agreement is not a necessary part of Warner's stating a claim. Docs. 79. Accordingly, to consider the settlement agreement, the School Board's motion should be converted to a motion for summary judgment.

Rule 56(a) permits a judgment as a matter of law if the movant shows the absence of a genuine dispute as to any material fact. This requires construing evidence and finding all reasonable inferences in favor of the opposition. *Harris v. Ostrout*, 65 F.3d 912, 915 (11th Cir. 1995). Rule 56(d) provides that, "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition," the court may defer ruling or deny the motion. "Rule 56(d) provides shelter against a premature motion for summary judgment 'when facts are unavailable to the nonmovant.'" *Estate of Todashev by Shibly v. United States*, 815 F. App'x 446, 450 (11th Cir. 2020). Summary judgment is premature "when a party is not provided a reasonable opportunity to discover information essential to his opposition." *Smith v. Fla. Dept. of Corrections*, 713 F.3d 1059, 1064 (11th Cir. 2013). A decision under Rule 56(d) receives an "abuse of discretion" review on appeal. *Fla. Power & Light Co. v. Allis Chalmers Corp.*, 893 F.2d

7

1313, 1316 (11th Cir. 1990).

Warner argues in favor of a stay because he needs discovery on "whether the waiver of civil rights was knowingly and voluntary" and "whether there was a 'meeting of the minds' to form an enforceable contract." Docs. 104, 106. In other words, Warner seeks "extrinsic evidence" of the parties' intent. Doc. 16 at 2. Both Warner's motion to compel and the School Board's motion to stay discovery show that Warner has not previously sought discovery on these topics despite the School Board's first raising in May, 2023, an affirmative defense of "release, discharge, and waiver" based on the settlement agreement. Docs. 30 at 17–19, 93 at 11–24, 96-2, 96-3. [3] The School Board argues that discovery is unnecessary because the settlement agreement is unambiguous and susceptible to interpretation without extrinsic evidence. Doc. 109 at 3–5. Additionally, the School Board contends that discovery into the state of mind of its attorneys is privileged and confidential. Doc. 109 at 7.

Warner's declaration fails to show that extrinsic evidence of the parties' intent is "essential" to his opposition. FED. R. CIV. P. 56(d). A settlement agreement is a contract. *In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009). Under Florida law, which

---

[3] A copy of the settlement agreement filed at Doc. 82-1 contains significant redactions to protect the privacy of J.W. and the confidentiality of the settlement terms. Despite receiving leave to file that agreement under seal, Doc. 54, no sealed and unredacted version appears on the docket. Accordingly, a December 10, 2024, order directs the plaintiff to provide an unredacted copy of the settlement agreement for an *in camera* inspection to facilitate a review of Warner's enforceability arguments. Contemporaneously, Warner sent me (with a copy to defense counsel) an unredacted version for inspection. Because this report relies on unredacted portions of the settlement agreement, I added to the electronic docket a sealed, unredacted version of the agreement at Doc. 111 to facilitate review of this report.

applies here,[4] "the terms of a contract provide the best evidence of the parties' intent[.]" *Key v. Allstate Ins. Co.*, 90 F.3d 1546, 1549 (11th Cir. 1996). If the terms of a contract "are clear and unambiguous, a court must interpret the contract in accord[] with its plain meaning, and, unless an ambiguity exists, a court should not resort to outside evidence or the complex rules of construction to construe the contract." *Id.* Absent ambiguity, extrinsic evidence is irrelevant to the interpretation of the settlement agreement. *See K.B. Home Jacksonville, LLC v. Liberty Mut. Fire Ins. Co.*, No. 3:18-cv-371-J-34MCR, 2019 WL 4228602, *5 (M.D. Fla. Sept. 5, 2019); *Johnson Enter., Inc. v. FPL Grp., Inc.*, 162 F.3d 1290, 1310 (11th Cir. 1998).

