# United States District Court
## For The Middle District of Florida
## Tampa Division

Blake Warner

v.

The School Board of
Hillsborough County Florida

Case Number 8:23-CV-181-SDM-LSG

## Plainitff's Objections to the Magistrate's R&R

Plaintiff Blake Warner, proceeding pro se, respectfully submits these objections to the Magistrate Judge's Report and Recommendation ("R&R"). Doc. 112. The R&R contains significant factual and legal errors that warrant rejection. Contrary to the R&R's characterization, this case is not *at all* about the school assignments of Plaintiff's child, J.W., but rather about the systemic racial discrimination that Mr. Warner personally experienced starting as a child in the 1990s by the Hillsborough County School Board, and its present-day effects on Warner directly as a taxpayer, a former student, a community member, and as a current and prospective homeowner.

The R&R contains significant legal and factual errors warranting reversal, including:

1. erred in applying state law contract principles to the federal civil rights release when federal law governed;

2. violated the party presentation rule by raising arguments not advanced by the parties, including manufacturing an entire affirmative of "agreement not to sue" that defendant waived by not raising or pleading in their answer;

3. erred by ruling sua sponte on standing with no notice or opportunity to be heard on the issue;

4. erred in releasing civil rights claims premised on school boundary changes the board made more than a year after the date of release and was not "specifically related to J.W." and were explicitly carved out to "not cover ... any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement";

1

5. erred when it found all of the consideration promised to J.W. was consideration to Warner (not J.W.), because then J.W. did not receive any consideration for his release of claims against the board and Warner lacks the capacity to release his child's claims in his own capacity.

6. erred finding that Warner's voter map challenge was "specifically related to J.W." under the theory that Warner's "vote dilution" challenge was some how a continuation of his child's IDEA. litigation;

7. erred in not giving Warner an opportunity to submit *any* argument after converting the board's Rule 12(c) motion to summary judgment;

# I  SUMMARY JUDGMENT

The report erred by failing to properly scrutinize the civil rights waiver under the "totality of the circumstances" test to ensure that the releases were "knowingly, voluntary, and intelligently" made with sufficient awareness of the relevant circumstances and likely consequences. *see* Strickland. Brady v. United States, 397 U.S. 742, 748 (1970); United States v. Brown, 586 F.3d 1342, 1346 (11th Cir. 2009). Rather, the report exclusively applied state law contract principles. But the question of waiver of federally guaranteed constitutional rights is a federal question controlled by federal law. *see* Rollins v. Sec'y, Fla. Dep't of Corr., 613 F. App'x 869, 4 (11th Cir. 2015), Brookhart v. Janis, 384 U.S. 1, 4 (1966), Boykin v. Alabama, 395 U.S. 238, 243 (1969). Even the board acknowledged that the "totality of the circumstances" is the correct test when they referenced the standard in the settlement agreement[1].

True, state law contract principles do apply generally to the settlement agreement, but federal common law controls when they conflict. And federal common law has a higher "knowingly, voluntary, and intelligently" standard that *requires* courts to consider extrinsic evidence that state law *might* otherwise exclude and imparts a different standard on whether the agreement is "clear and unambiguous".

## 1.  THE REPORT MISINTERPRETED THE RELEASE

The R&R focuses on two questions: (1) whether Warner's §1983 claims "specifically relate to J.W.'s education," and (2) whether those claims existed as of March 15, 2022. (Doc. 112 at 13). While the first inquiry is appropriate, the second is overly broad and should be limited to claims arising between 2017 (the year J.W. arrived in Hillsborough County for kindergarten) and March 15, 2022. By definition, any claim involving conduct after March 15, 2022 cannot be "specifically related" to J.W.'s education as of that date. Moreover, the settlement agreement itself excludes claims based on "any act or omission occurring after the Effective Date," even if the claim relies in part on pre–Effective Date facts.

---

[1]"the Parent hereby *knowingly and voluntarily* releases and discharges the School Board" (emphasis mine). Doc. 81 ¶ 5

Because Plaintiff challenges the School Board's adoption of new school assignment boundaries in 2023—over a year after the March 15, 2022 release—there is no need to address whether those boundaries "specifically relate to J.W.'s education." They clearly fall outside the release's temporal scope.

Additionally, ambiguity exists in the agreement's phrase "specifically relate to J.W.'s education." The R&R cites the Oxford English Dictionary for "relate" and "specifically," noting they serve to narrow an otherwise broad term. (Doc. 112 at 13). However, the R&R does not define "education," even though Mr. Warner interprets "education" to mean direct instruction provided specifically to J.W., whereas the Board contends it encompasses the entire educational system which would necessarily include *where* the instruction takes place. The very dictionary cited by the Court—defining "education" as "[t]he systematic instruction, teaching, or training in various academic and non-academic subjects given to or received by a child, typically at a school…"[2]—supports Mr. Warner's narrower view.

There are no allegations in the Third Amended Complaint challenging the specific "systematic instruction" or teaching J.W. received. Indeed, the Board has never argued that the quality of instruction differs among its schools. Whether "education" is meant narrowly (i.e., actual classroom instruction for J.W.) or expansively (i.e., anything related to the entire school system) is a significant distinction that must be resolved. Under Florida law, contract interpretation typically presents a legal question; but where contract terms are ambiguous or susceptible to multiple reasonable interpretations, the matter becomes a factual issue that should be submitted to the fact finder. See Smith v. State Farm Mut. Auto. Ins. Co., 231 So. 2d 193, 194 (Fla. 1970); First Nat'l Bank of Lake Park v. Gay, 694 So. 2d 784, 788 (Fla. 4th DCA 1997). Consequently, discovery is necessary to clarify this ambiguity and determine whether the release applies to claims regarding the 2023 boundary changes, particularly when those boundary changes occurred long after the Effective Date of the agreement.

## 2.  COUNT ONE, THE SCHOOL ASSIGNMENT MAPS

The R&R incorrectly concludes that "Warner's claims are logically, causally, and specifically connected with J.W.'s education because they involve the school assignments of J.W., which is fundamentally a part of his education." In reaching this conclusion, the R&R identifies four alleged facts in the operative complaint to show that Count One is "specifically related" to J.W.'s education. But those facts either do not appear in the current operative complaint or do not concern J.W:

1. the School Board improperly assigned J.W. to Adams Middle School even though Warner lives geographically closer to Carrollwood K-8 in 2023, after he moved to that home in October 2022.

---

[2]https://www.oed.com/search/dictionary/?scope=Entries&q=education

2. Warner's home is assigned to a middle school and a high school that are challenged.

3. Warner is forced to compete in a race-based school enrollment system to enroll his minor child in one of HCSB's public schools.

4. "In the settlement, the parties negotiated and agreed to future school assignments for J.W. The settlement agreement demonstrates that Warner's previous dispute with the School Board (or, at the very least, its resolution) involved J.W.'s school assignments through high school. The claims here involve J.W.'s middle and high school assignments."

## A. PAST REFERENCES TO J.W.'S SCHOOL ASSIGNMENTS

The R&R relies on allegations that (1) J.W. was improperly assigned to Adams Middle School near Warner's 2022 home and (2) Warner's house is zoned for certain middle and high schools he challenges. The first is a vestige from an earlier version of the complaint, and is not connected to any cause of action in the operative complaint. Regardless, these purported facts are irrelevant to Warner's present claims. They address only which schools are assigned to Warner's home—an issue affecting his property value whether or not he has any children in the public school system. Indeed, Warner's operative complaint clarifies that he is challenging the county's broader school boundary lines for virtually every public school in Hillsborough County, not just those zoned to his residence. Thus, whether J.W. attends (or even intends to attend) those schools is immaterial.

