

UNITED STATES           OF AMERICA

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 90th CONGRESS
SECOND SESSION

## VOLUME 114—PART 3

FEBRUARY 8, 1968, TO FEBRUARY 22, 1968

(PAGES 2603 TO 3952)

UNITED STATES GOVERNMENT PRINTING OFFICE, WASHINGTON, 1968

chairman of the District of Columbia Council would be authorized to designate members of the (D.C.) Council to maintain contact with each NPC.

The Agency for Planning and Development would be required to provide the NPC's and any other interested citizens' groups with full information on proposals that it was developing which affected specific neighborhoods. The Agency would also be required to consult with the NPC's and to hold public hearings prior to any action being taken upon any proposal. At these hearings the NPC's and anyone else could present their views and alternatives.

There would also be established an Office of Neighborhood Planning to service the Neighborhood Planning Councils. The director of this Office would be chosen by a majority of the chairmen of the NPC's and he would serve a one year term. His appointment would be subject to the approval of the Mayor.

The federal agency planning functions now exercised by the National Capital Planning Commission would be transferred to a new unit, the Office of Federal Development in the National Capital Region, in the Executive Office of the President. This Office would review all agency proposals for building sites and other federal facilities in the Washington region. A commission composed of five distinguished planners and architects appointed by the President would advise the Office on the proposals it was considering.

The Office would be required to refer all agency proposals submitted to it to the local jurisdictions and the Metropolitan Washington Council of Governments (COG) for comment. The Office would also be responsible for the development in cooperation with COG and the local jurisdictions (including the District) of federal site plans for the region which complemented other regional and local planning objectives. It would then review the agency proposals on the basis of their conformity to the federal plan and on the basis of the comments of the local jurisdictions and COG.

The agencies would be required to develop their own five year (or longer) capital improvement programs for their facilities needs in the region and to submit these to the office for review.

## INTERFERENCE WITH CIVIL RIGHTS

The Senate resumed the consideration of the bill (H.R. 2516) to prescribe penalties for certain acts of violence or intimidation, and for other purposes.

Mr. MONDALE. Mr. President, I wish to speak in support of the fair housing amendment.

In this session of Congress we have talked about and will continue to talk about manpower training programs to remedy hard-core unemployment and about the deplorable state of ghetto area schools. One of the means the Senate and this Congress can begin to remedy these situations is through the passage of a fair housing law.

The pattern of racial segregation in housing affects employment opportunities and the racial composition and quality of schools. Any city planner planning the ideal city will tell you that journey-to-work considerations are crucial in the location of housing and employment. Low-income people cannot afford the expenses of private transportation to work. In the first half of this century, industry and most employment in American cities was located in the cities' central sector, and housing for the low-

income groups was also located in the central sector.

Among the many reasons for industry's move to the suburbs in the past 15 years are the requirements of mechanized assembly lines which need space all on one level and the requirements for increased parking areas. In addition, the increase of interstate truck transportation required that industries locate on the outskirts of large cities. Industries found no barriers to moving out where more land was available, but discrimination in housing prevented the nonwhite workers from following them. Those who could not afford the transportation to work were left without employment.

The Secretary of Housing and Urban Development, Robert Weaver, testified before the Committee on Banking and Currency's Subcommittee on Housing and Urban Affairs that in the first 5 years of this decade, one-half to two-thirds of all new factories, stores, and other mercantile buildings in all areas of the country except the South were located outside the central cities and metropolitan areas. If this trend continues, and it is expected to, expanding job opportunities will be in or near the suburbs rather than in core cities.

Eighty percent of the nonwhite population of metropolitan areas in 1967 lived in central cities. Under present conditions, these persons are unable to move to suburbia because of housing discrimination practices and because of the lack of low- and moderate-cost housing. They are the least able to afford the high cost of transportation and, unable to live in the central city and work in the suburbs, they will be deprived of many jobs.

Recently U.S. Department of Labor reports show that unemployment is so much worse in the slum ghettos than in the country as a whole. National unemployment rates do not begin to show the problems of minority workers. Unemployment figures of 3.7 or 4 percent do not indicate the rate of unemployment in the slums. In the slums, few persons have decent jobs, up to one-half are unable to earn better than a poverty-level income, and between 10 to 20 percent of those who should be working are not working at all.