Warner identifies no ambiguity permitting the consideration of extrinsic evidence. Rather, Warner simply disagrees with how the School Board interprets the release and argues that, if the Court accepts the School Board's interpretation, the phrase "specifically related to J.W.'s education" would be superfluous. Doc. 87 at 7–8. This is not an ambiguity but rather an argument about how the agreement should be interpreted. *See People's Trust Ins. Co. v. Lamolli*, 352 So. 3d 890, 895 (Fla. 4th DCA 2022) ("Rules of construction require that no word or part of an agreement is to be treated as a redundancy or surplusage if any meaning, reasonable and consistent with other parts, can be given to it."). Warner received sufficient notice and opportunity

---

[4] The agreement contains a provision choosing Florida law to govern "the validity, construction, and enforcement of this Agreement." Doc. 111 at ¶ 11. "Florida courts generally enforce contractual choice-of-law provisions unless the chosen forum's law contravenes strong public policy." *Kasparov v. Schnorenberg*, No. 3:15-cv-1093-J32PDB, 2016 WL 8846261, *8 (M.D. Fla. Aug. 16, 2016).

to provide his view on the matter. Docs. 85, 87, 103–07. Furthermore, discovery into the state of mind of the School Board or its attorneys would necessarily seek privileged and protected information. Accordingly, Warner's motion to stay summary judgment should be denied.

## B. The settlement agreement is enforceable, and the release covers Warner's claims in this case.

According to the School Board, the settlement agreement bars Warner's claims because the agreement contains "a broad release" and "specific school assignments, for middle school and high school" for J.W. Doc. 82-1. Additionally, the School Board asserts that Warner's claims fail because the School Board "took no action affecting Warner or his child following the release." Doc. 86.

Warner responds (1) that the release is narrowly tailored to cover only those claims "specifically related to J.W.'s education," which excludes his current claims; (2) that, even if the release covers Warner's claims, the language is ambiguous; and (3) that count one accrued after the effective date of the release. Doc. 87. Warner also raises a variety of substantive challenges to the enforceability of the contract, including that the agreement lacks consideration, that Warner's releasing his civil rights claims was neither knowing nor voluntary, and that the release violates public policy. Doc. 87.

### i.  The release is unambiguous.

"'[C]ourts have established rules [for] . . . the construction of contracts.'" *Silver v. Silver*, 992 So. 2d 886, 888–89 (Fla. 2d DCA 2008) (quoting *Fla. Power Corp. v. City*

10

*of Tallahassee*, 18 So. 2d 671, 674 (1944)). A settlement agreement is a contract subject to these rules. *In re Chira*, 567 F.3d at 1311; *Norfolk S. Corp. v. Chevron, U.S.A., Inc.*, 371 F.3d 1285, 1290 (11th Cir. 2004); *Santana v. Miller*, 314 So. 3d 346, 348 (Fla. 3d DCA 2020) ("Releases are contracts, thus, are to be governed and interpreted according to well-settled principles of contract law."). If the language of a release is clear and unambiguous, the court must "construe the terms according to [their] plain meaning." *Steffen v. Gray, Harris & Robinson, P.A.*, 283 F. Supp. 2d 1272, 1284 (M.D. Fla. 2003), *aff'd sub nom. Steffen v. Gray, Harris & Robinson*, 138 F. App'x 297 (11th Cir. 2005). A court cannot consider "additional evidence of the drafter's intentions." *Norfolk*, 371 F.3d at 1290. Rather, the court's role "is to determine the intention of the parties from the language of the agreement, the apparent objects to be accomplished, other provisions in the agreement that cast light on the question, and the circumstances prevailing at the time of the agreement." *Schwartz v. Fla. Bd. of Regents*, 807 F.2d 901, 905 (11th Cir. 1987); *Silver*, 992 So. 2d at 888–89.