## B. COMPETITION IN A RACE-BASED EDUCATION SYSTEM

The R&R cites Warner's assertion that he is "forced to compete" in a race-based enrollment system to enroll his "minor child" in public school. This reference appears solely under a heading labeled "Injury," indicating it was pled to establish Article III standing—not as a distinct cause of action. Indeed, the settlement agreement purports to release claims, not jurisdiction. Thus, allegations to support standing are immaterial to the question of whether J.W.'s claims are waived. Even if this allegation were directed toward J.W., the operative complaint advances other independent grounds for standing (e.g., non-tangible harms, decreased property value, loss of community), confirming that any reference to J.W. here does not transform the entire action into a suit "specifically related" to J.W.'s education.

Even if the court oddly "releases" standing, the court is required to dismiss the action without prejudice, *not* grant summary judgment, and Warner could just refile in state court with more relaxed standing. *see* Tocmail, Inc. v. Microsoft Corp., a Wash. Corp., 67 F.4th 1255, 1267 (11th Cir. 2023) (reversing summary judgment with direction to dismiss without prejudice due to lack of standing).

Furthermore, this fact does not explicitly refer to J.W., rather it says "child". There is no evidence in the record regarding how many minor children Warner has currently (or in the past) or whether he plans to have more children. Therefore on this record, the court cannot conclude that this fact is related to J.W at all.

## C. SETTLEMENT AGREEMENT ON "FUTURE SCHOOL ASSIGNMENTS"

The R&R mistakenly concludes in the fourth fact that Warner's "previous dispute" with the Board addressed J.W.'s "school assignments through high school." In fact, the referenced "dispute" was a due process complaint under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §1400 et seq., which allows parents to challenge only the identification, evaluation, IEP, or placement[3] of a student with disabilities. There is no evidence of any prior dispute involving J.W.'s general school assignment, nor does the operative complaint specifically challenge an existing or prior school assignment for J.W.

Moreover, the underlying due process complaint raised by Warner focused on a denial of a Free Appropriate Public Education (FAPE) for J.W. during COVID-related remote learning and a subsequent mask mandate. It did not concern J.W.'s prospective school assignments under district zoning.

The R&R also errs in finding that the parties "agreed to future school assignments for J.W." Contrary to that suggestion, the settlement merely guaranteed J.W.'s admission into two identified schools if—and only if—he chose to apply through the district's school-choice program. This is distinct from a compulsory "assignment" to those schools. Indeed, J.W. has never attended either program and currently attends an entirely different school. Thus, far from "conclusively resolv[ing] all disputes over J.W.'s school assignments" (Doc. 112 at 15), the settlement simply conferred additional school-choice options.

Finally, the R&R's reliance on potential IEP recommendations regarding other schools misunderstands the role of "placement" under IDEA law. By requiring a FAPE in the least restrictive environment, some students with unique abilities may require specialized programs available only at select campuses. Any transfer arising from an IEP-team recommendation addresses this individualized educational need—not a general district assignment or boundary dispute. The settlement's reference to this possibility merely clarifies that if the IEP team recommends a specialized program at a different school, it would not constitute a contractual breach.

## D. EVENTS OCCURRED AFTER DATE OF RELEASE

Even if facts one and two were germane, those two facts are predicated on events that occurred after the March 2022 date of release because the claims did not accrue until a) Warner moved from South Tampa to North Tampa in October 2022[4] and b) the school board changed the assignment boundaries of the schools around his north tampa home in 2023. As of March 2022, it was neither possible for Mr. Warner to challenge the school assignments of a north tampa home (that he did not reside at until October 2022) nor challenge school assignment boundaries that did not exist until 2023. Therefore the reports finding that "these claims existed as of March 15,

---

[3]In the IDEA context, "placement" refers to the setting in which the student receives special education and related services in the least restrictive environment; it does not refer to general school zoning or boundary-line assignments.

[4]not relevant since Warner is not specifically challenging J.W.'s school assignment.

2022" is factually incorrect as those claims accrued after the March 2022 date of release and are explicitly excluded from the release:

"The Parties further agree that this release shall not cover any claim that is not regarding J.W.'s education *or any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement.* (emphasis mine)"Doc. 82-1 ¶ 5

### E.  CHANGES IN WARNER'S ASSIGNED SCHOOLS

The R&R's conclusion that, because Hillsborough Public Schools were segregated at some point in 1933, Warner "can never make a school segregation claim" in the future—regardless of any changes in school boundaries or assignments—is plainly erroneous. Taken to its logical extreme, the R&R would suggest that the school board could unlawfully assign Warner's children to a 100% Black school and that no claim would lie simply because "segregation existed in 1933." This reading defies both common sense and controlling legal principles.

### F.  EACH BOUNDARY CHANGE GIVES RISE TO A NEW SET OF FACTS

School segregation claims are inherently fact-driven. The principles of res judicata are guiding here. Every boundary change and student assignment can raise new constitutional or statutory violations because each arises out of a different "transaction or series of transactions." Trustmark Ins. Co. v. ESLU, Inc., 299 F.3d 1265, 1269–70 (11th Cir. 2002). A past historical finding that schools were once segregated simply does not foreclose future claims based on new or different conduct by the board.

### 3.  CIVIL RIGHTS CLAIMS CANNOT BE PROSPECTIVELY WAIVED

Any reading of the release that would bar Warner—or anyone else—from challenging unlawful future segregation would be an unenforceable prospective waiver of civil rights, because it would violate public policy by undermining civil rights statutes. The law does not permit defendants to immunize themselves in perpetuity from potential future violations of federal anti-discrimination mandates.

Interpreting the release to foreclose all future challenges to boundary-line decisions offends the fundamental principle that courts must remain open to redressing new and ongoing civil rights violations. If a school board adopts boundary policies next year—or at any time—that are unlawful, the affected individuals must be able to challenge those policies.

In sum, any suggestion that Warner is forever barred from asserting segregation claims because of conditions predating the release is contrary to the principles of res judicata and the prohibition on prospective waivers of civil rights. Every new boundary or assignment decision constitutes a fresh factual scenario that may give rise to a separate and valid claim.

## 4.  COUNT TWO, DISTRICT VOTING MAPS

The report erred in finding that Warner's district voting map challenge is "specifically related to J.W.'s education" because "the pleading history demonstrates that this claim is simply another iteration of the same dispute over school assignments for J.W. that began in the [IDEA due process complaint]] with the School Board and that continued in this Court on January 26, 2023.". First, as previously argued, it is not possible to challenge residential student assignments in due process complaints; that litigation involved a denial of special education services during COVID-19 and the mask mandate.

This is the second time the report has erroneously suggested that the IDEA settlement was about discriminatory student assignments. The board has never made this argument. Admittedly, that guarantee of student choice might seem out of place in an IDEA settlement without context. As is evident by the presence of an IEP, J.W. has some unique abilities, which require that he has a consistent routine and learning environment. Mr. Warner had overextended himself financially to live in that Plant school district. At the time, J.W. was already assigned to Plant High School. The purpose of the school choice agreement was to ensure a consistent learning environment by avoiding having to change schools if Warner was unable to find and maintain affordable housing in that same district.

Even if this lawsuit was a continuation of the IDEA litigation (it was not), the board never raised this argument, so it is precluded by the party presentation rule.

The R&R also incorrectly found that:

1. "The purpose of the agreement is 'to conclusively resolve and settle any and all claims pertaining specifically to the education of J.W.'"; the purpose of the settlement was to settle the IDEA due process complaint, which the R&R later agrees with ("The agreement resolves the 'Lawsuit' by guaranteeing to J.W. 'a school assignment through the District Choice Options program'", with the 'Lawsuit' referring to the IDEA due process complaint). There is no evidence in the record that supports the proposition that the settlement agreement was anything but an IDEA settlement.

2. "The agreement resolves the 'Lawsuit' by guaranteeing to J.W. 'a school assignment through the District Choice Options program'"; not true, the lawsuit was resolved by the board agreeing to take remedial steps to address a denial of FAPE to J.W. in addition to guaranteed school choice enrollment.

3. "In exchange for that guarantee and other concessions offered by the School Board, the 'Parent' (Warner) agrees to dismiss the Lawsuit with prejudice and to 'release claims the Parent purports to have against the School Board and District as set forth in paragraph 5[.]'". Not true, Warner lacked individual capacity to dismiss a lawsuit that he is not a party to. J.W. agreed to dismiss the lawsuit.