I give a few specific examples presented by the National Committee Against Discrimination in Housing showing the movement of jobs from the central city to the suburbs. New York City lost more than 180,000 manufacturing jobs in the years 1951 to 1965 when its nonwhite and Puerto Rican population was increasing by almost one-quarter of a million. New employment gain of approximately 30,000 jobs occurred especially in manufacturing industries in the suburbs of the cities.

Between 1962 and 1965, when St. Louis city's employment increased less than 3,000, St. Louis County gained almost 53,000 jobs, mostly manufacturing and service type jobs.

In Baltimore between 1951 and 1965, total employment increased only 1,450. Baltimore lost almost 20,000 jobs in manufacturing and urban Baltimore gained 86,272 in those years.

The city of Philadelphia lost nearly

50,000 jobs from 1952 to 1965, but the ring around Philadelphia gained 215,000 jobs.

What is the transportation situation for the inhabitant of the Negro ghetto out to these jobs? In New York, the monthly commuting total on the Long Island Railroad equals $30. In St. Louis there is no public transportation to many of the areas to which jobs moved. Where there is transportation, the trip costs about $6.50 a week and takes from 1½ hours to 2 hours each way.

In Baltimore, the trip ranges from $4 a week and a 40-minute ride each way to $15 and an hour's ride each way. In Philadelphia, a person working in Montgomery County would have to change buses at least three times and pay about $6.60 a week in commuter tickets.

The Watts riots in Los Angeles indicated that the problem is even of greater magnitude in California. I commend to the reading of the Senate the remarkable book entitled "Rivers of Blood, Years of Darkness," by Robert Conot. This book spells out many of the aspects that contributed to the tragic rioting in the Watts area and the fact that one of the key factors was this pool of unskilled employment, penned in the ghettos and sealed off from employment, unable to afford cars or public transportation. There is in addition the inconvenience of spending time to find jobs, if jobs can be found. These factors were such as to discourage completely efforts to find employment. I think the best example of that is the recent Aerojet-General plant located in the center of the Watts area. That company produces military tents under Federal contract. The initial employment was to be 75 employees. In response to help wanted ads, more than 5,500 residents of the Watts area applied. That showed the absolutely pathetic need for unskilled jobs in that one area alone.

The same situation exists in San Francisco. To commute from any one of the several Negro ghettos in San Francisco or the East Bay to job openings in South San Francisco, Martinez, Livermore, or Point Richmond, a person would find it almost impossible if he had to rely on public transportation. To commute from Hunters Point in San Francisco to a job in Contra Costa County in the East Bay would require from three to four transfers, a cost of about $15 a week, and a 4- to 5-hour commute time each day. A more reasonable commute, via Alameda or West Oakland, to jobs in Contra Costa County costs about $11.50 a week, takes at least 2 hours each way, and is restricted primarily to travel during peak rush hours, which makes any off-hour job of this kind virtually impossible.

Unless the county is willing to invest billions of dollars in a cheap, fast, and multidestination transportation system, ghetto residents will not be able to reach most jobs. A much simpler solution to one facet of the employment problem would be to open housing to everyone.

The pattern of racial segregation in housing also affects the racial composition and quality of schools. The neighborhood school concept, until recently,

CONGRESSIONAL RECORD — SENATE *February 15, 1968*

coupled with patterns of racial housing, operated despite a Supreme Court decision in Brown against the Board of Education to keep Negroes in de facto segregated schools. And the condition of these schools is a question of considerable concern for many. The schools in Washington, D.C., in New York City, and in other large city ghetto areas have been the subject of intense criticism. Jonathan Kozol's book, "Death at an Early Age," depicts the conditions of schools in Boston. The book describes the efforts of a young teacher in the Boston school system to deal with the deplorable conditions which literally destroy the young students attending those schools.

The stopgap solution for this result of lack of fair housing measures has been, as for unemployment, to provide transportation. For education this has come in the form of busing. Neither de facto segregation nor busing would be the case if we could do away with discrimination in housing.

The U.S. Commission on Civil Rights has recently published a study entitled "Racial Isolation in the Public Schools." This report demonstrated that there is a relationship between the confinement of Negroes to central city ghettos and inferior educational opportunities. For this reason, since housing discrimination produces inequality of educational opportunity, the Commission recommended in that report a Federal fair housing law in order to minimize the impact of housing segregation on education.