Here, the language of the settlement agreement is clear and unambiguous. The purpose of the agreement is "to conclusively resolve and settle any and all claims pertaining specifically to the education of J.W." Doc. 82-1 at ¶ 1. The agreement also covers "any and all purported claim[s] raised in the matter of *J.W. v. Hillsborough County School District*," which the agreement defines as the "Lawsuit." Doc. 82-1 at ¶ 1. The agreement resolves the "Lawsuit" by guaranteeing to J.W. "a school assignment through the District Choice Options program . . . for middle school to Coleman Middle School . . . and for high school to Plant High School . . . provided

11

that the Parent completes the CHOICE application[.]" In other words, the agreement

says that J.W. is not required to attend his neighborhood school but may attend

Coleman Middle School and Plant High School through the district's school choice

program. Doc. 82-1 at ¶ 4(b). At the time of the agreement, J.W. was in elementary

school. Doc. 79 at ¶ 53.

      In exchange for that guarantee and other concessions offered by the School

Board, the "Parent" (Warner) agrees to dismiss the Lawsuit with prejudice and to

"release claims the Parent purports to have against the School Board and District as

set forth in paragraph 5[.]" Doc. 82-1 at ¶ 4. In paragraph five, Warner "knowingly

and voluntarily releases and discharges the School Board and District from any and

all claims, demands, causes of action, complaints or charges, known or unknown

specifically related [to] J.W.'s education, services, and educational program in the

district through the date of the execution of this Agreement." The release contains a

non-exclusive list of items covered by the release, including "all losses of any kind

whatsoever related specifically to J.W.'s education, which the Parent has or might

have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of

this Agreement." The release also covers claims "that may belong independently to

J.W." Finally, the release explains that "this release shall not cover any claim that is

not regarding J.W.'s education or any new claim that may arise by reason of an act

or omission occurring after the Effective Date of this Agreement." Doc. 82-1 at ¶ 5.

      The plain language of the release covers all claims "specifically related to

J.W.'s education" that existed as of March 15, 2022, and that belonged to Warner or

to J.W. Thus, the issues are (1) whether the Section 1983 claims in Warner's third amended complaint specifically relate to J.W.'s education and (2) whether those claims existed as of March 15, 2022.

"The plain meaning of the word 'relate' is 'to show or establish a logical or causal connection between.'" *Cont'l Cas. Co. v. Wendt*, 205 F.3d 1258, 1262–63 (11th Cir. 2000) (rejecting an ambiguity argument and explaining that "[t]he words 'relate' or 'related' are commonly understood terms in everyday usage."). The word "specifically" modifies "related" and means "in a manner that is exact and clear; precisely, explicitly, particularly; with a particular or clear purpose, meaning, etc." *Specifically*, OXFORD ENGLISH DICTIONARY (Online Edition), https://www.oed.com/dictionary/specifically_adv?tab=meaning_and_use#1445937 910 (last visited Jan. 7, 2025). Thus, the phrase "specifically related" appears intended to narrow the "'very broad range of connections'" implicit in the word "related." *Wendt*, 205 F.3d at 1263 (quoting *Gregory v. Home Ins. Co.*, 876 F.2d 602, 605–06 (7th Cir. 1989)).

> a.    *Count one, the school assignment maps.*

The third amended complaint claims that the School Board's assignment boundaries county-wide are gerrymandered, but Warner focuses his attention on the assignment boundaries in north and south Tampa.[5] Doc. 79 at ¶ 22, 36–78. As to

---

[5] As explained later in this report, Warner lacks standing to sue for racial gerrymandering of boundaries other than those where he lives.

J.W., Warner alleges that, in 2023, the School Board improperly assigned J.W. to Adams Middle School even though Warner lives geographically closer to Carrollwood K-8, which is a higher performing school with a boundary covering a "significantly more White" geographic area. Doc. 79 at ¶ 52–62. Both schools are in north Tampa, where Warner moved some time after October 2022. Doc. 79 at ¶ 3, 69, 71, 83. Warner alleges that, even though he resides on the edge of the boundary for Gaither High School, his home is assigned to Chamberlain High School, which has a greater population of racial minorities. Doc. 79 at ¶ 69. Among other things, Warner alleges that he, as a parent, is "being forced to compete in a race-based school enrollment system to enroll his minor child in one of HCSB's public schools." Doc. 79 at ¶ 93.