4. "The release contains a non-exclusive list of items covered by the release, including 'all losses of any kind whatsoever related specifically to J.W.'s education, which the Parent has or might have by virtue of any fact(s), act(s) or event(s) occurring prior to the Effective Date of this Agreement.'" Slightly disagree, this finding ignores the later clause that negates this: "The Parties further agree that this release shall not cover ... any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement.".

## 5.   AMBIGUITY IN CONTRACTS UNDER STATE LAW

An agreement is ambiguous under Florida law if, as a whole or by its terms and conditions, it can reasonably be interpreted in more than one way. Fla. Power & Light Co. v. Hayes, 122 So. 3d 408 (Fla. 4th DCA 2013).

Contractual ambiguities are either 'patent' or 'latent'. Patent ambiguities "are on the face of the document, while latent ambiguities do not become clear until extrinsic evidence is introduced and requires parties to interpret the language in two or more possible ways." Nationstar Mortgage Co. v. Levine, 216 So. 3d 711 (Fla. 4th DCA 2017).

A patent ambiguity appears on the face of a contract and arises from the use of defective, obscure, or insensible language. Emergency Assocs. of Tampa, P.A. v. Sassano, 664 So. 2d 1000 (Fla. 2d DCA 1995). Under Florida law, patent ambiguities cannot be resolved by introduction of parol or extrinsic evidence. Landis v. Mears, 329 So. 2d 323 (Fla. 2d DCA 1976). Therefore, when a contract does not clearly indicate the parties' intention, the court must declare that the patently ambiguous provision is a nullity. See Connelly v. Smith, 97 So. 2d 865 (Fla. 3d DCA 1957).

By contrast, a latent ambiguity exists "where the language employed is clear and intelligible and suggests a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among two or more possible meanings." Ace Elec. Supply Co. v. Terra Nova Elec., Inc., 288 So. 2d 544 (Fla. 1st DCA 1973). "[W]hen a contract is rendered ambiguous by some collateral matter, it has a latent ambiguity, and the court must hear parol evidence to interpret the writing properly." RX Solutions, Inc. v. Express Pharmacy Servs., Inc., 746 So. 2d 475 (Fla. 2d DCA 1999). A latent ambiguity is thus brought to light when extraneous circumstances reveal "an insufficiency in the contract not apparent from the face of the document." Hunt v. First Nat'l Bank, 381 So. 2d 1194 (Fla. 2d DCA 1980).

A significant difference between patent and latent ambiguities is that extrinsic evidence is normally inadmissible to construe a patent ambiguity because the admittance of such evidence "would allow a trial court to rewrite a contract with respect to a matter the parties clearly contemplated when they drew their agreement." Emergency Assocs. of Tampa, P.A., 664 So. 2d 1000 (Fla. 2d DCA 1995). On the other hand, "'[e]xtrinsic evidence . . is admissible to explain a latent ambiguity' . . . be-

cause doing so 'is but to remove the ambiguity by the same kind of evidence as that by which it is created.'" Mac–Gray Servs., Inc. v. Savannah Assocs. of Sarasota, LLC, 915 So. 2d 657 (Fla. 2d DCA 2005).

There is also an exception to the general rule against extrinsic evidence that applies where the patent ambiguity concerns identify capacity, or the parties' relationship with each other. Indeed, Florida courts allow parol evidence regarding identity, capacity, and the parties' relationship with one another even when the ambiguity exists on the face of the document because the court would not be rewriting the terms of the contract." Nationstar Mortgage Co. v. Levine, 216 So. 3d 711 (Fla. 4th DCA 2017). Here, Warner challenged the identity and capacity of the agreement on the basis that it is ambiguous whose capacity Warner released the claims in, and J.W. cannot release his civil rights if he did not receive consideration for that release. Warner's position is that the board gave consideration to J.W. by guaranteeing him enrollment to specific schools (among other things). The board and the R&R disagreed and said that promise of the guarantee of enrollment for J.W. was consideration to Warner. If that is true, then J.W. did not receive any consideration to form a valid contract and Warner does not have the capacity to release J.W.'s claims on his own – it must be on behalf of the child. The report cannot have it both ways – and the report failed to address this problem at all.

Moreover, contractual ambiguities are usually construed against the drafter of the underlying agreement under Florida law. Berloni S.p.A. v. Della Casa, LLC, 972 So. 2d 1007 (Fla. 4th DCA 2008). But this is not always the case. For example, courts cannot construe a restrictive covenant, such as an employees' non-solicitation provision, narrowly against the drafter of the contract. Fla. Stat. § 542.335. Thus, it is crucial to understand the subject matter and possible ramifications at the time the contract is actually drafted. Proper contract construction is vital to obtaining a fair and equitable result and avoiding issues with ambiguous terms and conditions.

## A.  SPECIFIC AMBIGUITIES

The report erred in finding that Warner identified no ambiguity, yet he called out the release's "specifically related to J.W.'s education .. all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services"[5] as *both* a patent and latent ambiguity (in addition to arguing interpretation). This language is ambiguous because it does not clearly define what constitutes a claim "specifically related to J.W.'s education." Plaintiff's current claims concern racial gerrymandering of school district boundaries and voter disenfranchisement— issues that affect the entire school district and not solely J.W.'s education. The ambiguity lies in whether such claims, which are not directly related to J.W.'s educational services or placement, are barred by the release. If the phrase "specifically related to J.W.'s education" is given an overly broad interpretation, it renders the limiting

---

[5]"the scope of the release was not clear and unambiguous ... The words 'specifically related to J.W.'s education... all claims for services, supports, therapies, evaluations, tutoring, training, compensatory education or services' ..." *see* Doc. 87 pp. 7

language of the release meaningless. The report disregarded this as a question of interpretation by focusing on Mr. Warner's reference to the rules of construction; however, the report missed that courts fall back to the rules of construction to address patent ambiguities.

As addressed more in depth below, there is also a patent ambiguity in the "agreement not to sue": The section that states releases claims "related to any other facts, acts, or events occurring in whole or in part on or before the Effective Date" expressly conflicts with "the Parties further agree that this release shall not cover ... any new claim that may arise by reason of an act or omission occurring after the Effective Date of this Agreement". One section exclusively applies to claims containing any facts before the date of release, and the other exempts any claims based on facts that occurred after the date of release – they cannot both be true.

Also addressed more in depth below, there are serious ambiguities regarding identity and capacity of the parties. The agreement frequently conflates Mr. Warner and his child J.W, treating them as if they are the same entity – but they are not. The record demonstrates that the settlement is an IDEA settlement for J.W., yet it also makes statements like "the Parent hereby ... releases and discharges the School Board ... from any and all claims ... specifically related J.W.'s education, services, and educational program in the District ...". But these claims belong to the child, not the parent – the parent cannot waive the child's claims on behalf of himself, only on behalf of the child.

## 6.   EXTRINSIC EVIDENCE UNDER FEDERAL LAW

The R&R erred by concluding that Florida contract law bars consideration of extrinsic evidence of knowledge and voluntariness when assessing a release of federal rights. When a plaintiff releases claims arising under federal civil rights statutes, the question of validity is governed by federal law, and courts must consider the totality of the circumstances. Town of Newton v. Rumery, 480 U.S. 386, 392 (1987); Brookhart v. Janis, 384 U.S. 1, 4 (1966). By improperly restricting its analysis to the four corners of the agreement, the R&R disregards binding precedent that requires a searching inquiry into all relevant facts and circumstances.

As the Supreme Court held in Alexander v. Gardner-Denver Co.: "In determining the effectiveness of any such waiver, a court would have to determine at the outset whether [a person] had voluntarily and knowingly consented to the settlement of his cause of action." 415 U.S. 36, 52 n.15 (1974). Although Florida law may inform certain aspects of a contractual dispute, it does not override the federal standard for waiving federal claims. None of the authorities cited in the R&R involve the release of claims under federal civil rights statutes; thus, those authorities cannot dictate the outcome where federally created rights are at issue.