Open housing is absolutely essential to the realistic achievement of such accepted goals as desegregated schools and equal opportunity. Much of the statutory civil rights progress of recent years will be little more than theoretical until open housing becomes a reality. Because the composition of the student body is determined by the composition of the residents of the area in which this school is located, the soundest way to attack segregated education and the quality of the schools resulting from it is to attack the segregated neighborhood. Testimony at the hearings on the Fair Housing Act brought out that it is virtually impossible to provide high quality education to disadvantaged minorities as long as they are restricted to living in older congested sections of cities. The opportunity to go to school with members of other racial and ethnic and economic groups tends to improve the educational achievement of disadvantaged children, according to findings of educational research including the Coleman report.

De facto segregation in schools and education is directly traceable to the existing patterns of racially segregated housing. We cannot afford to allow our efforts to provide the best education possible to all Americans to be thwarted by actions of private persons, actions which are antisocial, immoral, and which ultimately amount to contravention of our public policy in favor of equal educational opportunity. Fair housing is therefore more than merely housing. It is part of an educational bill of rights for all citizens.

Without it, the dream of full and fair social opportunities for all Americans is an illusion.

(At this point, Mr. Williams of New Jersey assumed the chair.)

Mr. ELLENDER. Mr. President, the open housing amendment to the pending bill declares that it is the policy of the United States to prevent discrimination in the purchase, rental and occupancy of all housing. Title II of the amendment provides that the bill will take effect in three stages, that is, its provisions shall apply to the Federal Government and its agencies immediately. After December 31, 1968, the provisions of the amendment would also then apply to all dwellings in which the owner is not a resident at the time of the sale, and dwellings intended for occupancy by five or more families. The final stage of the bill is December 31, 1969, when it would apply to all dwellings. However, there are exempted dwellings which are occupied by no more than four families, if the owner actually occupies one of the living quarters as his residence.

The amendment further provides that discrimination in the sale and rental of houses is not only unlawful, but also the printing or publication or any statement or notice indicating a preference based on race, religion, or national origin. Apparently, under this provision any newspaper publisher who accepted an advertisement indicating a preference by the owner of a certain race or religion would be in violation of the law. Apparently, freedom of speech and press guaranteed in the Bill of Rights is to be abolished with the inauguration of this open housing amendment.

The amendment also provides that any person involved in the financing of housing who in any way discriminates against a person applying for a loan would be made criminally liable.

Any person operating a multiple listing service or real estate brokers' service, who indicated a preference for one race or another, would be in violation of the law. In the hearings held in 1966 and 1967, most of the real estate organizations testified against the whole open housing bill, and not just this section alone. The amendment further provides that it is unlawful to interfere, coerce, intimidate, or do anything which would interfere with the so-called right of open occupancy. There is exempted from these provisions the right of a religious organization to show preference in any institution controlled by it for its own members.

There would be created an additional Assistant Secretary to the Department of Housing and Urban Development to implement the provisions of the amendment. The Secretary of Housing and Urban Development, or his agents, are given unlimited power to implement and enforce the so-called right of open occupancy. He is given the power to entertain complaints, engage in factfinding in particular disputes, render judgments on the charges of discrimination, issue restraining orders and subpenas, and assess penalties for failure to comply with his judgments. Never in the history of the United States or of the civilized world has a political appointee been

granted such far-reaching and sweeping executive and judicial powers. He may even institute proceedings against an alleged violator without having even received a complaint.

The intent of the proposed amendment gives authority to the Secretary to conduct what is termed "educational activities." He is authorized to pay out sums of money to bring groups of people together to be educated in this new social order. It is indeed a sad day for the United States when Congress would even consider permitting a political appointee to engage in this type of propaganda and brainwashing of our own citizens. I do not believe that it is unfair of me to say that the Department of Housing and Urban Development is the poorest run department of any of our Federal agencies, even taking into account that it is a relatively new department. The officials charged with the administration of the programs have indicated an ignorance of congressional acts and congressional intent to an unbelievable extent. The bureaucratic bungling in the Department of Housing and Urban Development is unparalleled in any of our executive departments.