Warner's claims are logically, causally, and specifically connected with J.W.'s education because they involve the school assignments of J.W., which is fundamentally a part of his education. In the settlement, the parties negotiated and agreed to future school assignments for J.W. The settlement agreement demonstrates that Warner's previous dispute with the School Board (or, at the very least, its resolution) involved J.W.'s school assignments through high school. The claims here involve J.W.'s middle and high school assignments. Thus, these claims relate specifically to J.W.'s education.

Furthermore, these claims existed as of March 15, 2022. According to Warner, the south Tampa school assignment boundaries "correspond nearly perfectly" to maps created in 1933 that racially segregated housing. Doc. 79 at ¶ 39.

Warner alleges no change in the assignment maps for north or south Tampa affecting his residence or J.W.'s neighborhood school assignment. Although Warner alleges a post-March 2022 change in the north Tampa boundaries for Carrollwood K-8, the complaint nowhere alleges that the change impacted Warner's north Tampa school assignment map. Doc. 79 at ¶ 62 (explaining that Warner lives outside the Carrollwood K-8 assignment map). Thus, the complaint demonstrates that the allegedly racially motivated boundaries affecting Warner existed at the time that Warner settled with the School Board.

When the parties settled the Lawsuit, J.W. was in elementary school and lived in homes "assigned to A-rated schools Plant High School, Wilson Middle School, and Mitchell Elementary." Doc. 79 at ¶ 83. When Warner first filed this action, J.W. was attending Mitchell elementary school and intended to attend Coleman and Plant for middle and high school. Doc. 1 at ¶ 4. As evidenced by paragraph four of the settlement agreement, the parties contemplated that Warner might not continue to live in such a location, and so they guaranteed J.W. admission to Coleman and Plant regardless of his assigned neighborhood school. The purpose of this concession is obvious—to conclusively resolve all disputes over J.W.'s school assignments through his high school graduation. Nothing in the agreement says that these assignments depend on where Warner lives. In fact, the agreement appears to acknowledge the absence of such a limit by saying that the agreement "does not guarantee transportation to either school site." Doc. 82-1 at ¶ 4. Additionally, Warner agreed

that J.W.'s "IEP"[6] team could recommend school assignments other than Coleman and Plant if necessary to ensure that J.W. receives a "FAPE."[7] Doc. 82-1 at ¶ 4 (further stating "it shall not be a violation of this Agreement for J.W.'s IEP Team to make such a recommendation.").

Accordingly, the language, context, and circumstances of the agreement demonstrate the parties' intent to resolve all disputes over J.W.'s school assignment through J.W.'s graduation from high school. Although Warner moved to north Tampa after the settlement and J.W. received a new school assignment, this is not a "new claim." Rather, this is a continuation of his previous dispute with the School Board. Warner's school assignment claim relates specifically to the dispute that Warner resolved and falls squarely within the claims that he agreed to release in March 2022.

b.    *Count two, the school voting district map.*

Whether the release covers Warner's challenge to the voting district maps is a closer call. As the School Board argues and Warner acknowledges, the School Board promulgated a new voting district map on December 16, 2021. Doc. 79 at ¶ 100, Doc. 86 at 7. This is the map that Warner attacks. Because the map existed before March 2022, Warner's racial gerrymandering claim existed at that time too. The

---

[6] "Individualized Education Plan."