The Supreme Court has long required courts to examine all pertinent facts and circumstances surrounding the execution of a waiver of federal rights. Brookhart, 384

U.S. at 4. In the Eleventh Circuit, the totality-of-the-circumstances standard necessarily includes evidence of the parties' negotiations, the plaintiff's state of mind, the presence (or absence) of counsel, relative bargaining power, and any signs of pressure, misrepresentation, or confusion. See Puentes, 86 F.3d at 198.

This Court must ensure that, where fundamental federal rights are at stake, any purported waiver reflects a deliberate, knowledgeable, and voluntary choice. See Rumery, 480 U.S. at 394–95 (discussing policy considerations inherent in releasing federal civil rights claims). Allowing state-law contract rules alone to govern the scope and enforceability of such releases risks undermining the crucial safeguards that federal law provides. Brookhart, 384 U.S. at 4; Alexander, 415 U.S. at 52 n.15. Because the R&R fails to engage in this heightened federal inquiry, its recommendation is legally insufficient and should be rejected.

## 7. EXTRINSIC EVIDENCE UNDER STATE LAW

Under Florida law, "[i]f a written contract is ambiguous or obscure in its terms, so that the contractual intention of the parties cannot be understood from a mere inspection of the instrument, extrinsic evidence of the subject matter of the contract, of the relations of the parties to each other, and of the facts and circumstances surrounding them when they entered into the contract may be received to enable the court to make a proper interpretation of the instrument." Larsen v. AirTran Airways, Inc., No. 8:07-CV-00442-T-17TBM, 2009 WL 1076035, at *10 (M.D. Fla. Apr. 21, 2009) (quoting L'Engle v. Scottish Union & Nat'l Fire Ins. Co., 37 So. 462 (Fla. 1904)). The Florida Supreme Court has similarly held that where the language of a contract "is susceptible of being given more than one meaning," the court "may consider parol or extrinsic evidence to explain, clarify or elucidate the ambiguous term." Friedman v. Virginia Metal Prods. Corp., 56 So. 2d 515, 517 (Fla. 1952).

Here, the settlement agreement's language is reasonably susceptible to more than one interpretation. In particular, the broad general release language, later narrowed to limit its scope, raises a genuine question as to the parties' true intent regarding which claims were meant to be released. Such ambiguity warrants the introduction of extrinsic evidence to clarify the scope of the release. As the Middle District of Florida has emphasized, "[a] release should not be read to include matters of which the parties had no intention to dispose." Sunbelt Cranes Constr. & Hauling v. Gulf Coast Erectors, 189 F. Supp. 2d 1341, 1346 (M.D. Fla. 2002). Likewise, the Florida Supreme Court has concluded that when contractual language is ambiguous, extrinsic evidence may be offered to determine the parties' intention. J.M. Montgomery Roofing Co. v. Fred Howland, Inc., 98 So. 2d 484, 485 (Fla. 1957).

Because of these well-established principles, Warner should have been permitted to seek discovery and to present evidence of pre-execution negotiations, including earlier drafts of the agreement. Such evidence would demonstrate how and why the parties transitioned from a broader proposed release to a narrower final release,

thus shedding light on the mutual intent behind the settlement. Limiting the analysis to the four corners of the final document—when the pertinent terms are facially ambiguous—prevents the fact-finder from considering the precise circumstances under which the parties reached their agreement.

In sum, the settlement agreement cannot be fully understood in isolation, and extrinsic evidence is indispensable to resolving the ambiguity surrounding the scope of the release. Under controlling Florida law, the Court should allow the admission of parol evidence so that it may properly interpret the parties' intent and ensure that the release is enforced in accordance with that intent.

## 8.  PRIOR ORAL AGREEMENT

The report erred in refusing to consider the extrinsic evidence of prior oral agreements. Warner shows (1) the Settlement Agreement lacks an integration or merger clause—thus permitting consideration of extrinsic evidence under Florida law; (2) even if the parol evidence rule applied, the "inducement" and "latent ambiguity" exceptions compel this Court to consider Warner's undisputed evidence of the parties' prior oral agreement; and (3) Warner's Declaration establishes that he was induced to sign the Agreement based on assurances that only IDEA-related claims would be released.

### A.  THE ABSENCE OF A MERGER CLAUSE

Under Florida law, "evidence of a prior or contemporaneous oral agreement is inadmissible to vary or contradict the unambiguous language of a valid contract," Chase Manhattan Bank v. Rood, 698 F.2d 435, 436 (11th Cir. 1983), only when it is demonstrated that the parties intended the written agreement to be the final and complete expression of their bargain. See Johnson Enterprises of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1309 (11th Cir. 1998).

One way of demonstrating such intent is the use of a merger or integration clause, which establishes that "no other understandings or agreements" exist beyond the four corners of the document. Id. Here, the record is devoid of a merger clause or any other indication that the parties intended the Settlement Agreement to incorporate their complete and final agreement. Indeed, nothing in the Agreement itself suggests that its scope is comprehensive or that it is fully integrated. In the absence of any such language, the Agreement cannot be considered fully integrated under Florida law, and parol evidence is admissible to determine the actual scope of the released claims.

### B.  THE INDUCEMENT EXCEPTION

Even assuming arguendo that the parol evidence rule applies, Florida courts recognize an "inducement" exception "whereby parol evidence is admissible to establish a contemporaneous oral agreement which induced the execution of a written contract, though it may vary, change, or reform the instrument." Mallard v. Ewing, 164 So. 674, 678 (Fla. 1936); see also Johnson Enterprises, 162 F.3d at 1309–10

(11th Cir. 1998). Here, the undisputed evidence demonstrates that Warner was induced to sign the Agreement based on the School Board's assurances that only IDEA-related claims—specifically, the pending claims related to J.W. in the Due Process action—would be released.

Warner's Declaration (Doc. 107-1 ¶¶ 4–8) details explicit discussions with Hillsborough County Public School's Assistant Director, Compliance and Staffing, Suzette Sample, and attorney LaKisha Kinsey-Sallis, in which both representatives communicated the understanding that Warner's signature was necessary to release only special education claims related to J.W. Through these representations, Warner was induced to sign the purportedly "broad" release, believing it had been narrowed to reflect that mutual understanding.

## 9. RELEASE WAS NOT KNOWINGLY AND VOLUNTARILY

The report erred in finding that "the release clearly and unambiguously waives Warner's right to bring a claim specifically related to J.W.'s education that existed as of March 15, 2022, and prevents Warner from suing the School Board based on any other fact, act, or event occurring before March 15, 2022.".

First, the report exclusively applied state law on whether the agreement was clear and unambiguous. The standard for whether a federal civil rights release is clear and unambiguous is different between federal and state law.

Settlement agreement waivers of federal civil rights must be clear and unmistakable, not tacitly swept up in broad waivers. *see* Wright v. Universal Maritime Serv. Corp., 525 U.S. 70, 80 (1998) ("[W]e will not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is 'explicitly stated.' More succinctly, the waiver must be clear and unmistakable."). Moran v. Burbine, 475 U.S. 412, 421 (1986) ("the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it").

Furthermore, under federal law, whether the agreement was clear and specific is an issue of fact unsuitable for summary judgment. W. B. v. Matula, 67 F.3d 484, 498 (3d Cir. 1995) ("there is at least a dispute of fact whether the agreement is clear and specific as to a waiver of any damage claims.")

Next, as previously argued, this interpretation ignores the part of the release that explicitly exempts any claim that arises after the date of execution even if part of that claim is based on facts that occurred before the date of release.

The report then goes on to erroneously find that the release was knowingly and voluntarily based exclusively on the text of the agreement stating the same. As explained previously, extrinsic evidence must be considered, and the report explicitly excluded it. The court cannot shirk its duty to engage in a fact-intensive inquiry by relying on a perfunctory conclusion in the agreement.