As Senators know, I have supported every housing act which has become law in the last 31 years. In my earlier years in the Senate, I was a member of the committee which considered all housing legislation. I toured the country to ascertain the housing needs of the American people. I have done everything in my power to see that all people in this country, regardless of race, have had decent housing. In very recent years, I have even supported rent supplement programs at considerable political cost, I might add. Each and every time I have attempted to secure any information of value from the Department of Housing and Urban Development regarding new proposals or the operation of existing programs, I have been met with nothing but delays, misinformation, lack of information—no information.

In granting power and authority to the Secretary of Housing and Urban Development and his agents, we must proceed on the assumption that the least qualified people will occupy those positions of power because there is no assurance that the best people will ever hold these jobs. As has been said by one of my colleagues, "no good Secretary would want such power as this amendment invests in him, and no bad Secretary should have it."

This open housing amendment holds out the traditional bait to the Northern States by providing that their local open housing laws may take precedence over the Federal law and the Secretary is authorized to refrain from enforcing the Federal law in such States.

I may say, Mr. President, that quite a few States have such laws. We have heard a discussion this afternoon of such a law in the State of Oregon.

As I suggested to my good friend the Senator from Oregon, with the State having only 1 percent of its population Negro, and most of the 1 percent located in the city of Portland, they have no problem.

I was surprised when the Senator from

*February 15, 1968* EXTENSIONS OF REMARKS 3135

Oregon stated that there was a ghetto in Portland, when only 20,000 Negroes live throughout the State, and more than 18,000 of them are in the city of Portland.

The Secretary or his agents are authorized to hold hearings and investigate, and to have access to premises, records, documents, and individuals and any other evidence to determine if there are any violations of the provisions of this act. Here, again, is another constitutional safeguard to the right of privacy, a citizen's right to be secure in his home, trampled underfoot by this amendment. As I said before, it is unbelievable that the Senate would consider for a moment enacting the provisions of this amendment into law, taking away all of the rights which were fought for so long and so hard.

This bill is so obnoxious because it weights the controversy so heavily in favor of the person who claims to have been discriminated against. There is no attempt to maintain evenhanded justice. A person can file a complaint against the owner of a dwelling or the Secretary of Housing and Urban Development can file the complaint, or the Attorney General can bring an action in the U.S. District Court against an alleged violator, all independently of each other, or all working together, depending upon their own discretionary choice. Anyone who violates the Secretary's orders can be fined $50 a day for disobeying such an order. In the past, Congress has created special commissions such as the Interstate Commerce Commission, and has endowed it with quasi-judicial functions. It has made certain by the enactment of the Administrative Procedure Act—APA—and other rights of redress against arbitrary acts of the Commission to insure that a respondent or violator would be protected in his constitutional rights.

However, in this case, an ordinary political appointee of the President and his agents who hold office at the pleasure of the President, are invested with these overwhelming executive and judicial powers, without any safeguards for the rights of an accused person. To my knowledge, this is the first time a partisan political official in this Government would be granted such powers.

The pending amendment on open housing represents the ultimate in social extravagance in the United States. Every cherished liberty purchased at a high cost in Anglo-American history over the centuries is cast aside. All personal rights and liberties of the individual are ripped away for the alleged purpose of preventing discrimination. All the personal liberties wrung from the sovereigns from the Magna Carta to the Bill of Rights are trampled under foot. If this amendment becomes law, those guaranteed rights will be nothing but lies and dead concepts. The curators of our archives have placed the Declaration of Independence and the Constitution in a steel and concrete vault. How stupid and foolish. Do they not know that the protection of the Constitution is here on this very floor and in the minds and actions of all Americans? The vault contains but empty promises on faded parchment. The fulfillment of the promises has not been kept.

Under this amendment the Secretary of Housing and Urban Development would become a virtual commissar of housing—violating every right of life, liberty, and property. Sweeping judicial powers, I repeat, are given the Secretary and his agents to investigate the facts of alleged discrimination, render judgments against an accused and assess penalties. No right to file a complaint in court is granted an accused until 6 months after the Secretary or his agents

have rendered their judgments that a violation has occurred. However, if the Secretary should decide against one of the so-called aggrieved persons he can go into Federal court in 30 days. In other words, if a so-called aggrieved person does not get a favorable decision from the Secretary within 30 days he can get the Attorney General to go into Federal court with his complaint. However, the poor fellow accused of discrimination cannot get a fair trial in a duly constituted court for 6 months.