[7] "Free Appropriate Public Education." *See* https://www.ed.gov/laws-and-policy/civil-rights-laws/disability-discrimination/disability-discrimination-key-issues/disability-discrimination-providing-free-appropriate-public-education-fape (last visited Jan. 10, 2025).

closer question is whether this claim specifically relates to J.W.'s education. Warner claims the racial gerrymandering of school voting district maps diluted his vote, which meant reducing the voting power of the black constituency in Warner's district. Doc. 79 at ¶ 125; *see Shaw v. Reno*, 509 U.S. 630, 640–41 (1993) (explaining dilution of voting power). This alleged vote dilution led to a white majority on the School Board, which used its majority to impose the June 20, 2023, school assignment boundary changes that "harmed minority communities in District 5." Doc. 79 at 72, 94–96.

Although Warner's claim of vote dilution resulting from the voting district changes relates broadly to J.W.'s education, the "specific" relation is difficult to see in the third amended complaint. Nothing in Warner's complaint alleges that this change affected J.W. Rather, Warner claims that this change primarily affected minorities in District 5. The problem with this claim is that Warner lacks standing to assert a racial gerrymandering claim outside of his own district.[8] As for a claim within his own district, the dilution of Warner's vote could lead to the election of School Board members not preferred by Warner and, thereafter, to unfavorable changes in J.W.'s schools. Viewed in this manner, the connection appears too attenuated to qualify as "specifically related to J.W.'s education." By contrast, the pleading history demonstrates that this claim is simply another iteration of the same

---

[8] *Gill v. Whitford*, 585 U.S. 48, 65–66 (2018) (explaining that "a plaintiff who alleges that he is the object of a racial gerrymander . . . has standing to assert only that his own district has been so gerrymandered.").

dispute over school assignments for J.W. that began in the administrative "Lawsuit" with the School Board and that continued in this Court on January 26, 2023.

Even if count two could survive the release, the claim cannot survive the settlement agreement's more broadly worded "Agreement Not to Sue." Doc. 82-1 at ¶ 6. In this paragraph, Warner agrees not only to refrain from filing any of the "Released Claims" in court but also agrees that,

> [N]or shall any other court actions, agency action/process or other legal proceedings of any type be filed that are connected in any way to or by virtue of or related to any other facts, acts, or events occurring in whole or in part before the Effective Date of this Agreement.

Doc. 82-1 at ¶ 6. This provision prevents Warner from filing any other court action that connects "in any way" to facts, acts, or events occurring before the effective date of the agreement. Accordingly, even if Warner's claim survives the release, the covenant not to sue prevents Warner from asserting that claim against the School Board. *Torjagbo v. United States*, 285 F. App'x 615, 620 (11th Cir. 2008); *U.S. Fire Ins. Co. v. Mikes*, 576 F. Supp. 2d 1303, 1319 (M.D. Fla. 2007); *Rosen v. Fla. Ins. Guar. Ass'n*, 802 So. 2d 291, 295 (Fla. 2001) (quoting *Atlantic Coast Line R.R. v. Boone*, 85 So. 2d 834, 842 (Fla. 1956)).

Because the School Board promulgated the voting district map in December 2021, Warner's challenge to that map relates to an act occurring before March 15, 2022. Accordingly, under the broad language of paragraph six, the settlement agreement prevents Warner from maintaining this claim.

### ii.  The settlement agreement is enforceable.

Warner argues that the settlement agreement lacks consideration, that his release was neither knowing nor voluntary, and that the release violates public policy. As explained below, each argument fails.

#### a.      The agreement has valid consideration.

A contract requires an offer, acceptance, and consideration. *Pezold Air Charters v. Phoenix Corp.*, 192 F.R.D. 721, 725 (M.D. Fla. 2000). Consideration "'need not be money or anything having monetary value[] but may consist of either a benefit to the promisor or a detriment to the promisee.'" *Thayer v. Randy Marion Chevrolet Buick Cadillac*, LLC, 519 F. Supp. 3d 1062, 1068 (M.D. Fla. 2021), *aff'd*, 30 F.4th 1290 (11th Cir. 2022) (quoting *Fla. Power Corp. v. Public Serv. Comm'n*, 487 So. 2d 1061, 1063 (Fla. 1986)).