To R&R also erred when it found (or suggested) that the "totality of the circum-

stances" test does not apply to waiver of civil rights in 1983 actions ("Because Warner is not an employee who released his employer, Beadle and similar precedent are inapplicable here. However, even if analyzed under Beadle, Warner's claim would fail."). At least one sister court has explicitly held just that. *see* W. B. v. Matula, 67 F.3d 484, 497 (3d Cir. 1995) ("applying 'totality of circumstances' to 1983 claim"). It is important to understand the difference between constitutional rights and statutory rights. beadle and its progeny regard *statutory* rights. The report's finding that the same level of scrutiny does not apply to waivers of constitutional rights is wrong. Waivers of constitutional rights demand *more* scrutiny than waivers of statutory rights, not less.

The Court has stated, over and over, that "[w]aivers of constitutional rights not only must be voluntary but must be knowing, intelligent acts done with sufficient awareness of the relevant circumstances and likely consequences,". *see* Brady v. United States, 397 U.S. 742, 748 (1970) (citing Brookhart v. Janis, 384 U.S. 1 (1966)); see also Schriro v. Landrigan, 550 U.S. 465, 479 (2007) (citing Iowa v. Tovar, 541 U.S. 77, 88 (2004)); Tovar, 541 U.S. at 88 (citing Johnson v. Zerbst, 304 U.S. 458, 464 (1938)); Tacon v. Arizona, 410 U.S. 351, 355 (1973) (Douglas, J., dissenting) (quoting Brady, 397 U.S. at 748); D.H. Overmeyer Co. v. Frick Co., 405 U.S. 174, 185 (1972) (citing Brady, 397 U.S. at 748); Brookhart, 384 U.S. at 4 (citing Johnson, 304 U.S. at 464); Johnson, 304 U.S. at 464; Patton v. United States, 281 U.S. 276, 312 (1930); Pennsylvania ex rel. Herman v. Claudy, 350 U.S. 116, 118 (1956); Williams v. Kaiser, 323 U.S. 471, 472 (1945); Gideon v. Wainwright, 372 U.S. 335, 339–40 (1963); White v. Maryland, 373 U.S. 59, 60 (1963); Arsenault v. Massachusetts, 393 U.S. 5, 6 (1968); Boykin v. Alabama, 395 U.S. 238, 242 (1969).

The 'totality of the circumstances' test is the correct standard to apply to determine if a civil rights waiver was "knowingly, voluntary, and intelligently" made. *see* United States v. Smith, 821 F.3d 1293, 1305 (11th Cir. 2016) ("applying 'totality of the circumstances' to fifth amendment rights waiver"), Norris v. Suntrust Banks, Inc., Case No: 5:19-cv-430-Oc-37PRL, at *7 (M.D. Fla. Feb. 3, 2020) ("applying 'totality of circumstances' to jury trial waiver"). Yet the R&R not only failed to "make fact-intensive inquiries to determine whether, under 'the totality of the circumstances,' that it was required to do, the court explicitly excluded or ignored all extrinsic evidence. *see* Duvall v. Sun-Sentinel Co., No. 12-62497-CIV-SCOLA, at *2-3 (S.D. Fla. July 1, 2013) (citing Myricks v. Fed. Reserve Bank of Atlanta, 480 F.3d 1036, 1040 (11th Cir. 2007)) ("the Court cannot dismiss on the basis of those documents alone, no matter how broad the release's language. Instead, Eleventh Circuit case law instructs that the Court must make fact-intensive inquiries to determine whether, under "the totality of the circumstances,").

It was also an error for the report to exclude extrinsic evidence favorable to Warner, then cherry pick certain extrinsic facts that tended to support the report's conclusion such as "the release here occurred after several months of negotiation between Warner and an attorney for the School Board" (Doc 112. pp. 22).

## 10.   PRESUMPTION AGAINST WAIVER

Federal law recognizes a strong presumption against waivers of civil rights.  See Herrera v. 7R Charter Ltd., No. 21-11766, at *6 (11th Cir. Jan. 5, 2022). Despite this established principle, the School Board has offered no evidence or argument to overcome that presumption. Instead, it urges this Court to do precisely what decades of jurisprudence prohibit: enforce a civil rights waiver solely by examining the bare text of the settlement agreement, without the thorough, fact-based inquiry that federal law requires. By accepting the Board's invitation, the R&R erred in departing from the well-established principle that courts must rigorously evaluate waivers of federal civil rights.

## 11.   RELEASE MUST BE FREE OF COERCION AND DECEPTION

The undisputed evidence—set forth in the Declaration of Blake Warner (Doc. 107-1)—shows that the School Board repeatedly assured Mr.  Warner that the release applied only to special education (IDEA) claims pertaining to J.W. and that Mr. Warner's signature was necessary solely because he, as J.W.'s parent, enjoyed certain procedural rights under the IDEA. Despite those representations, the Board now seeks to construe that release in a manner far broader than what was discussed and agreed upon, effectively forcing Mr.  Warner to waive personal constitutional and civil rights claims wholly unrelated to J.W.'s special education rights. This reneging on an agreed-upon limitation renders the release invalid and unenforceable under well-established federal law forbidding trickery, deception, and coercion in procuring a waiver of one's rights. United States v.  Elbeblawy, 899 F.3d 925, 935-36 (11th Cir. 2018) ("We have explained that 'the totality of the circumstances ... must reveal both an uncoerced choice and the requisite level of comprehension.'").

As set forth in Mr. Warner's sworn declaration (Doc. 107-1):

### A.   NEGOTIATIONS CENTERED ON J.W.'S IDEA CLAIMS

In or around November 2021, Mr.  Warner and the Board (through Assistant Director, Compliance and Staffing, Ms.  Sample) discussed settling Mr.  Warner's pending Due Process Complaint filed on behalf of J.W. under the Individuals with Disabilities Education Act (IDEA).

 The proposed settlement was explicitly tied to J.W.'s educational placement and specific concessions regarding admission to certain schools, thereby resolving the IDEA dispute.

### B.   INITIAL DISAGREEMENT OVER OVERBROAD LANGUAGE

On December 3, 2021, counsel for the School Board, Ms. Kinsey-Sallis, proposed an overbroad release purporting to waive more than the specific IDEA claims at issue.  Mr.  Warner refused to sign because that was never what he had agreed to with Ms. Sample.

## C.  FURTHER ASSURANCES THAT THE RELEASE WAS NARROW

In March 2022, Mr. Warner was again told by the Board's counsel that the only reason his name appeared in the release was because he "possessed certain I.D.E.A.-related rights as a parent" and that, to finalize the settlement, he needed to sign away only those rights pertinent to J.W.'s special education claims. Based on those representations, Mr. Warner believed—reasonably and in good faith—that he was releasing only the pending special education claims through the date of execution.

By contrast, the Board now claims that the release was far broader, extending to personal and constitutional claims having no nexus to J.W.'s IDEA rights. This attempt to enforce a more expansive reading than what was expressly promised—and which formed the very basis of Mr. Warner's consent—constitutes precisely the sort of "trickery or coercion" that federal law prohibits when a party purports to waive civil or constitutional rights.

Lastly, forcing a parent to waive their own constitutional rights as a condition of securing their child's educational right to a FAPE is also inherently coercive and unenforceable.

## 12.  CONSIDERATION

The report erred by finding that "Warner signed the agreement in both his personal capacity and on behalf of J.W., and Warner promised to release the School Board in exchange for the benefits promised to J.W. Doc. 82-1 at 2, 4. This is valid consideration and binds Warner, both individually and as the parent of J.W".

The threshold mistake is the Report's conflation of Mr. Warner and J.W. into a single unified entity for purposes of the Agreement's consideration analysis, rather than as two distinct contracting parties. The Agreement designates "Blake Warner" in two capacities: (1) Mr. Warner personally, and (2) Mr. Warner on behalf of J.W.. Each capacity is a separate legal identity with separate rights and obligations. Florida contract law requires that each party receive separate or identifiable consideration. By lumping the parties together, the Report sidesteps the essential question: Where did the consideration flow with respect to Mr. Warner individually? Where did the consideration flow with respect to J.W. as a minor child?