Nothing so monstrous has been perpetrated on civilized people since the French and Russian Revolutions. The howling mobs are always the same—whether it is Paris in 1793, Petrograd in 1917 or Detroit in 1967. It is always in the name of democracy and equality. Equality is the last refuge of the trifling, the shiftless and the incompetent. This amendment runs into many of the same constitutional objections as the pending bill does, only it violates more provisions of the Bill of Rights.

The amendment is more or less the same bill that was considered in 1966 and 1967. On May 27, 1966, the Attorney General of Louisiana filed an opinion in the form of a memorandum with the Judiciary Committee on the constitutional questions raised. At some future time I shall quote from his very thoughtful and learned opinion.

---

## ADJOURNMENT

Mr. BYRD of West Virginia. Mr. President, if there be no further business to come before the Senate, I move, in accordance with the previous order, that the Senate stand in adjournment until 12 o'clock meridian tomorrow.

The motion was agreed to; and (at 4 o'clock and 16 minutes p.m.) the Senate adjourned until tomorrow, Friday, February 16, at 12 o'clock meridian.

---

# EXTENSIONS OF REMARKS

## The 16th Annual Presidential Prayer Breakfast

## HON. FRANK CARLSON
### OF KANSAS
### IN THE SENATE OF THE UNITED STATES
*Thursday, February 15, 1968*

Mr. CARLSON. Mr. President, on Thursday morning, February 1, the 16th consecutive annual Presidential prayer breakfast was held. The breakfast was attended by the President of the United States, the Vice President of the United States, the Speaker of the House, members of the Cabinet, members of the Supreme Court, members of the diplomatic corps, Governors of various States, and members of the executive and legislative branches of the Government.

Also present were presidents of national and international labor unions, outstanding leaders in the field of industry and business, chancellors and presidents from a select number of universities and colleges, and men of distinction from the courts, from communications, and

from every other phase of our economic life.

We have found this event to be very meaningful, not only to those of us who gather at the breakfast, but also to millions of citizens across this Nation.

I ask unanimous consent to have printed in the Extensions of Remarks the text of the program and the proceedings.

There being no objection, the program was ordered to be printed in the RECORD, as follows:

PROGRAM OF PRESIDENTIAL PRAYER BREAKFAST

Invocation: The Hon. John A. Volpe, Governor, State of Massachusetts.

Introduction of Head Table and Statement: Sen. Frank Carlson, Kans.

Greetings from House Breakfast Group: Rep. Ben Reifel, S. Dak.

Old Testament Reading: Rep. John W. McCormack, Mass.; Deuteronomy 6:4–17, Read by Sen. Joseph Tydings, Md.

Greetings from Senate Breakfast Group: Sen. John Stennis, Miss.

New Testament Reading: John 15:1–17, The Vice President of the United States.

Prayer for National Leaders: Hon. Robert C. Weaver, Secretary Housing and Urban Development.

Message: General Harold K. Johnson, Chief of Staff, U.S. Army.

Address by Lyndon B. Johnson, President of the United States.

Closing Prayer: Hon. Price Daniel, Office of Emergency Planning.

Closing Song: The Singing Sergeants.

INVOCATION, GOV. JOHN A. VOLPE

We raise our voices in prayer to the God of men and nations acknowledging our dependence on Him and our earnest intention to do His will. On this earth we only see dimly His divine light. After we hear too softly the sound of His voice. May His grace make us each day more sensitive to our duty, more conscious of how helpless we are without Him. As we ask His blessing on ourselves, we ask Him also to guide this nation and all others into the paths of peace and justice. Too often in our bewildered world, His sons are enemies separated by conflict and violence seeking to resolve by power what must be earned in peace. Those who call Him Father must by this fact be brothers, but how easily oppression, persecution and discrimination divide them one from the other and make a mockery of brotherhood and justice. The world God made for man, man has remade according to his own weakness. Help us, oh Lord, to know your ways and give us strength to follow them. Make us humble