Here, paragraph four of the settlement agreement, entitled "Consideration," has two subparagraphs, both of which contain promises by the School Board to provide concessions related to J.W. and his education. Doc. 82-1 at ¶ 4. Those promises include guaranteed school assignments to Coleman and Plant. Doc. 82-1. The School Board provides this consideration in exchange for the "promises made by the Parent[.]" Doc. 82-1. Specifically, in exchange for the promises to J.W., Warner agrees that he will both "execute and abide by the terms of th[e] Agreement" and "release claims the Parent purports to have against the School Board and District as set forth in paragraph 5[.]" Doc. 82-1. Warner signed the agreement "individually and on behalf of J.W." Doc. 82-1.

19

Warner argues that the promises by the School Board were "consideration for J.W, not for Mr. Warner" and that therefore "the release is only potentially enforceable on J.W. *not* Mr. Warner." Doc. 87 at 5. However, this construction of the settlement agreement defies its plain terms. Warner signed the agreement in both his personal capacity and on behalf of J.W., and Warner promised to release the School Board in exchange for the benefits promised to J.W. Doc. 82-1 at 2, 4. This is valid consideration and binds Warner, both individually and as the parent of J.W.

b.    *The agreement was knowing and voluntary.*

As explained above, the release clearly and unambiguously waives Warner's right to bring a claim specifically related to J.W.'s education that existed as of March 15, 2022, and prevents Warner from suing the School Board based on any other fact, act, or event occurring before March 15, 2022. In the agreement, Warner "acknowledges that he has had the opportunity to obtain the advice of legal counsel of his choice prior to executing this Agreement and agrees that he had an opportunity to read and consider the agreement in its entirety." Doc. 111 at ¶ 2. Additionally, "[t]he Parties confirm that they had the opportunity to have the Agreement explained to them by an attorney and that they are relying on their own judgment and/or on the advice of their respective attorneys[] and confirm their competence to understand and accept the terms and conditions of the Agreement." Doc. 111 at ¶ 2.

Despite this language, Warner argues that he did not knowingly and voluntarily release his civil rights claims as part of the settlement agreement. Warner

20

asserts that the release deserves scrutiny under *Beadle v. City of Tampa*, 42 F.3d 633, 635 (11th Cir. 1995), and similar precedent. Doc. 87 at 8–9. In *Beadle*, a police officer resigned because the police department required him to work on his Sabbath day. *Id.* at 634. When he submitted his resignation letter, a supervisor provided him a document in which the officer agreed not to sue in exchange for a waiver of his training and hiring expenses. *Id.* at 635. The officer "reviewed this document for less than thirty minutes and signed it without consulting an attorney." *Id.* The district court found that the officer's release was neither knowing nor voluntary, and *Beadle* affirms. *Id.* at 635–36; *see also Myricks v. Fed. Reserve Bank*, 480 F.3d 1036, 1042 (11th Cir. 2007) (explaining that, to release a Title VII claim, an employee's consent to the settlement must be voluntary and knowing based on the totality of the circumstances); *Puentes v. United Parcel Serv., Inc.*, 86 F.3d 196, 197 (11th Cir. 1996) (finding that twenty-four hours was insufficient time for employees to review release forms).