Because the Report never distinguishes between Mr. Warner (in his personal capacity) and J.W. (represented by Mr. Warner), it overlooks that any consideration meant to resolve J.W.'s pending IDEA due process complaint logically must belong to J.W., not Mr. Warner individually. Conversely, any consideration specifically meant to settle Mr. Warner's individual claims must flow personally to Mr. Warner. The Agreement on its face never articulates any direct benefit or "bargained-for exchange" for Mr. Warner individually, yet the Report treats the purported consideration for J.W. as equally satisfying the requirement of consideration for Mr. Warner's personal release of claims.

## A.   REPORT FAILS TO RESOLVE CAPACITY AMBIGUITIES

The Agreement states that it is entered by "the Parent … individually and on behalf of his minor child." That language alone creates a patent ambiguity: Was Mr. Warner personally promising to release claims in exchange for guaranteed school placement and other benefits that were conferred on J.W.? Or, was Mr. Warner merely signing in a representative capacity to release J.W.'s educational claims, in exchange for the District's providing educational services to J.W.?

Under Florida contract principles, courts must look to see if each contracting party receives new consideration that the promisor was not already obligated to provide. Ferguson v. Carnes, 125 So. 3d 841, 842 (Fla. Dist. Ct. App. 2013) (citing Diaz v. Rood, 851 So. 2d 843, 846 (Fla. 2d DCA 2003)). The Agreement's failure to specify whose capacity is implicated for each promise creates a latent ambiguity as well. The Report does not address these ambiguities at all, instead concluding that lumping "Warner" (personally) together with "J.W." somehow cures any consideration problem. It does not.

## B.   THE REPORTS CONCLUSION LEADS TO AN IMPOSSIBLE RESULT

The inevitable consequence of the Report's reasoning is that J.W.'s IDEA due process claims were supposedly released, while J.W. received no consideration whatsoever (because the Report assigns the benefit of the bargain to Mr. Warner as though it could simultaneously satisfy both parties). That reasoning is untenable:

J.W. must receive the educational benefits. The entire purpose of the Agreement was to resolve J.W.'s claims regarding the denial of a Free Appropriate Public Education ("FAPE") under the IDEA. Under Florida law, a minor's settlement must provide something of benefit to the minor when he is relinquishing his own legal rights.

Mr. Warner cannot release the child's claims in Warner's own name. Mr. Warner, in his role as guardian advocate, could only settle J.W.'s claims on J.W.'s behalf. Doing so necessarily means J.W. must receive the educational services as consideration for those released claims. If the consideration flows only to Mr. Warner, then J.W. receives nothing, and the settlement of J.W.'s claims is void.

If the consideration is already owed to J.W., it cannot serve as fresh consideration for Mr. Warner. As noted, the Agreement repeatedly references guaranteed school placement and special education services for J.W.—nothing references a distinct or additional personal benefit to Mr. Warner. Under Ferguson v. Carnes, 125 So. 3d at 842, and Diaz v. Rood, 851 So. 2d at 846, a promise that a party "was already obligated to do" does not constitute new consideration. Hence, if the District had a duty to provide this educational relief to J.W. (or was agreeing to do so via settlement with J.W.), that same, singular consideration cannot simultaneously become a new obligation to Mr. Warner in his personal capacity.

### C. Only one logical interpretation: there is no valid contract with Mr. Warner personally

The only logical reconciliation of these inconsistencies and ambiguities is that the Board entered a valid, binding contract with J.W. (via Mr. Warner acting solely as the child's representative) to settle J.W.'s IDEA claims, in exchange for special education services and guaranteed school placement through the school choice program. Under that valid agreement, J.W. receives consideration (educational benefits), and J.W. releases his own FAPE/IDEA claims.

In contrast, nothing in the document furnishes separate consideration to Mr. Warner personally, and thus he is not bound by a release of his individual claims. To interpret the contract otherwise would either deprive J.W. of any consideration (which would invalidate the settlement of J.W.'s claims) or merge J.W. and Mr. Warner into a single "person" (which is legally impermissible).

## 13. PARTY PRESENTATION RULE

In our adversarial system, courts act as neutral arbiters of disputes presented by the parties, rather than independent investigators of facts or arguments. This principle, known as the "party presentation rule," bars courts from injecting new factual issues, arguments, or affirmative defenses into a case on their own initiative. As the Supreme Court explained in United States v. Sineneng-Smith, "in our adversarial system of adjudication, we follow the principle of party presentation. That is, we rely on the parties to frame the issues for decision and assign to courts the role of neutral arbiter of matters the parties present." 140 S. Ct. 1575, 1579 (2020) (internal quotation marks and citation omitted).

Similarly, in Greenlaw v. United States, the Court stated: "In our adversary system, in both civil and criminal cases, in the first instance and on appeal, we follow the principle of party presentation. That principle forecloses the courts from awarding relief that is not requested by a party." 554 U.S. 237, 243 (2008). These decisions collectively confirm that courts may not construct or revive arguments independently of the parties and must refrain from injecting new factual issues.

The party presentation rule is rooted in fairness and the predictability of litigation. Parties must have notice of the issues and an opportunity to be heard. When a court raises new facts or arguments sua sponte—facts and arguments the parties did not assert or have an opportunity to refute—it undermines both fairness and the essence of the adversarial process.

The report did not just put flesh to the bones of the board's argument: the report conjured an entirely new chimera by raising new affirmative defenses, new arguments, and asserting new facts that none of the parties raised. The party presentation rule and waiver forbid this.

Allowing a court to raise or introduce entirely new matters—factual or legal—would create uncertainty for all parties and encourage a game of guessing what the

court might raise next. By adhering to the party presentation rule, courts foster an environment in which parties can focus on presenting their strongest arguments, secure in the knowledge that their case will be decided upon that presentation, rather than on the court's independent, unforeseen theories.

## 14.   AGREEMENT NOT TO SUE

The report erred in applying section 6 "agreement not to sue" because: a) the board waived that affirmative defense by not raising it in their answer, b) the report violated the party presentation rule by applying this argument that the board never raised (likely because both parties interpreted it differently than the R&R), and c) section 6 was misinterpreted, ambiguous, conflicts with itself and other parts of the agreement, and is otherwise unenforceable.

### A.   AGREEMENT NOT TO SUE WAIVED

The R&R's erred by enforcing this clause of the settlement because this is an affirmative defense the board never raised and is therefore waived. Liberty Mut. Fire Ins. Co. v. State Farm Fla. Ins. Co., No. 20-12970, at *16 (11th Cir. Apr. 6, 2022). Not only does this violate the party presentation rule, it also improperly overrides the Board's deliberate waiver of that affirmative defense[6]. The board only raised the affirmative defense of *release* under section 5 *not agreement not to sue* under section 6. *see* THIRD DEFENSE Doc. 82 pp. 33 - 35. The board included the entirety of section 5, emphasized several parts of it, but made no mention to section 6. Agreements not to sue and release of claims are not synonymous. *see* Rosen v. Florida Ins. Guaranty Assn, 802 So. 2d 291, 295 (Fla. 2001)(citing Atlantic Coast Line Railroad Company v. Boone, 85 So. 2d 834, 841 (Fla. 1956)) (distinguishing the difference between a release and an agreement not to sue).

Affirmative defenses, which go to the heart of a defendant's liability, are governed by Rule 8(c) of the Federal Rules of Civil Procedure. Under this rule, failure to raise an affirmative defense in the defendant's responsive pleading constitutes a waiver of that defense. Hassan v. U.S. Postal Serv., 842 F.2d 260, 263 (11th Cir. 1988). A district court should not, in the face of waiver, unilaterally revive or create a defense for a defendant. Doing so not only contravenes the Federal Rules, but also deprives the opposing party of notice and the opportunity to address the defense.