To determine whether a release of Title VII claims is knowing and voluntary, *Beadle* cites a list of "factors" first delineated in *Gormin v. Brown-Forman Corp.*, 963 F.2d 323, 327 (11th Cir. 1992). *See* 42 F.3d at 635–36. As *Gormin* explains, some circuits evaluate the "totality of the circumstances" while others apply "ordinary contract principles." 963 F.2d at 327. *Gormin* describes these as "different labels" for "the same process" but advises the district court to "consider such factors in

21

determining the validity of the release." *Id.*[9]

Warner seeks to extend these "factors" to the release of his Section 1983 claims. Doc. 87 at 8. Because Warner is not an employee who released his employer, *Beadle* and similar precedent are inapplicable here. However, even if analyzed under *Beadle*, Warner's claim would fail. Unlike *Beadle*, the release here occurred after several months of negotiation between Warner and an attorney for the School Board. Doc. 107-1. Warner then signed the agreement, which acknowledged that he had an opportunity to read and to consider the agreement, as well as to consult with an attorney. The agreement, and particularly the release provision, is clear and unambiguous, as explained above. Thus, Warner's argument that he did not "knowingly, voluntarily, and intelligently" release civil rights claims fails.

c.    *The release comports with public policy.*

"Extreme caution" is warranted when a party seeks to void a contract based on "public policy." *Action Nissan, Inc. v. Hyundai Motor Am.*, 617 F. Supp. 2d 1177, 1189–90 (M.D. Fla. 2008) (quoting *Bituminous Cas. Cor. v. Williams*, 17 So. 2d 98, 101 (Fla. 1944)). "'Freedom of contract is the general rule . . .'" and interference with that freedom occurs only in "exceptional circumstances." *City of Largo v. AHF-Bay Fund, LLC*, 215 So. 3d 10, 15–16 (Fla. 2017).

---

[9] Notably, this Title VII precedent appears to derive from a footnote in *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 52 n.15 (1974), which deals with the prospective waiver of Title VII claims in a collective bargaining agreement. As that footnote explains, the issue of a waiver as part of a voluntary settlement agreement was not before the Court.

Warner cites *Town of Newton v. Rumery*, 480 U.S. 386 (1987), in support of his claim that the settlement agreement violates public policy. *Rumery* evaluated a "release-dismissal" agreement in which a plaintiff released his civil rights claim against law enforcement in exchange for the prosecutor's dismissing criminal charges against him. 480 U.S. at 389–91. *Rumery* finds that the plaintiff voluntarily waived his right to sue under Section 1983 and, therefore, "the public interest opposing involuntary waiver of constitutional rights is no reason to hold this agreement invalid." *Id.* at 394. *Rumery* further explains that a "release-dismissal" agreement "may further legitimate prosecutorial and public interests." *Id.* at 398. In so finding, *Rumery* explains how the release of a Section 1983 claim can, in fact, further public policy and the public interest by preventing marginal or frivolous lawsuits and by conserving the public resources necessary to defend against such lawsuits. *Id.* at 395–96.

Similar to *Rumery*, the vindication of constitutional rights is not the only public policy interest at stake here. Public policy favors protecting public resources and preserving those resources for their intended purposes, as well as preserving the freedom to contract and upholding the expectations and finality created by a valid release. Furthermore, nothing prevents someone other than Warner from vindicating the important public interest described in Warner's complaint. Unlike *Rumery*, where the plaintiff's claim involved conduct particular to him by the local police, here Warner's claim attacks issues that broadly impact the citizens of Hillsborough County. Thus, someone else could arguably establish standing to bring the types of

claims that Warner released. Accordingly, Warner presents no basis for voiding the settlement agreement based on public policy.

### C. Even if some claims fall outside the scope of the release and covenant not to sue, those claims fail for lack of standing.

Warner's third amended complaint purports to state a broader challenge to the assignment and voting district maps by contesting all of the maps and not just those affecting Warner. These claims, even if outside the scope of the settlement agreement, fail for lack of standing. To establish standing under Article III of the United States Constitution, a plaintiff must allege facts sufficient to demonstrate that he suffered "(1) an injury in fact, (2) fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by the requested relief." *Fed. Election Comm'n v. Cruz*, 142 S. Ct. 1638, 1646 (2022).

> "[T]o establish an injury in fact, [a plaintiff] must first demonstrate that the [defendant] has invaded some 'legally protected interest' of his." A "legally cognizable injury" requires infringement of "an interest ... protected by statute or otherwise." That "interest must consist of obtaining compensation for, or preventing, the violation of a legally protected right."

*Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cnty*, 450 F.3d 1295, 1304 (11th Cir. 2006). An injury may not be abstract. *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004). Rather, "[a] plaintiff must point to some type of cognizable harm, whether such harm is physical, economic, reputational, contractual, or even aesthetic." *Id.*; *see also Lujan v. Def. of Wildlife*, 504 U.S. 555, 563 (1992) (holding that an injury in fact requires a party provide a particularized showing that he is directly injured in an individual capacity). In other words, the

injury "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014). Traceability requires that the plaintiff establish "a causal connection between the injury and the conduct complained of." *Lujan*, 504 U.S. at 560.

Courts "refuse[] to recognize a generalized grievance against allegedly illegal governmental conduct as sufficient for standing to invoke the federal judicial power." *United States v. Hays*, 515 U.S. 737, 743 (1995). An individual lacks standing to challenge government action, including discrimination based on race, on the basis that he possesses a general right to equal protection under the law. *Id.* at 744. If an individual can demonstrate that he personally suffered some injury from alleged racial classification, that individual "has standing to challenge the classification in federal court." *Id.*; *Allen v. Wright*, 468 U.S. 737, 755 (1984) (stating that standing for redress of injury caused by racial classification is only available to plaintiffs that are "personally denied equal treatment by the challenged discriminatory conduct.").

A person's right to vote is "individual and personal in nature." *Gill*, 585 U.S. at 65. Thus, a claim of vote dilution is district specific. *Id.* at 66. "[A] plaintiff who alleges that he is the object of a racial gerrymander—a drawing of district lines on the basis of race—has standing to assert only that his own district has been so gerrymandered." *Id.* at 66 (citing *Hays*, 515 U.S. at 744–45). Thus, a plaintiff who complains of gerrymandering in districts other than his own "asserts only a generalized grievance against governmental conduct of which he or she does not approve." *Id.*

25

In the third amended complaint, Warner challenges the school assignment
and voting district maps throughout Hillsborough County. Doc. 79 at ¶ 22–23, ¶
155–68. However, "[o]nly those citizens able to allege injury 'as a direct result of
having personally been denied equal treatment' may bring such a challenge." *Hays*,
515 U.S. at 746. Because "a plaintiff's injury must be 'limited to the inadequacy that
produced [his] injury in fact,'" Warner has standing to challenge only those
boundaries personally affecting him. *Gill*, 585 U.S. at 66; Doc. 79 at ¶ 125. As
explained above, Warner released his claims "specifically related to J.W.'s
education" and otherwise agreed not to sue the School Board for claims predicated
on conduct occurring before March 15, 2022. Those claims include his challenge to
the voting district maps, which the School Board last amended in 2021. Ultimately,
the settlement agreement forecloses the only claims for which Warner can plausibly
allege standing.

### III.   CONCLUSION

Based on the findings in this report, I recommend (1) converting the motion for judgment on the pleadings, Doc. 86, to a motion for summary judgment and granting a judgment in favor of the School Board; (2) denying Warner's motions to strike, to compel, and to stay summary judgment, Docs. 85, 93, 106; (3) terminating any other pending motion and closing the case.

**REPORTED** on this 14th day of January, 2025.

LINDSAY S. GRIFFIN
United States Magistrate Judge

### **NOTICE TO PARTIES**

A party has fourteen days from the day of service of this report either to file written objections to the proposed findings and recommendation or to seek an extension of the fourteen-day deadline. 28 U.S.C. § 636(b)(1)(C). Under Eleventh Circuit Rule 3-1, a party failing to object to a magistrate judge's findings or recommendations "waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions." 11th Cir. R. 3-1; 28 U.S.C. § 636(b)(1).  If the parties wish to expedite the resolution of this matter, they may promptly file a joint notice of no objection.