### B.   THE REPORT MISINTERPRETED THE RELEASE

Even if we overlook the fact that the board never raised this affirmative defense or argument (we cannot), the report misinterpreted section 6:

> "The Parent agrees not to maintain, argue, institute, or file any of the Released Claims in any court, administrative or agency process or other legal forum whatsoever, *nor shall any other court actions, agency action/process or*

---

[6]"As federal courts do not have carte blanche to depart from the principle of party presentation[,] . . . it is an abuse of discretion for a court to override a party's deliberate waiver." (cleaned up))" J & J Sports Prods. v. Los Ranchos Latinos Inc., No. 22-13434, at *6 (11th Cir. Aug. 1, 2024).

*other legal proceedings of any type be filed that are connected in any way to or by
virtue of or related to any other facts, acts, or events occurring in whole or in part
on or before the Effective Date of this Agreement.*" Emphasis mine

The court incorrectly focused on the emphasized text in the latter half, ignoring
the first half. This boils down to an interpretation of a patently ambiguous run-on
sentence replete with commas:

The report interprets this sentence as two distinct clauses:

"The Parent agrees not to maintain, argue, institute, or file any of the Re-
leased Claims in any court, administrative or agency process or other legal
forum whatsoever"

and

"nor shall any other court actions, agency action/process or other legal pro-
ceedings of any type be filed that are connected in any way to or by virtue of
or related to any other facts, acts, or events occurring in whole or in part on
or before the Effective Date of this Agreement"

This interpretation is untenable because the first clause is a "limited release" and
the second a "general release". Read in isolation as the report does, the limited re-
lease would be meaningless as the general release would release everything. The
rules of contract construction forbid this: every word must be given meaning. Ad-
ditionally, it is generally understood and customary that "agreements not to sue"
only apply to released claims. And the report found that the release in ¶ 5 was a
limited release consistent with the first clause of ¶ 6, *not* a general release.

The only way to reconcile this patent ambiguity is to interpret the two sections
as read together to agree not to maintain any action based on any of the released
claims.

Lastly, Section 6 adds nothing of value, because the claims were already released
in section 5, therefore the "agreement not to sue" should be ignored[7].

## 15.  IDEA EXHAUSTION

Enforcement of IDEA settlement agreements is federalized under 20 U.S.C. §
1415 § 1415(e)[8] and is subject to exhaustion of administrative remedies. *see* School
Bd. of Lee Cty. Fla. v. M. M, 348 F. App'x 504, 512 (11th Cir. 2009) (holding

---

[7]"In paragraph 3 of the Settlement Agreement Plaintiff covenants not to sue any of the Released Parties for any claim
covered by the waivers and releases, except Plaintiff may bring a claim to enforce the Agreement. I fail to see the point of
this provision. Do Defendants believe the covenant not to sue will stop Plaintiff if she decides to breach the Agreement
by suing Defendants on the released wage claims? For this reason, it adds nothing of value that I can discern.". Leleux
v. Covelli Family Ltd. P'ship, Case No: 6:17-cv-747-Orl-37TBS, at *7 (M.D. Fla. Oct. 18, 2017)

[8]"Any State educational agency or local educational agency that receives assistance under this subchapter shall en-
sure that procedures are established and implemented to allow parties to disputes involving any matter, including mat-
ters arising prior to the filing of a complaint pursuant to subsection (b)(6), to resolve such disputes through a mediation
process."

exhaustion is required for claims concerning breaches of agreements settling due process complaints). There is neither any evidence in the record that the school board exhausted administrative remedies nor any argument regarding exceptions to exhaustion. Failure to exhaust is a jurisdictional defect. *see* Babicz by & Through Babicz v. Sch. Bd., 135 F.3d 1420, 1422 (11th Cir. 1998). Allowing parties to bypass the IDEA's exhaustion requirement by reframing claims as contract disputes would disrupt the statutory framework and circumvent the dispute resolution procedures established by Congress. Therefore, this court lacks subject matter jurisdiction over any enforcement of the IDEA settlement agreement.

## 16. PUBLIC POLICY

Requiring a parent to waive personal constitutional rights as a prerequisite for securing a child's right to a Free Appropriate Public Education (FAPE) is coercive and violates public policy. Courts have routinely held that waivers extracted under such conditions are unenforceable. See Newton v. Rumery, 480 U.S. 386, 392 (1987). Likewise, broad waivers of unrelated claims in the context of IDEA settlements are presumptively invalid.

Federal precedent underscores this point. Public policy disfavors sweeping waivers of systemic discrimination claims. Alexander v. Gardner-Denver Co., 415 U.S. 36, 39 (1974). A waiver that lacks specificity and fails to expressly delineate the relinquished civil rights is unenforceable. See Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 704 (1945) (holding that statutory protections intended to serve the public interest cannot be waived in advance via generalized releases).

In its analysis, the R&R failed to weigh the public's interest against the enforcement of the release, focusing instead on the School Board's perceived need to avoid litigation. Newton v. Rumery, 480 U.S. at 392, clearly states that "a promise is unenforceable if the interest in its enforcement is outweighed in the circumstances by a public policy harmed by enforcement of the agreement." Here, the potential harm to public policy—preventing individuals from challenging broad systemic discrimination—overrides any purported benefit to enforcement.

Finally, the R&R incorrectly posits that "someone else could arguably establish standing to bring the types of claims Warner released." In reality, the last lawsuit to challenge these conditions was initially filed in the 1950s, and the organization that brought it (the NAACP in Hillsborough County) is now in a conflicted position because they lease their commercial real estate headquarters from the School Board. Furthermore, nearly two years of the four-year statute of limitations for these boundary-line challenges have already elapsed without any new legal action. Under these circumstances, reliance on the possibility that "someone else" might sue does not negate the severe public policy concerns posed by enforcing this release.

### 17. STANDING

Without notice or opportunity to be heard, the R&R sua sponte erroneously ruled that "Warner lacks standing to sue for racial gerrymandering of boundaries other than those where he lives". The R&R references the standing argument from Count 2 (voting map challenge) in Count 1 (school assignment map challenge) citing Gill v. Whitford, 585 U.S. 48, 65–66 (2018).

First, it was error to apply Gill (addressing standing to challenge specific voter districts) to the school assignment map challenge because a voter can only vote in exactly *one* district, but a parent can enroll their child in *any* public school regardless of what school is assigned to their home. And when the capacity of the school is directly related to the boundaries assigned to them, those "full" schools might have available space if the boundaries were redrawn to comply with federal law. This is why the supreme court conferred standing to parents when they are " being forced to compete in a race-based system that may prejudice the plaintiff". Parents Involved in Cmty. Sch. v. Seattle Sch. Dist. No. 1, 551 U.S. 701, 718–19 (2007). Second, Warner plead that he is a current and prospective homeowner who is not tied to any one area of Hillsborough county and that those school assignment boundaries affect the property values of his current prospective homes which is enough to challenge the boundaries of every school in Hillsborough County. Third, Warner alleged emotional and psychological harms of the defendant's discriminatory practices to establish an "injury in fact". Laufer v. Arpan LLC, 29 F.4th 1268, 1274 (11th Cir. 2022) (later vacated due to mootness).

Finally, with regards to the voting map challenge. While it is true that Warner has never resided in District 1, he did reside in District 2 and District 3 – both districts border the challenged District 1. Therefore, any discrimination in the boundaries of District 1 would directly affect the districts that Warner lived in. He explicitly pleaded that the board was sucking large amounts of minority voters out of his district and packing them into District 1, which would dilute his minority vote in his voting districts. Stated another way, Warner is alleging that his distrcts were gerrymandered because the changes in district 1 directly changed his district's boundaries. Gill v. Whitford, 138 S. Ct. 1916, 1929 (2018) ("voters who allege facts showing disadvantage to themselves as individuals have standing to sue") (quoting Baker, 369 U.S., at 206, 82 S.Ct.). Therefore, Warner did suffer an injury of fact in his districts.

## II    RULE 56(D) MOTION

The R&R improperly denied Plaintiff's motion to stay summary judgment under Rule 56(d), despite clear precedent in the Eleventh Circuit holding that summary judgment should not be granted before the non-moving party has had an adequate opportunity to conduct discovery. *see* Todashev v. United States, No. 19-10245 (11th Cir. June 19, 2020), Reflectone, Inc. v. Farrand Optical Co., Inc., 862 F.2d 841, 843 (11th Cir. 1989); Alabama Farm Bureau Mut. Cas. Co. v. Am. Fidelity Life Ins. Co., 606 F.2d 602 (5th Cir. 1980).

The only bases for the R&R denying Warner's rule 56(d) motion was because 1) "[his] declaration fails to show that extrinsic evidence of the parties' intent is 'essential' to his opposition."; 2) that he failed to seek discovery before the close of discovery; and 3) "discovery into the state of mind of the School Board or its attorneys would necessarily seek privileged and protected information". All three are incorrect, immaterial, or both.

The R&R's reliance on the School Board's assertion of privilege over key documents further underscores the necessity of discovery. Plaintiff should have been allowed an opportunity to test such assertions through appropriate legal mechanisms.

Warner may ultimately be unsuccessful in this action, but he is at least entitled to a full opportunity to develop his case. *Ala. Farm Bur. Mut. Cas. v. Am. Fid. Life Ins. Co.*, 606 F.2d 602, 617 (5th Cir. 1980).

## 1.    THE COURT MUST CONSIDER EXTRINSIC EVIDENCE

The R&R erred in finding that "warner's declaration fails to show that extrinsic evidence of the parties' intent is 'essential' to his opposition. FED. R. CIV. P. 56(d).". First, R&R erred in finding that the purpose of the declaration is to show that extrinsic evidence is essential. This is not correct, that is the purpose of the rule 56(d) *motion* (to argue law on why the sought discovery will be relevant). The purpose of the affidavit is simply to proffer facts that, if proven, would defeat the summary judgment motion. To that end, the *motion* did offer a legal basis to consider extrinsic evidence, and the declaration did proffer facts that, if proven, would defeat summary judgment. Specifically, that the agreement was not "knowingly and voluntary made", the agreement was ambiguous under state and federal law and extrinsic evidence was required to reconcile it, and whether there was a meeting of the minds required to form a valid contract.

Next, the report erred in finding that Florida law governs the release ("Under Florida law, which applies here"). This is incorrect, as previously argued, federal law controls the interpretation of a civil rights release. Nowhere in the report's 56(d) analysis did they consider federal law which is clear error. As previously argued, Warner was entitled to discovery under both federal law (knowingly and voluntarily) and state law (latent ambiguities, meeting of the minds), and it was an error to deny him discovery before forcing him to respond to summary judgment as that evidence was admissible, relevant, and essential to opposing summary judgment.

## 2.    WARNER PROMPTLY SOUGHT DISCOVERY

The R&R erroneously found that "Warner has not previously sought discovery on these topics despite the School Board's first raising in May, 2023". This is both factually incorrect, misleading, and irrelevant. First, Warner served a discovery request seeking documents related to the settlement agreement in November 2023. *see* Doc. 68-2 ¶ 1 (seeking documents related to the affirmative defense of release). The

court stayed discovery from December 2023 through August 2024. *see* Doc 71. After discovery had resumed, Warner promptly sought the deposition of the school board attorney who participated in the negotiation that settlement (Doc. 61), and intended to depose the school board employee who signed the agreement after some discovery had been turned over (Doc. 106-1 ¶ 8), and he had intended to serve more discovery requests related to the settlement agreement once some discovery had been returned (Doc. 106-1 ¶ 7).

Nevertheless, all of this is irrelevant because not only had discovery not been closed, no scheduling order had ever been issued to give Warner notice of when discovery would end. Therefore, the court cannot deny discovery to Warner simply based on the argument (that the board never even raised) that he did not complete discovery before the close of discovery.

### 3.   THE BOARD WAIVED PRIVILEGE

The R&R incorrectly concludes that Defendant may assert the affirmative defense of release while simultaneously withholding related privileged materials. By invoking release and placing at issue the intent, formation, and voluntariness of the settlement, Defendant has necessarily waived any privilege over attorney communications or work product concerning that settlement. See Cox v. Adm'r U.S. Steel & Carnegie, 17 F.3d 1386, 1417 (11th Cir. 1994) (explaining that a party waives privilege by injecting privileged communications into the litigation).

Indeed, when a party grounds its defense on the negotiation and intent behind a contract, it cannot then refuse to disclose communications bearing on those very issues. See GAB Bus. Servs. Inc. v. Syndicate 627, 809 F.2d 755, 762 (11th Cir. 1987) (reversing denial of discovery into privileged materials where the party affirmatively raised the underlying agreement as a defense). As this Court has recognized, the attorney-client privilege is intended to serve as a shield, not a sword to deny an opposing party the means to challenge the defense. See Centennial Bank v. ServisFirst Bank, Inc., No. 8:16-cv-88-T-36CPT, at *7 (M.D. Fla. Mar. 4, 2020).

Defendant cannot selectively invoke privilege while simultaneously using the settlement to defeat Plaintiff's claims. Courts have consistently held that a party waives privilege by using the substance of the privileged information in support of its defense yet withholding that same information from its opponent. See Conkling v. Turner, 883 F.2d 431, 434 (5th Cir. 1989) ("[A] litigant cannot use as a sword the very privilege he seeks to maintain as a shield."). Here, Defendant's reliance on the release necessarily opens up discovery into the communications bearing on its formation and validity.

### 4.   NO OPPORTUNITY TO OPPOSE SUMMARY JUDGMENT

The Magistrate erred by not affording Warner an opportunity to fully oppose summary judgment after converting Defendant's Rule 12(c) motion into a Rule 56 mo-

tion. The Eleventh Circuit has held that before a Rule 12(c) motion may be converted into a summary judgment motion, the court must: 1) Notify the parties of the conversion; and 2) Provide the parties an opportunity to submit evidence *and* legal arguments. *see* Marine Coatings of Alabama, Inc. v. United States, 792 F.2d 1565, 1568 (11th Cir. 1986); Jones v. Auto. Ins. Co. of Hartford, Conn., 917 F.2d 1528, 1532 (11th Cir. 1990).

The R&R erroneously found that "Warner received sufficient notice and opportunity". While the court provided a limited period for the submission of evidence, it did not provide Plaintiff with an opportunity to present full briefing and argument in response to the converted motion[9]. Both parties understood this order to submit evidence, not argument[10]. Plaintiff's initial response was filed in the context of a Rule 12 motion and did not contain the level of factual dispute and evidentiary argument that would typically be included in summary judgment briefing. Additionally, Warner did not argue every point he could, instead heavily relying on procedural arguments to defeat the Rule 12 motion. Procedural points that the Magistrate actually sustained[11]. Therefore, Warner was correct, and if the Magistrate had not converted the motion, then he would have won.

This failure to provide an opportunity to oppose summary judgment is prejudicial, as it deprived Plaintiff of his constitutional right to be heard including the right to assert material facts, the right to be put on notice of factual contentions the board makes, and then an opportunity to dispute them in accordance with Rule 56 procedures, and the report issued findings of fact that Warner never had an opportunity to dispute. Warner was caught off caught when the R&R found numerous material facts that no party asserted (*see* party presentation rule).

## III  Conclusion

Warner respectfully requests that the court reject the R&R, deny or stay summary judgment against Warner, and grant summary judgment against the board.

Feb 9, 2025

_____

Date

/s/blake warner

_____

Signature
Blake Warner, *pro se*
2211 S Village Ave
Tampa, FL 33612
E-Service: BLAKE@NULL3D.COM

---

[9]Doc. 103 ("the parties must provide the Court all material pertinent to the motion for judgment on the pleadings")

[10]*see* Doc. 106 where Plaintiff requests a briefing schedule to submit summary judgment argument and Doc. 109 where Defendant does not oppose but also requests briefing

[11]"Accordingly, to consider the settlement agreement, the School Board's motion should be converted to a motion for summary judgment.". Doc. 112 pp. 7